```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF GEORGIA
 2


 3
     MAHENDRA AMIN, M.D.,          § CIVIL ACTION FILE NO.
 4                                 § 5:21-CV-00056-LGW-BWC
                                   §
 5                                 §
                   Plaintiff,      §
 6                                 §
          vs.                      §
 7                                 §
                                   §
 8                                 §
     NBCUNIVERSAL MEDIA, LLC,      §
 9                                 §
                                   §
10                                 §
                   Defendant.      §
11   ~~~~~~~~~~~~~~~~~~~~~~~~~

12              VIDEOTAPED DEPOSITION OF
                     ANDREW FREE
13


14


15                   9:44 a.m. EST
            Tuesday, the 15th day of August, 2023
16


17

                       Suite 1600
18              999 Peachtree Street, NE
                     Atlanta, Georgia
19


20


21

          Blanche J. Dugas, RMR, CRR, CCR No. B-2290
22


23


24


25
```

**Page 2**

APPEARANCES OF COUNSEL

On Behalf of the Plaintiff:
    STACEY G. EVANS, Esquire
    Stacey Evans Law
    Building One, Suite 200
    4200 Northside Parkway, NW
    Atlanta, Georgia  30327
    (404) 275-4135
    sevans@staceyevanslaw.com

On Behalf of the Defendant:
    ELIZABETH A. MCNAMARA, Esquire
    Davis Wright Tremaine, LLP
    21st Floor
    1251 Avenue of the Americas
    New York, New York  10020-1104
    (212) 603-6437
    (212) 489-8340 (facsimile)
    lizmcnamara@dwt.com

On Behalf of the Non-Party Witness Andrew Free:
    CHARLES D. TOBIN, Esquire
    Ballard Spahr, LLP
    12th Floor
    1909 K Street, NW
    Washington DC  20006-1157
    (202) 661-2218
    (202) 661-2299 (facsimile)
    tobinc@ballardspahr.com

    KYLE A. CEUNINCK, Esquire
    Ballard Spahr, LLP
    Suite 1600
    999 Peachtree Street, NE
    Atlanta, Georgia  30309-4421
    (678) 420-9330
    (678) 420-9301 (facsimile)
    ceuninckk@ballardspahr.com

Also Present:
James Downie, videographer
Amble Johnson
Cynthia Counts, Esq.
Amanda Levine

**Page 3**

INDEX OF EXAMINATION

EXAMINATION                                    PAGE
EXAMINATION                                      5
BY MS. EVANS

                    - - -

INDEX TO EXHIBITS

EXHIBIT    DESCRIPTION                           PAGE
123        Subpoena to testify at a                6
           deposition in a civil
           action
124        E-mail chain Bates-stamped             79
           FREE_0004494

125        Form Bates-stamped                    101
           FREE_0004625 through 4627
126        E-mail chain, Bates-stamped           165
           FREE_0001121 through 1123

127        E-mail chain, Bates-stamped           167
           FREE_0001132 and 1133
128        E-mail chain regarding WSJ            183
           request, Bates-stamped
           FREE_0001254 through 1258
129        E-mail chain, Bates-stamped           197
           FREE_0001662

130        ICE's continued detention            218
           and removal of survivors
           impedes efforts to
           investigate, closed session
           briefing before the
           Democratic Caucus of the
           United States Senate,
           October 26, 2020,
           Bates-stamped FREE_0004810
           through 4812

**Page 4**

131    E-mail string,                          232
       Bates-stamped FREE_0003911
       and 3912
132    E-mail string,                          234
       Bates-stamped FREE_0004462
       through 4465
133    E-mail string,                          234
       Bates-stamped FREE_0000874
       through 878
134    E-mail string,                          237
       Bates-stamped FREE_0000268
       through 271
135    Privilege log                           253
136    Privilege log                           256
137    E-mail chain, Bates-stamped             274
       FREE_0000296 through 301

138    E-mail string,                          283
       Bates-stamped FREE_0000420
       through 424

       (Original Exhibits 123 through 138
have been attached to the original
transcript.)

**Page 5**

    Videotaped Deposition of Andrew Free
              August 15, 2023

    VIDEOGRAPHER:  This is the beginning
of Media 1 in the deposition of Andrew Free
in the matter of Mahendra Amin, M.D. versus
NBCUniversal Media, LLC.  Today's date is
August 15th, 2023.  The time is 9:45 a.m.
    If the attorneys present would please
introduce themselves for the record, after
which the court reporter will swear in the
witness.
    MS. EVANS:  Stacey Evans on behalf of
the plaintiff.
    MS. MCNAMARA:  Elizabeth McNamara on
behalf of NBCUniversal.
    MR. TOBIN:  Charles Tobin on behalf of
non-party witness Andrew Free.
    MR. CEUNINCK:  Kyle Ceuninck on behalf
of non-party witness Andrew Free.
              ANDREW FREE,
having been first duly sworn, was examined and
testified as follows:
EXAMINATION
BY MS. EVANS:
    Q.  Good morning, Mr. Free.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                        Pages 6..9

Page 6

1    A.   Good morning, Ms. Evans.
2    Q.   I'm Stacey Evans, as you just recognized,
3    and we met a little bit earlier.  I'm going to be
4    asking you questions today on behalf of Dr. Amin.
5         The first thing I'm going to do is hand you
6    and a copy for your counsel and also for Ms. McNamara,
7    this is a copy of an earlier subpoena.  There's
8    nothing really for you to do with this document.  I
9    just like to mark these for the record so that I can
10   keep track of where I am later.  That's essentially
11   the subpoena that brings us here today, except that we
12   did change the date by agreement.
13   A.   Okay.  You need this back or no?
14   Q.   No.
15        MR. TOBIN:  Is that going to be
16   Exhibit 1?
17        MS. EVANS:  It's 123.  Sorry.  If I
18   didn't say that, I meant to say that.  The
19   subpoena -- an earlier subpoena for
20   Mr. Free's deposition, which I've just
21   marked as Exhibit 123.
22        (Plaintiff's Exhibit 123 was marked
23   for identification.)
24   Q.   (By Ms. Evans)  Mr. Free, what is the date
25   of that subpoena, or the date that it says your

Page 7

1    deposition will be?
2    A.   July 19th, 2023.
3    Q.   Do you recall receiving an earlier subpoena
4    with regard to your deposition?
5    A.   I didn't receive an earlier subpoena.  I
6    think somebody had accepted it on my behalf.
7    Q.   You recall an earlier discussion about a
8    deposition being taken; right?
9    A.   Yes.
10   Q.   And at that point, were you represented by
11   counsel?
12   A.   Yeah, I was in the process of seeking
13   counsel from Ms. McNamara.
14   Q.   Did you ever enter into an attorney-client
15   relationship with Ms. McNamara?
16   A.   I was seeking legal advice, so I think we
17   have -- we do not have a retainer agreement, no.
18   Q.   Did you ever sign a retainer agreement with
19   Ms. McNamara or her firm, anyone else from her firm?
20   A.   No.
21   Q.   And you're represented by counsel here
22   today, Mr. Tobin?
23   A.   Yes.
24   Q.   When did you engage Mr. Tobin?
25   A.   Sometime earlier this spring.

Page 8

1    Q.   Did you authorize Ms. McNamara to accept
2    service of the subpoena on -- on your behalf earlier
3    this year?
4    A.   As far as I can recall, I did.
5    Q.   Did you have any conversations with her
6    after that point?
7    A.   As I sit here today, I'm thinking about the
8    timeline and I think the answer is yes.  I think I
9    eventually told Ms. McNamara --
10        MR. TOBIN:  I'm going to caution you
11   to reserve context when you're seeking
12   legal advice.
13        THE WITNESS:  So yes.
14        MR. TOBIN:  Therefore, it's covered by
15   the attorney-client privilege and I
16   instruct you not to answer that.
17   Q.   (By Ms. Evans)  Understanding your -- your
18   attorney's instruction, I want to just go back and ask
19   my question, and then I'll ask my second question
20   which I think will be objectionable.
21        After the time that you authorized
22   Ms. McNamara to accept service of a subpoena on your
23   behalf, did you have conversations -- a conversation
24   or conversations with her after that time?
25   A.   I think so.

Page 9

1    Q.   More than once?
2    A.   I think so.
3    Q.   How many times would you say?
4    A.   I don't recall.
5    Q.   More than five?
6    A.   No.
7    Q.   Somewhere between two and five?
8    A.   Probably.
9    Q.   Okay.  Did you have any conversations with
10   Ms. McNamara regarding your conversations with MSNBC?
11        MR. TOBIN:  Object to the question.
12   That calls for information disclosed during
13   the consultation and pursuing legal advice;
14   therefore, it's privileged.
15        I'll instruct you not to answer.
16   Q.   (By Ms. Evans)  Are you following your
17   attorney's advice?
18   A.   I am.
19   Q.   When did it become -- strike that.
20        When did you -- when did you say you engaged
21   Mr. Tobin?
22   A.   I didn't.  I said I think it was, like,
23   earlier this year, spring, maybe April, May.  I'm not
24   certain.
25   Q.   And when were -- strike that.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                    Pages 10..13

1    When was the first of your conversations
2  with Ms. McNamara after you authorized her to accept
3  service?
4      A.   I don't know.
5      Q.   Was it before or after you engaged
6  Mr. Tobin?
7      A.   Before.
8      Q.   Did you have any conversations with
9  Ms. McNamara after you engaged Mr. Tobin?
10     A.   Not that I recall.
11     Q.   You're an attorney; true?
12     A.   I'm a lawyer.
13     Q.   What's the difference?
14     A.   Attorneys practice.
15     Q.   I always wondered that.
16          Have you ever practiced?
17     A.   I have.
18     Q.   When did you stop practicing?
19     A.   November 2022.
20     Q.   Why did you stop practicing?
21     A.   I reached a point in my career where I felt
22  like the change I wanted to make needed to happen
23  through different means, through education, through
24  helping support other folks, and I also reached a
25  point in my career where the work that I was doing was

1  weighing on me, my relationship to my family.  So I
2  chose to transition and do different work.
3      Q.   What are you doing currently?
4      A.   So I run a transparency project with Al Otro
5  Lado, which is a binational human rights nonprofit.
6  We help immigration attorneys, migrants, refugees,
7  folks in custody, folks abroad, media, nonprofit
8  organizations, academics, try and figure out how to
9  get the information they're seeking from public
10  entities, and then try and figure out, like, what that
11  information means once they get it and understand it.
12          I also participate in a lot of organizing
13  coalitions.  I finished a one-year appointment as a
14  visiting scholar and adjunct professor at the
15  University of Washington law school.  It became clear
16  that I was not going to get more academic appointments
17  until I wrote and published.  So I was not able to do
18  that while teaching my first year because I put a lot
19  of time in teaching.  So I'm also writing and trying
20  to finish articles about the Freedom of Information
21  Act, and that's some of the other work that we've been
22  doing.
23     Q.   Is your transparency project called
24  Detention Kills?
25     A.   It is.

1      Q.   Did you found that?
2      A.   I did.
3      Q.   What year?
4      A.   2017 was when we came together.  2019 is
5  when we started to articulate that understanding of
6  the system.
7      Q.   Do you have funders?
8      A.   Yes.
9      Q.   Who are they?
10     A.   So the key funder is an organization called
11  Justice Catalyst out of Boston.  We also seek and
12  receive individual donations from, you know, just
13  folks.
14     Q.   Individuals?
15     A.   Yes.
16     Q.   Do you receive any funding from any media
17  organizations?
18     A.   No.
19     Q.   Do you receive funding from any attorneys?
20     A.   Yes.
21     Q.   Are any of the attorneys that you -- strike
22  that.
23          Do any of the attorneys that you receive
24  funding from do work on behalf of media companies?
25     A.   I don't know the book of business of the

1  folks.  I don't think so.  I'm trying to think because
2  there's -- there's some modes of very, very small
3  dollar donations like Patreon and some sort of one-off
4  fundraising that our fiscal sponsor, Al Otro Lado,
5  does, and I can imagine that maybe somebody who's
6  donated could have that sort of relationship.  I'm not
7  aware of it.
8      Q.   Understood.
9          You currently live in Atlanta?
10     A.   I do.
11     Q.   How long has that been true?
12     A.   Since late 2019, early 2020.
13     Q.   And before that, you were in Nashville?
14     A.   I was.
15     Q.   What caused you to move to Atlanta?
16     A.   The apartment that I was living in in
17  Nashville was converted to an Airbnb, and I was the
18  last tenant to sign a lease before it was converted.
19  So every single building in the -- every single
20  apartment in the building got converted.  And I had
21  been traveling to do work as an attorney, and didn't
22  have, like, a -- like, a residence.  My child lives
23  here.  It seemed better than just coming and staying
24  during parenting time.  And so this is where I ended
25  up.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 14..17

Page 14

1    Q.   Do you live alone?
2    A.   No.
3    Q.   Who do you live with?
4    A.   Sarah Owings.
5    Q.   Anyone else?
6    A.   Sarah's daughter when there's parenting
7  time, my son when I have parenting time.
8    Q.   Other than children, the only -- strike
9  that.
10        The only adults are you and Ms. Owings?
11   A.   That's right.
12   Q.   Are you and Ms. Owings married?
13   A.   No.
14   Q.   Are you in any sort of romantic
15 relationship?
16   A.   No.
17   Q.   Platonic roommates?
18   A.   Yes.
19   Q.   Could be a TV show.
20   A.   Comedy or...
21   Q.   Drama.  All of the above.
22        MR. TOBIN:  Be the third for "Three's
23    Company."
24        MS. EVANS:  That's what I was thinking
25    of.

Page 15

1        MR. TOBIN:  We got two cats.
2        MS. EVANS:  It's just a little
3    different.
4    Q.   (By Ms. Evans)  Okay.  Strike that.
5        At some point, you began -- strike that.
6        At some point, did you attempt to look for
7  documents that you had related to Irwin County
8  Detention Center?
9    A.   Yes.
10   Q.   And when was that?
11   A.   Earlier this year following the service of
12 the subpoena on Mr. Tobin.
13   Q.   The document subpoena?
14   A.   Yeah.
15   Q.   Did you have a -- strike that.
16        You're an attorney I realize, but did you
17 have attorneys other than you helping you search for
18 and collect documents?
19   A.   I'm just a lawyer.
20   Q.   I used it again.  I'm sorry.
21   A.   You don't get in trouble if you say it;
22 right?
23        Yeah.  So it was really helping, like,
24 putting the documents into a format that they could be
25 turned over.  So I collected documents and then turned

Page 16

1  them over to my attorneys.
2    Q.   Did you have any IT assistance?
3    A.   I think that -- yes.
4    Q.   Was it someone inside Mr. Tobin's firm or
5  outside?
6    A.   Yes.  Inside.
7    Q.   Do you use text messaging to communicate?
8    A.   I do.
9    Q.   Do you use Signal?
10   A.   I do.
11   Q.   Do you use any other messaging apps?
12   A.   I do.
13   Q.   What are those?
14   A.   WhatsApp.
15   Q.   Anything else?
16   A.   There are messaging functions within other
17 apps.  So there's Signal and WhatsApp.  Text message
18 would be a messaging app, in my understanding of it,
19 and then, you know, communicate through Slack or
20 through Twitter DMs or through --
21   Q.   Facebook messaging?
22   A.   I don't use Facebook.  I mean...
23   Q.   Does Instagram have a messaging feature?
24   A.   I think it does.  There's an Instagram DM
25 feature.  I don't really -- certainly didn't use it

Page 17

1  for this.
2    Q.   I don't understand Instagram.  I have it,
3  but I don't understand.
4        Did you look for documents within your text
5  messages, WhatsApp, Signal, Slack and Twitter DMs?
6    A.   I did.
7    Q.   And you turned all those over to your
8  counsel?
9    A.   If I found them.
10   Q.   Did you find any?
11   A.   I did.
12   Q.   Do you know Chris Hayes?
13   A.   I do.
14   Q.   How do you know him?
15   A.   He was on the news, and then because he's on
16 the news, our paths have crossed in working on
17 stories.
18   Q.   When was the first time your paths crossed?
19   A.   I would say the summer the family separation
20 was unfolding, so 2018.
21   Q.   Have you ever talked with Mr. Hayes in
22 person?
23   A.   I have.
24   Q.   How many times?
25   A.   Once that I can recall.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                    Pages 18..21

1    Q.   And where was that?
2    A.   Los Angeles.
3    Q.   Was that at a -- an event for his podcast?
4    A.   It was.
5    Q.   Have you talked with Mr. Hayes on the phone?
6    A.   I have.
7    Q.   Have you talked with Mr. Hayes on the phone
8  regarding Irwin County Detention Center or Dr. Amin?
9    A.   I don't recall, but I believe I did.
10   Q.   How many times?
11   A.   I don't know exact times.
12   Q.   More than five?
13   A.   I don't think so.  I don't have a specific
14  recollection of the telephone call.
15   Q.   Did you exchange text messages?
16   A.   We did.
17   Q.   Did you exchange text messaging with
18  Mr. Hayes regarding Irwin County Detention Center?
19   A.   We did.
20   Q.   Did you find any of those messages when you
21  were reviewing documents?
22   A.   I don't think so.
23   Q.   Did you communicate with Mr. Hayes via
24  Signal?
25   A.   Yes.

1    Q.   Did you find any messages with him on your
2  Signal?
3    A.   I didn't.
4    Q.   Do you have Mr. Hayes' phone number?
5    A.   I think so.
6    Q.   In your phone?
7    A.   I'm not sure.  I think so, yeah.
8    Q.   Do you have your phone with you here today?
9    A.   I do.
10   Q.   During a break, I might ask you to look at
11  it.
12   A.   No.
13   Q.   You're not going to look at your phone?
14   A.   You're going to serve another subpoena today
15  or...
16   Q.   Well, you don't get to ask me questions.
17  But are you refusing to respond to information that
18  you have on your person?
19   A.   Are you trying to search me during my
20  deposition?
21        MR. TOBIN:  Let's -- let's.
22   Q.   (By Ms. Evans)  Answer my questions, please.
23  I think you should --
24        MR. TOBIN:  Let me just interpose an
25   objection.  There's -- the subpoena does

1   not require him to search his phone in the
2   middle of the deposition.  So I'm going to
3   instruct him to decline to comply with your
4   request.
5    Q.   (By Ms. Evans)  Mr. Free, do you know Julia
6  Ainsley?
7    A.   I do.
8    Q.   And how do you know Julia?
9    A.   We met or we started working together on
10  family separation early on in the Trump
11  administration.
12   Q.   Do you have Ms. Ainsley's phone number?
13   A.   I do.
14   Q.   In your phone?
15   A.   Yes.
16   Q.   Are you going to also refuse to provide that
17  to me?
18        MR. TOBIN:  He is.
19        THE WITNESS:  You want her phone
20   number?
21   Q.   (By Ms. Evans)  I do.
22        MR. TOBIN:  He's not -- Stacey, he's
23   not going to search his phone during this
24   deposition and provide any additional
25   information for you.

1        MS. EVANS:  I'm going to make my
2    record --
3        MR. TOBIN:  Yeah.  No.  That's fine.
4    Q.   (By Ms. Evans)  Mr. Free, are you refusing
5  to look at your phone and provide Ms. Ainsley's phone
6  number, which you admitted you have?
7    A.   You want me to give you Julia Ainsley's
8  phone number during this deposition?
9    Q.   I want you to answer my questions.
10   A.   But I'm just making sure I'm clear on what
11  you want.
12        MR. TOBIN:  He's asking for clarity on
13   what you're asking.
14        THE WITNESS:  Do you want the answer?
15   Q.   (By Ms. Evans)  Yes.  Yes.
16   A.   Okay.  So you need me, as Dr. Amin's
17  attorney, to look in my phone and tell you Julia
18  Ainsley's phone number.  That's what you want?
19   Q.   I'm asking you to do that, yes.
20   A.   Can I confer with my counsel?
21        MR. TOBIN:  And actually, that's not
22   necessary consistent with the objections
23   and the instructions previously.  He's not
24   going to search his phone during this
25   deposition and provide additional

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 22..25

Page 22

1    information that was not called for in the
2    subpoena.
3         Q.  (By Ms. Evans)  Mr. Free, do you know Jacob
4    Soboroff?
5         A.  I do.
6         Q.  How do you know Mr. Soboroff?
7         A.  He's a reporter.  We've worked together.
8         Q.  On what?
9         A.  I think we worked together starting on
10   family separation as well.
11        Q.  Do you have Mr. Soboroff's phone number?
12        A.  I do.
13        Q.  In your phone?
14        A.  I do.
15        Q.  Are you also refusing to provide -- strike
16   that.
17            Will you look at your phone and provide me
18   his phone number?
19            MR. TOBIN:  I'm going to instruct the
20       witness not to comply with that request
21       since it was not called for in the
22       subpoena.
23        Q.  (By Ms. Evans)  So the answer to my question
24   is no on advice of counsel?
25        A.  Can you ask the question again?

Page 23

1         Q.  Are you refusing to look at your phone and
2    provide me with Mr. Soboroff's phone number?
3         A.  I don't understand.
4            MR. TOBIN:  I think she's asking if
5        you're going to follow my advice.
6            THE WITNESS:  Yeah, I'm going to
7        follow your advice.
8         Q.  (By Ms. Evans)  Which means you won't
9    provide me the phone number?
10        A.  You have the phone number.
11           MR. TOBIN:  Just yes or no.
12           THE WITNESS:  I'm listening to my
13       counsel.
14        Q.  (By Ms. Evans)  Well, your counsel is asking
15   you, I think, to answer my questions which may be --
16   you know, you keep wanting to talk about being a
17   lawyer and an attorney.  You would be well-advised to,
18   right now, be a deponent.
19            I'm going to ask my question --
20           MR. TOBIN:  Stacey, ask your question.
21       Don't instruct my client.
22           MS. EVANS:  It didn't have to go here.
23       The witness is being antagonistic and I'm
24       going to do what I need to do.
25        Q.  (By Ms. Evans)  I'm going to get answers to

Page 24

1    my questions however long it takes, Mr. Free.
2            My question is:  Are you refusing to look at
3    your phone and provide me Mr. Soboroff's number which
4    you've admitted you have; yes or no?
5         A.  On the advice of my counsel, the answer is
6    yes.
7         Q.  Thank you.
8            Did you speak with Ms. Ainsley regarding
9    Irwin County Detention Center?
10        A.  I did.
11        Q.  When did you first speak with her?
12        A.  September 14th or 15th.
13        Q.  And who called who?
14        A.  I don't remember.
15        Q.  How many times did you talk to her about
16   Irwin County Detention Center?
17        A.  I don't recall exactly.
18        Q.  More than once?
19        A.  Yes.
20        Q.  More than twice?
21        A.  Yes.
22        Q.  More than three times?
23        A.  Yes.
24        Q.  More than four times?
25        A.  Yes.

Page 25

1         Q.  More than five times?
2         A.  Yes.
3         Q.  More than ten times?
4         A.  Probably.
5         Q.  Was that all on September 14th or 15th?
6         A.  No.
7         Q.  How long did your communications with
8    Ms. Ainsley regarding Irwin County Detention Center
9    span?
10        A.  I'd say about a month and a half till
11   mid-October, maybe later.
12        Q.  Did you speak with Mr. Soboroff regarding
13   Irwin County Detention Center?
14        A.  I did.
15        Q.  When did you first speak with Mr. Soboroff
16   regarding Irwin County Detention Center?
17        A.  I don't remember exactly.  It would have
18   been in that September 14th through 16th period.  It
19   would have been the first conversation.
20        Q.  Who did you speak with first, Mr. Ainsley,
21   Mr. Soboroff or Mr. Hayes?
22           MR. TOBIN:  Ms. Ainsley.
23           MS. EVANS:  I'm sorry.
24        Q.  (By Ms. Evans)  Who did you speak with first
25   with regard to Irwin County Detention Center?  Was it

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 26..29

Page 26

1  Ms. Ainsley, Mr. Soboroff or Mr. Hayes?
2      A.   I don't remember.
3      Q.   What about as between Ms. Ainsley and
4  Mr. Soboroff?
5      A.   I don't recall.
6      Q.   And what about as between Ms. Ainsley and
7  Mr. Soboroff on the one hand and Mr. Hayes on the
8  other?
9      A.   Don't recall.
10     Q.   With regard to Mr. Hayes, did he call you or
11 did you call him first with regard to Irwin County
12 Detention Center?
13     A.   I don't know.
14     Q.   And what about with Mr. Soboroff?
15     A.   Same answer.
16     Q.   You don't know?
17     A.   I don't recall.
18     Q.   And with Ms. Ainsley, do you not know or do
19 you not recall?  You used the different phrases, so
20 I'm just asking.
21     A.   Yeah.  I -- I don't have a clear
22 recollection of the timeline of any of these calls.  I
23 don't know if that saves you time.
24     Q.   I understand you keep a handwritten notebook
25 with regard to your work; is that right?

Page 27

1      A.   Yes.
2      Q.   And how long have you kept that notebook?
3      A.   It's multiple notebooks.  Once I fill one
4  up, I do another one.  I think I started 2017, maybe
5  earlier.
6      Q.   And what is your practice with regard to
7  making notes in these notebooks?
8          MR. TOBIN:  Object to the form.
9          THE WITNESS:  What do you mean?
10     Q.   (By Ms. Evans)  When do you decide to write
11 something down?
12     A.   I'm not sure if I understand.  What do you
13 mean, like...
14     Q.   Do you try to keep -- strike that.
15          Do you use the notebooks as sort of a
16 journal of activities?
17     A.   No.  It's more of sort of note-taking that's
18 meant to sort of preserve, like, a train of thought
19 within a context of work.  But I wouldn't call it,
20 like, a journal.  I -- I have a separate kind of
21 journal practice that I use personally, and I wouldn't
22 call it that.  It's essentially just having a place to
23 keep my notes that's not 18 different yellow pads.
24 That's why I switched to an actual book, because you
25 can put notes in a lot of different places.  I wanted

Page 28

1  it in one place.
2      Q.   And you keep a journal separate and apart
3  from the notebooks we're talking about here?
4      A.   Yeah.
5      Q.   Have you written in that journal regarding
6  Irwin County Detention Center?
7      A.   No.
8      Q.   Have you made notes in -- strike that.
9          The journal that I just asked you about, you
10 told me you didn't write about Irwin County Detention
11 Center; true?
12     A.   True.
13     Q.   I'm going to use the word "notebooks" --
14     A.   Okay.
15     Q.   -- to talk about the other part.  Under --
16 we're in agreement on that?
17     A.   Yeah, that's fine.
18          MR. TOBIN:  I'm just going to ask,
19     Andrew, make sure she's finished the
20     question before you give an answer.
21          THE WITNESS:  Sorry.
22     Q.   (By Ms. Evans)  It's hard.  It's such an
23 artificial way to talk to each other.
24          Did you write about Irwin County
25 Detention -- strike that.

Page 29

1          Did you make any notes regarding Irwin
2  County Detention Center in your notebooks?
3      A.   Yes.
4      Q.   And when did you start doing that?
5      A.   When I found out, so September 14th,
6  September 15th maybe.
7      Q.   Did you make notes regarding your
8  conversations with the media regarding Irwin County
9  Detention Center?
10     A.   I don't know.  Probably.
11     Q.   And you've turned all of those notebooks
12 over to your counsel?
13     A.   I have.
14     Q.   Was Ms. Owings at your house this morning?
15     A.   I wasn't at my house this morning.  I was
16 petsitting.
17     Q.   When was the last time you were at your
18 house?
19     A.   Last night.
20     Q.   Was Ms. -- was Ms. Owings at your house last
21 night?
22     A.   No.
23     Q.   When did you first learn of -- or strike
24 that.
25          At some point, you became aware of a letter

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 30..33

Page 30

1  that was either drafted or going to be drafted that
2  was put out by Project South; is that right?
3          MS. MCNAMARA:  Objection to form.
4          MR. TOBIN:  Join in the objection.
5          THE WITNESS:  Yeah, I don't think
6      that's accurate.
7      Q.   (By Ms. Evans)  Are you aware of a letter
8  that was drafted, at least in part, by individuals
9  connected with Project South?
10         MS. MCNAMARA:  Same objection.
11         THE WITNESS:  Are you talking about
12     the whistleblower report?
13     Q.   (By Ms. Evans)  I'll just show it to you.
14  All this chorus of objections, I think, is because
15  y'all want to call it a whistleblower complaint, but I
16  call it a letter, but I think we're talking about the
17  same thing.
18     A.   Is that a question?
19         MR. TOBIN:  Object -- object to your
20     statement, Stacey.  Let's just stick to
21     questions, please.
22         MS. EVANS:  You should tell your
23     client the same thing.
24         MR. TOBIN:  I think I did.
25     Q.   (By Ms. Evans)  I'm going to hand you what

Page 31

1  I'm -- what I've previously marked as Exhibit 2.  And
2  there's a copy for your counsel and for Ms. McNamara.
3          Mr. Free, have you ever seen Exhibit 2
4  before?
5      A.   I don't think that I've seen the front page,
6  but I've certainly seen the material that goes behind
7  it.
8      Q.   And for the record, the first page of
9  Exhibit 2 indicates that this was Exhibit A in a
10  pleading filed in this litigation.
11         And, Mr. Free, have you seen Page 2 of 28
12  through Page 28 of 28 that is a part of Exhibit 2
13  before?
14     A.   I have.
15     Q.   And when did you first see the -- see those
16  pages?
17     A.   I don't recall exactly, but I think it was
18  on September 14th.
19     Q.   Were you aware of the effort that led to
20  Exhibit 2 prior to September 14th?
21         MR. TOBIN:  Object to the form of the
22     question.
23         THE WITNESS:  What do you mean?
24     Q.   (By Ms. Evans)  Mr. Free, what did you do to
25  prepare for your deposition today?

Page 32

1      A.   Did you want the answer to the question you
2  just asked me?
3      Q.   I'm asking you a new question.
4      A.   Okay.  I read the 108-page Senate Permanent
5  Subcommittee on Investigations report.  I watched
6  Karina Cisneros' testimony.  I watched Senator
7  Ossoff's opening statement.  I read the Project South
8  CREW, Citizens for Responsibility and Ethics in
9  Washington, deliberate indifference 15-page report
10  from 2021.  I met with my counsel.  I meditated.  I
11  listened to Nina Simone.  I --
12         MR. TOBIN:  Stick with the substance
13     of your preparation, please.
14         THE WITNESS:  Yeah.
15     Q.   (By Ms. Evans)  Did you meet with counsel
16  more than once?
17     A.   I did.
18     Q.   How many times did you meet?
19     A.   Twice.
20     Q.   When was the first time?
21     A.   Earlier this summer.
22     Q.   Where did that meeting take place?
23     A.   Here at Ballard and Spahr.
24     Q.   And how long did that meeting last?
25     A.   Between three and four hours.

Page 33

1      Q.   Mr. Tobin was present; true?
2      A.   True.
3      Q.   Anyone else?
4      A.   Kyle.
5      Q.   Anyone else?
6      A.   Ballard staff, but they were just in and out
7  replacing some coffee and stuff.
8      Q.   Was anybody present on the phone?
9      A.   No.
10     Q.   Was anybody present on Zoom or some other
11  video?
12     A.   No.
13     Q.   And when was the second meeting?
14     A.   Last week.
15     Q.   And where did that meeting take place?
16     A.   Here.
17     Q.   And how long did that last?
18     A.   Maybe three and a half, four hours.
19     Q.   Mr. Tobin present?
20     A.   Yes.
21     Q.   And also Kyle?
22     A.   Yes.
23         MS. EVANS:  And, Kyle, I mean no
24     disrespect.  I just --
25         THE WITNESS:  Mr. Ceuniuck.  I didn't

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 34..37

Page 34

1  want to mess his name up.  Sorry.
2      Q.  (By Ms. Evans)  Anyone else present at that
3  second meeting?
4      A.  No.
5      Q.  Anyone present on the phone?
6      A.  No.
7      Q.  Anyone present on Zoom or another video?
8      A.  No.
9      Q.  The documents that you listed earlier that
10  you looked at, did you look at those during the
11  meetings or on your own?
12     A.  Which documents are you talking about?
13     Q.  You told me you've read the Senate report;
14  right?
15     A.  Yeah.
16     Q.  Did you do that on your own?
17     A.  I did.
18     Q.  What about watching the testimony and
19  Mr. Ossoff's opening statement?
20     A.  I did that on my own.
21     Q.  And then you mentioned a 15-page report from
22  2021?
23     A.  On my own.
24     Q.  Did you look at any documents during either
25  of your meetings with Mr. Tobin?

Page 35

1          MR. TOBIN:  I'm going to object and
2      instruct him not to answer.  The process of
3      documents that we looked over is both work
4      product and attorney-client privilege.
5          THE WITNESS:  On the advice of
6      counsel, I'm not going to answer the
7      question.
8          MS. EVANS:  I'm entitled to know what
9      documents he looked at.
10         MR. TOBIN:  I disagree with you,
11     Stacey.  I'm going to instruct him not to
12     answer that answer.
13         THE WITNESS:  I'm going to follow my
14     counsel's instruction.
15         MR. TOBIN:  Documents that the witness
16     reviewed while preparing for an event in
17     court with counsel is essentially work
18     product and attorney-client privilege, and
19     I say that so that the basis for our
20     objection is crystal clear.  We're not
21     objecting to any question you asked earlier
22     for the documents he looked at on his own.
23     Q.  (By Ms. Evans)  At any time between getting
24  the subpoena and arriving here this morning, did you
25  look at the document, at least what's reflected on

Page 36

1  Pages 2 through 28 of Exhibit 2?
2      A.  No.
3      Q.  Your counsel will object to this question,
4  but I'm asking it for the record.
5          Mr. Free, during your meetings with counsel,
6  did your counsel tell you that if he objects to form,
7  that you should ask me what I mean?
8          MR. TOBIN:  Object to the form of the
9      question and calls for attorney-client
10     privileged information.
11     Q.  (By Ms. Evans)  Are you going to follow your
12  client -- your attorney's advice?
13     A.  Only because I'm not waiving privilege, yes,
14  I am following my attorney's advice.
15     Q.  Do you know Azadeh Shahshahani?
16     A.  Shahshahani?
17     Q.  Yes.
18     A.  I do.
19     Q.  And how long have you known her?
20     A.  Since 2010.
21     Q.  Prior to September 14th, had you had any
22  conversations with Azadeh regarding anything that
23  ultimately became part of Pages 2 through 28 of
24  Exhibit 2?
25     A.  I don't think so with the caveat that I

Page 37

1  haven't looked at this report and if it covers things
2  that would have touched other matters where we might
3  have been co-counsel, maybe, but I -- I don't -- I
4  don't believe so.
5      Q.  Prior to September 14th, 2020, did you have
6  any conversations with Azadeh regarding women at Irwin
7  County Detention Center?
8      A.  I did not.
9      Q.  On any subject matter?
10     A.  No.  On -- wait.  On any subject matter of
11  women at Irwin County Detention Center or just --
12     Q.  Yes.
13     A.  Yeah, no, same answer.
14     Q.  You currently have no clients; is that
15  right?
16     A.  That's right.
17     Q.  Have you ever had a client who was detained
18  at Irwin County Detention Center?
19     A.  I have.
20     Q.  How many clients?
21     A.  Dozens.
22     Q.  When was the first time you represented
23  someone from Irwin County Detention Center?
24     A.  2017 or '18.  I don't recall exactly.  It
25  could have been 2019, but I think it was 2018.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 38..41

Page 38

1    Q.   When was the first time that you heard -- or
2    strike that.
3         Have you ever heard from a client of yours
4    that was detained at Irwin County Detention Center
5    that they had been seen by Dr. Amin?
6    A.   Yes.
7    Q.   When was the first time?
8    A.   Sometime after September 14th, 2020.
9    Q.   Prior to September 14th, 2020, despite
10   having had clients at Irwin County Detention Center,
11   you had not heard of anyone having visits with
12   Dr. Amin; is that right?
13   A.   The clients that I represented were men.  So
14   the answer is no.  That's correct.
15   Q.   All the dozens of clients that you
16   represented at Irwin County Detention Center were men?
17   A.   That's --
18        MR. TOBIN:  Object to the form of the
19   question.
20        THE WITNESS:  That's not what I said.
21   Q.   (By Ms. Evans)  That's why I'm asking.  So
22   the answer is no?
23        MR. TOBIN:  Object to the form of the
24   question.
25        THE WITNESS:  So the answer is no, not

Page 39

1    all of the clients that I represented at
2    Irwin were men.
3    Q.   (By Ms. Evans)  When was the first time you
4    represented a woman at Irwin County Detention Center?
5    A.   After September 14th.
6    Q.   Have you ever represented any woman at Irwin
7    County Detention Center who was not also represented
8    by Benjamin Osorio?
9    A.   Yes.
10   Q.   And who would that be?
11   A.   There are a number.  It is likely that I'm
12   not going to recall all of these.
13        MR. TOBIN:  Do the best you can.
14        THE WITNESS:  Betty Donga.  Her name
15   starts with an M, M-E-N-E-N.  Yuridia Rocha
16   Jamario, Andrea Manrique, Angela Fanas
17   Rojas, Karina Cisneros, Anna Santos Perez,
18   Blanca Ramirez, Luis, whose last name is
19   escaping me right now.  There was Pauline
20   Binum, Wendy Dowe, Sharise Grant, a Russian
21   woman whose name is also escaping me,
22   Tatiyana, Jaromy Navarro.
23        There are more whose names are not
24   coming to me at the moment.  There are a
25   lot of women.

Page 40

1    Q.   (By Ms. Evans)  Prior to -- or strike that.
2         Prior to September 16th, 2020, did you
3    represent any women at Irwin County Detention Center
4    who were not also represented by Benjamin Osorio?
5    A.   Yes.
6    Q.   And who would that be?
7    A.   Marcia, whose name I just forgot.  Marcia
8    Batan, who is Sarah's client.  And the timeline is
9    distant and not as clear as it was when it was closer,
10   so that's the one that sticks out for me.  Pauline as
11   well, I think.  I can't recall exactly when that
12   engagement started.
13   Q.   Pauline Binam?
14   A.   Pauline Binam.
15   Q.   Binam.  Pauline -- strike that.
16        Pauline Binam, to your knowledge, has never
17   been represented by Benjamin Osorio?
18   A.   That's correct.
19   Q.   Who of your clients who have ever been
20   detained at Irwin County Detention Center claim that
21   Dr. Amin performed a hysterectomy on them?
22   A.   So I just want to be clear about the
23   question.  You're saying claim now or claimed then?
24   Q.   Have ever claimed.
25   A.   Okay.  Yeah.  So in the wake of the

Page 41

1    whistleblower report, a number of women came forward
2    and indicated that they thought that they had either
3    been scheduled for or given a hysterectomy when we
4    engaged in getting the -- engaged the process of
5    getting medical records and looking at it.  Some of
6    those turned out to be other surgeries.
7         Jaromy thought she had been scheduled for a
8    hysterectomy.  I think she may have been told that by
9    an ICDC nurse actually.  There were one or two other
10   women in the immediate aftermath of the whistleblower
11   report who also believed that that's what had happened
12   to them.
13   Q.   You mentioned Jaromy.  Can you spell that,
14   please?
15   A.   Jaromy Navarro.  So it's J-A-R-O-M-Y.  And
16   then I think it might be Floriano, F-L-O-R-I-A-N-O,
17   Navarro, N-A-V-A-R-R-O.  Or it might be Navarro
18   Floriano, but I think it's Floriano Navarro.
19   Q.   And who are the one or two others that you
20   put in this category?
21   A.   As I sit here today, I can't recall.
22        I think that Pauline thought she had had a
23   partial hysterectomy.  I think once we secured the
24   medical records days later, it was a salpingectomy,
25   which would be a fallopian tube.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                        Pages 42..45

Page 42

1    Q.   And that was performed by a doctor who is
2    not Dr. Amin; is that right?
3    A.   I don't recall.
4    Q.   Did Ms. Binam claim that Dr. Amin performed
5    whatever surgery she had that you just mentioned?
6    A.   I don't recall.
7    Q.   So you've mentioned Ms. Navarro and Ms.
8    Binam.  Can you think of any others?
9    A.   The names are not coming to me as I sit here
10   today.
11   Q.   Okay.  Who of your clients who have ever
12   been detained at Irwin County Detention Center claim
13   that Dr. Amin performed a hysterectomy on them now?
14        MR. TOBIN:  Object to the form.
15        THE WITNESS:  So that's a different
16   question you asked before; right?
17   Q.   (By Ms. Evans)  Yes.
18   A.   Okay.  We had a -- the question before you
19   asked was about Ben as well.  But Mr. Osorio or except
20   for Mr. Osorio?
21        MR. TOBIN:  Would you mind repeating?
22        MS. EVANS:  I will.
23        THE WITNESS:  I'm sorry.  I don't want
24   to --
25        MR. TOBIN:  Let her repeat her

Page 43

1    question; see if you can answer it.
2    Q.   (By Ms. Evans)  Who of your clients who have
3    ever been detained at Irwin County Detention Center
4    claim that Dr. Amin performed a hysterectomy on them
5    as of now?
6    A.   So it's Ben's client, Barbara.  There was a
7    second woman, maybe Claudia, and I think that those
8    are the two.
9    Q.   What is Claudia's last name?
10   A.   I don't recall.
11   Q.   Did you draft any part of the document
12   reflected in Exhibit 2?
13   A.   I did not.
14   Q.   When did Barbara Rua engage you as counsel
15   if she did?
16   A.   So Ben reached out to me.  Mr. Osorio
17   reached out to me I want to say on September 14th
18   about co-counseling that matter.
19   Q.   And what about -- or strike that.
20        When did Ms. Binam engage you as counsel, if
21   she did?
22   A.   I don't recall the exact date.  It was the
23   date that she was on the brink of removal from the
24   United States, which was within three to four days
25   after the whistleblower report, maybe sooner.

Page 44

1    Q.   Did you call any media after reviewing the
2    document reflected in Exhibit 2?
3    A.   I did.
4    Q.   Who did you call?
5    A.   Do you have a time frame or...
6    Q.   Well, you -- strike that.
7        Remind me when you first recalled seeing the
8    document reflected in Exhibit 2.
9    A.   September 14th.
10   Q.   Did you call media on September 14th?
11   A.   I did.
12   Q.   Who did you call?
13   A.   I think I called Jose Olivares whose story I
14   read about the report in The Intercept.  It was either
15   Jose or John Washington, who I think was the co-author
16   of the story.  I'm not sure whether I called them or
17   texted them, as I sit here today, but I think I called
18   them.
19   Q.   Going back for a second.  You mentioned -- I
20   asked you who was -- strike that.
21        Do you recall a moment ago I asked you what
22   was Claudia's last name?
23   A.   I do remember that.
24   Q.   Do you think that was Herline Claude that
25   you were referring to?

Page 45

1    A.   I don't think so.  That name doesn't ring a
2    bell.
3    Q.   So on September 14th, you recall reaching
4    out to someone at The Intercept; is that right?
5    A.   Yes.
6    Q.   Anyone else in the media that you recall
7    reaching out to, whether by phone, text or any other
8    messaging service on September 14th?
9    A.   Yeah, I think there had been a piece on Law
10   & Crime as well, and I think I may have exchanged a
11   message with that person who put that piece out.  I
12   don't remember who did it, who put the piece out.
13   Q.   Did you reach out to anyone at MSNBC on
14   September 14th?
15   A.   I think I may have.  It was either the 14th
16   or 15th that we started talking.
17   Q.   And who did you reach out to?
18   A.   I don't remember.
19   Q.   It would have been Julia Ainsley, Jacob
20   Soboroff and/or Chris Hayes?
21        MS. MCNAMARA:  Objection to form; lack
22   of foundation.
23        THE WITNESS:  Yeah, I -- I don't
24   remember, but I don't think it would have
25   been anybody else.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 46..49

Page 46

1    Q.   (By Ms. Evans)  Did you communicate with
2  anyone else at MSNBC regarding Irwin County Detention
3  Center besides Mr. Hayes, Julia Ainsley, Jacob
4  Soboroff or Alexander Price?
5         MS. MCNAMARA:  Objection to form; lack
6     of foundation.
7         THE WITNESS:  Those are the
8     individuals that I can recall talking to.
9     I don't remember whether there was somebody
10    else on the phone with -- maybe if
11    Alexander Price is Xander.
12   Q.   (By Ms. Evans)  Yes.
13   A.   He might have been a producer.  Like, I
14  remember that person, but I don't remember other
15  conversations with other MSNBC reporters.
16   Q.   Did you also speak with individuals --
17  strike that.
18        Did you also reach out to individuals in the
19  media regarding Irwin County Detention Center on
20  September 15th?
21   A.   I think I did, yes.
22   Q.   And who did you reach out to on the 15th?
23   A.   I don't remember exactly.
24   Q.   Do you recall speaking with any broadcast
25  media besides MSNBC regarding Irwin County Detention

Page 47

1  Center on September 14th or September 15th?
2    A.   Broadcast media is, like, major television
3  networks or is it --
4    Q.   Television, yes.
5    A.   Okay.  I don't think so.
6    Q.   Why not?
7         MR. TOBIN:  Object to the form.
8         THE WITNESS:  Why -- why not what?
9    Q.   (By Ms. Evans)  Why didn't you reach out to
10  any other broadcast media besides MSNBC?
11        MR. TOBIN:  Same objection.
12        MS. MCNAMARA:  Objection to form.
13        THE WITNESS:  I don't know why I would
14    have.  I don't know why that expectation
15    would be that I would have.
16   Q.   (By Ms. Evans)  I'm just wondering if there
17  was any particular reason that you didn't.
18   A.   Yeah, no, not that I remember.
19   Q.   Did you have -- strike that.
20        Did you have relationships with other
21  reporters or on-air talent or producers at broadcast
22  media besides MSNBC during September 2020?
23        MR. TOBIN:  Object to the form.
24        THE WITNESS:  Yes.
25   Q.   (By Ms. Evans)  What networks?

Page 48

1    A.   CBS, PBS.  I don't know if that's broadcast,
2  but it's TV.  I think those are the ones that I can
3  think of that fall within your description.
4    Q.   Did you reach out to anyone at CBS on either
5  September 14th or 15th, 2020?
6    A.   Not that I can recall.
7    Q.   What about PBS?
8    A.   No.
9    Q.   What is your goal -- or strike that.
10        Detention Kills existed during
11  September 2020; is that right?
12   A.   Yes.  That's correct.
13   Q.   What would you say is your goal with the
14  organization Detention Kills?
15   A.   So the first goal is to support families of
16  people that detention has killed in those communities.
17  In the wake of a state violence incident, there is a
18  vacuum that happens on multiple levels.  There's a
19  vacuum of information about what happened.  There's a
20  vacuum of resources.  There's a vacuum of
21  accountability and truth.  And so we exist in part to
22  help fill that and connect folks who are interested in
23  filling that.
24        We also work in accountability to these
25  families, and generally what they articulate after

Page 49

1  they've lost a loved one in custody is that they want
2  answers from the people in the institutions
3  responsible for those deaths and they want it to not
4  happen again.
5         And so a lot of the work that we do is about
6  trying to make that materialize.  And once you start
7  aggregating these experiences and -- and seeing it
8  replicate and seeing the system treat people in the
9  same way over and over again, in terms of the lack of
10  information about their loved one after they've died,
11  the lack of an exchange about the systems that brought
12  that life to an end, and the lack of real prevention
13  and accountability, then you take another -- or I have
14  taken a more systemic view.
15        And so part of the goal is to shift
16  narratives and raise awareness about the harms of
17  detention, not just to people inside, but to
18  communities, and to help folks who are stakeholders
19  understand that there are other alternatives to this.
20  This is not inevitable.  Detention does not have to
21  kill, but it does, and until we accept that as a fact,
22  we can't really have an honest policy discussion about
23  what to do about it.  So, you know, asking what does
24  detention kill?  Does it kill transparency?  Does it
25  kill local budgets?  Does it kill humans, you know,

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                    Pages 50..53

1  like it did during COVID where if you had a detention
2  center in your community, you were three times more
3  likely to get COVID just by having it.  And in trying
4  to lead those discussions with facts and records as
5  opposed to rhetoric alone so that they can be
6  fruitful.
7      Q.   And prior to September 14th, 2020, had you
8  been working either on your own or with others to
9  raise awareness about the effects of COVID within the
10 detention system?
11     A.   I had.
12     Q.   And had you been able to get media attention
13 on that issue?
14     A.   At that time, that wasn't our focus -- my
15 focus in my work.  I was representing a certified
16 nationwide force labor class, the central district of
17 California, and we brought a temporary restraining
18 order against the largest -- one of the second largest
19 contractors, seeking protective equipment, seeking
20 COVID protocols for folks who were forced to clean as
21 alleged in the complaint and putting them at risk.
22          And so really the focus at that time was not
23 media attention.  The focus was getting judicial
24 intervention.  We ended up getting a decision from
25 Judge Bernal that we were likely to succeed on the

1  merits of our claims, but that the public interest did
2  not favor an injunction because hospitals and care
3  workers needed that PPE, and so it would take away
4  those resources at a time when the pandemic was
5  raging.  So that was April.
6          Subsequent to that, I worked with other
7  partners in the south to bring facility-specific COVID
8  challenges.  The one I worked most closely on was Dada
9  versus Witte, W-H -- W-I-T-T-E, in the Western
10 District of Louisiana, which covered multiple
11 facilities where people were at high risk of dying if
12 they contracted the virus.  And we were able to secure
13 an order from a judge in Louisiana requiring that ICE
14 release people, which was something that folks didn't
15 think was possible.  We subsequently did something
16 like that in Mississippi, something like that in
17 Alabama.
18          By that time, I was sort of, you know,
19 stepping away from the direct case development work
20 for those witnesses.  And it sort of integrated with
21 the COVID litigation that I was engaged in in
22 California and in Louisiana and in Mississippi,
23 Alabama.  There was also a nationwide class that was
24 certified out of the Central District of California
25 that I wasn't counsel on, Farihat, F-A-R-I-H-A-T, that

1  was being litigated to try and secure releases.
2          So, you know, to the extent that folks were
3  asking about the impact of COVID on people in
4  detention and those folks were -- folks were media, I
5  think I may have spoken to folks, but that was not
6  the -- the goal.  The goal was to get people safe and
7  free.
8      Q.   Had -- strike.
9          At any point in time, were you involved in
10 efforts to bring media attention to the impact of
11 COVID on people in detention?
12     A.   Yes.
13     Q.   And was that prior to September 14th, 2020?
14     A.   Yes.
15     Q.   And were you successful?
16     A.   How do you define success?  I mean, did
17 people look at it?  I think so, yeah.  I think that
18 there were stories about some of these cases.  I think
19 that some of the releases were covered.  You know, the
20 ask was to decarcerate that moment, to put people in
21 community.
22          I don't remember when the first time it
23 happened was, but at the beginning of the pandemic, my
24 project hosted with immigrant advocates network a
25 training on what to do when people die of COVID in ICE

1  custody so that we could preserve the record.
2  Frankly, we thought that the state would -- the state
3  being the federal government and its contractors --
4  would probably use the chaos and the novelty of the
5  situation to sort of elide some of the basic facts of
6  the preventability of some of these deaths.
7          Fortunately, the numbers of death were not
8  what we predicted based on the statistics that we had
9  at the time.  We were predicting that it could be
10 hundreds of people dying in custody based on a
11 50,000-person average daily population.  But I do
12 remember during that, you know, webinar discussing the
13 necessity of telling people what's going on and
14 framing that through the media because otherwise you
15 can do it in the dark if you're the -- if you're the
16 state.
17     Q.   Did you have any conversations with anyone
18 at MSNBC regarding the COVID conditions in any
19 detention center?
20     A.   I think I did.
21     Q.   And what do you recall?
22     A.   I recall nothing specific other than a felt
23 sense that this is not going to be a story that we
24 cover because everybody is suffering from it and
25 frontline workers and other aspects of society really

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                          Pages 54..57

---

Page 54

1  are where the focus is going to be.  I don't remember
2  anybody telling me that, but that's generally the
3  sense that I got, was that this is a crisis for
4  everyone and somehow, you know, for the various
5  reasons that inform what comes out in the news, the
6  fact that it was a crisis for meant -- for everyone
7  meant that it was going to take a lot of work to make
8  it -- to make the crisis that was going -- going on
9  behind bars more visible to people.
10     Q.   Do you recall any of the individuals that
11  you spoke with at MSNBC regarding COVID?
12     A.   Not specifically.  It would have been the
13  people we talked about with the exception of Xander.
14  It would have been Jacob, Julia.  I don't think it
15  would have been Chris.  It would have been Jacob and
16  Julia.
17     Q.   Do you consider part of your work -- or
18  strike that.
19          During the time that you were a lawyer, did
20  you consider it part of your work to have detention
21  centers closed?
22     A.   Yes.
23     Q.   And did you consider it part of your work at
24  the time that you were a lawyer to have individuals
25  released from detention?

Page 55

1     A.   Yes.
2     Q.   Would you consider that -- strike that.
3          Would you consider those two things, closing
4  detention centers and having individuals released,
5  your main goals as a lawyer at the time that you were
6  a lawyer?
7          MR. TOBIN:  Object to the form.
8          THE WITNESS:  Yeah, main goals is a
9          little much.  I think litigating harm
10         inside to, you know, there's people locked
11         in there and closing detention centers is
12         really hard.  They exist for a reason.
13         There's a full set of considerations that
14         dictates that that's going to happen.
15         Releases are hard, too, you know.  That is
16         the -- the status quo.
17              And so a lot of the work was helping
18         folks inside mitigate harm and understand
19         how to advocate in an environment where
20         there's not enough people to -- to get them
21         off.
22     Q.   (By Ms. Evans)  You mentioned the Farihat
23  release.  Am I saying that right?
24     A.   Farihat.
25     Q.   Farihat.  And that refers to what?

Page 56

1     A.   It's a case in the Central District of
2  California that was brought by the Civil Rights
3  Education and Enforcement Center, CREEC, SPLC, some
4  big firms that originated before COVID, and it was
5  about the mistreatment of folks with disabilities in
6  custody.  And, you know, blind folks, deaf folks,
7  folks with serious and debilitating, both physical and
8  mental, health conditions and the absence of
9  meaningful protections for those folks, both under the
10  Constitution's due process clause and under the Rehab
11  Act, Section 504 of the Rehabilitation Act.
12          Once COVID happened and the science sort of
13  informed who was most at risk of getting it and
14  suffering either death or long-term debilitating
15  effects from it, Farihat kind of shifted into a -- a
16  COVID case.  There had, I believe, already been a
17  class certified of folks in ICE detention centers
18  under Farihat.
19     Q.   Were you successful in having any clients
20  removed from Irwin County Detention Center because of
21  COVID?
22     A.   Yes.
23     Q.   How many?
24     A.   At least half a dozen, maybe a dozen.
25     Q.   And over what time period, if you recall?

Page 57

1     A.   In September 20- -- 2020 to December of
2  2020.
3     Q.   Were you successful in having any clients
4  removed from Irwin County Detention Center because of
5  their involvement in any allegations regarding
6  Dr. Amin?
7     A.   I think you'd have to ask, but because of
8  ICE, you know, I don't make those determinations.
9  Arthur Musante, other folks with the Atlanta field
10  office of ICE were making those determinations.
11  People who had been making COVID release requests
12  since April, May, under Farihat, people who had the
13  same medical conditions and who had been denied
14  suddenly became eligible for release under Farihat,
15  including Marcia, who was -- that was Sarah's client,
16  who was suddenly -- after the whistleblower report,
17  she was suddenly eligible for release under Farihat.
18     Q.   How many detainees -- strike that.
19          How many people that were in detention would
20  you put in the category of having made a request for
21  release under Farihat and not getting it, but then
22  making statements regarding Dr. Amin and then getting
23  released?
24     A.   I don't know an exact number.  I would put
25  it at at least a half a dozen, maybe more.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 58..61

Page 58

1    Q.    Are you aware -- strike that.
2          Of the 6 to 12 individuals that you told me
3    earlier you believe were released between
4    September 2020 and December 2020 regarding COVID, how
5    many of those individuals made statements regarding
6    Dr. Amin?
7    A.    I just want to be clear.  When I said 6 to
8    12, I think I said a half dozen, a dozen, but before
9    that, I said I'm not sure exactly.  So I'm not giving
10   you exact numbers.  I'm trying to ballpark it for you
11   instead of just telling you I don't know; okay?
12         But several of those people had not seen
13   Dr. Amin, but most of them had because those were the
14   people that I was in contact with.
15   Q.    Have you ever been to Irwin County Detention
16   Center?
17   A.    No.
18   Q.    At some point -- or strike that.
19         You became aware of the document reflected
20   in Exhibit 2 on September 14th, 2020; true?
21   A.    True.
22   Q.    Around that same time, you were in
23   communication with Mr. Osorio?
24   A.    Yes.
25   Q.    At some point, you became involved with a

Page 59

1    larger group of individuals regarding Irwin County
2    Detention Center; is that fair to say?
3          MR. TOBIN:  Object to the form.
4          THE WITNESS:  There were a lot of
5          people who had allegations involving
6          Dr. Amin and they had lawyers.  And so that
7          universe of folks expanded pretty quickly,
8          yes.
9    Q.    (By Ms. Evans)  How did that -- strike that.
10         How did the larger group of individuals who
11   had clients who made allegations about Dr. Amin come
12   to your attention?
13   A.    So I would say personal relationships and
14   networks.  I think that in the immediate aftermath --
15   aftermath of the whistleblower report, folks really
16   weren't even sure if this was the same doctor who had
17   affected their individual immigration client or
18   clients.  And so it was immigration lawyers talking to
19   each other.
20         There was a -- is or not there was a
21   Southeast Immigrant Freedom Initiative team for the
22   Southern Poverty Law Center at Irwin.  They were aware
23   of folks there.  So I think it was just the bar kind
24   of talking to one another.
25   Q.    And who are the attorneys in that group that

Page 60

1    you can recall?
2    A.    Sarah Owings, Mr. Osorio, Elizabeth
3    Matherne, folks at Project South represented a couple
4    of folks.  That would be Priyantha Bhatt and the folks
5    at SPLC, Diego, whose name is -- last name is escaping
6    me right now.  I want to say Alexis Ruiz at Ruiz &
7    Zambrano, Kimberlee Payton Jones.  There -- there are
8    more.  There were a number -- there's a large number
9    of attorneys who had -- that they had represented who
10   were impacted by this.  There were folks at O'Melveny
11   & Myers in LA representing Andrea Manrique.  So
12   those -- I'm talking about pre-existing relationships
13   with folks that SPLC represented.
14         I want to say Laura Rivera at SPLC at the
15   time.  Those are the folks I can think of right now,
16   but I know that there are more.
17   Q.    At some point, did you become sort of the --
18   I'll get an objection to this because -- you became
19   sort of the tracker, the keeping track of all the
20   numbers; is that right?
21   A.    I was one of those people.  I think that
22   multiple -- so sort of is the answer to your question.
23         No objection.  Yeah.
24         MR. TOBIN:  I didn't say a word.
25   Q.    (By Ms. Evans)  Who were the others that you

Page 61

1    would consider as the trackers?
2    A.    Yeah, so because of the volume of their
3    practice, the SPLC's Southeastern Freedom Initiative
4    was trying to compile a list of folks who may have had
5    experiences that would be relevant.  And then I think
6    that Project South was trying to compile a list of
7    folks that -- already had a list of folks.  Those
8    are the folks that I can recall at that period of time
9    in, like, September 2020.
10   Q.    At some point, Innovation Law Lab became
11   involved?
12   A.    That's correct.
13   Q.    How did that come about?
14   A.    I asked for their help.
15   Q.    And was that through Ariel Prado?
16   A.    Ariel Prado, yeah.
17   Q.    And did you know her previously?
18   A.    Ariel is a dude.  And I did not previously.
19   Q.    Oh.  I'll get it right eventually.
20         My understanding is that Mr. Prado and at
21   least -- or strike that.
22         Who was the group that was involved in this
23   effort from Innovative Law Lab besides Mr. Prado?
24   A.    At Innovation Law Lab?
25   Q.    Yes.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 62..65

Page 62

1    A.   Alex -- excuse me, not Alex.  Ian Philabaum
2  came for a brief period of time.  That's
3  P-H-I-L-A-B-A-U-M.  But Ariel was the point person.
4  And then I'm trying to think if Tess Hellgren --
5  Hellgren, who was an attorney at Law Lab, was involved
6  at that point.  She could have been, but I don't think
7  so.
8    Q.   At some point, did Mr. Prado go onsite at
9  Irwin County Detention Center?
10   A.   He did.
11   Q.   And when did that happen?
12   A.   Very shortly after the whistleblower report
13  came out.  I would say within five days to a week,
14  maybe -- and let me back up.
15         It could have been Mr. Philabaum, but I
16  think it was Ariel, yeah.
17   Q.   Someone from --
18   A.   Someone from Law Lab, yes.
19   Q.   And were there multiple visits by that
20  group?
21   A.   Yeah.
22   Q.   How many would you say?
23   A.   So the team in place was at the facility
24  nearly every day during COVID for 6 to 10 hours
25  interviewing people and just having conversations with

Page 63

1  folks inside.
2    Q.   But this was all some -- sometime after
3  September 14th, 2020?
4    A.   Correct.
5    Q.   Every day, 6 to 10 hours a day for how long?
6    A.   Until -- at least until sort of mid-October
7  when things transitioned over to the National
8  Immigration Project of National Lawyers Guild and the
9  Columbia Law School team, UGA's clinic, maybe until
10  December, actually, of 2020 -- 2020.
11   Q.   And what was the purpose of Innovative Law
12  Lab being onsite that much at Irwin County Detention
13  Center?
14   A.   You mean Innovation Law Lab?
15   Q.   Yes.
16   A.   Yeah.  So it was to talk to people, to
17  ensure that folks who may have had experiences, both
18  related to Dr. Amin and related more generally to the
19  medical abuse and neglect at the facility, had an
20  opportunity to share those experiences, to try and
21  make sure they weren't alone, to identify people who
22  either had some form of immigration relief, by which I
23  mean some defense to deportation, or who had some
24  other pathway to care and protection were being spoken
25  with.

Page 64

1         And in some cases, the purpose was to help
2  facilitate a speedier removal.  In the case of some,
3  they had been at Irwin so long that they no longer
4  believed that the United States would protect them and
5  they wanted to be removed speedily.  They had been
6  transferred from Puerto Rico to be imprisoned at
7  Irwin.
8    Q.   When you say they wanted to be removed
9  speedily, do you mean removed from the United States?
10   A.   The United States.  Sorry to talk over you.
11   Q.   No, that's okay.  We were -- we were in sync
12  there.  It's all good.
13         When Innovation Law Lab was onsite at Irwin
14  County Detention Center, were they affirmatively
15  asking women if they had seen Dr. Amin?
16   A.   Yes.
17   Q.   And what was the purpose of that?
18   A.   To identify --
19         MR. TOBIN:  Object to -- object to the
20    form.
21         Go ahead and answer.
22         THE WITNESS:  Yeah, I mean, to
23    identify what is the universe of people
24    we're talking about here.
25   Q.   (By Ms. Evans)  Was that also a potential

Page 65

1  grounds for halting deportations?
2    A.   I mean, the time that you're asking the
3  question, you -- you don't know.  It wasn't for
4  several people who came forward.  Those people were
5  still deported over their objection.
6         In my mind, there was a policy that was --
7  it was an executive policy that was promulgated in
8  2011 under which certain victims, witnesses or
9  plaintiffs in non-frivolous civil rights matters were
10  to be given prosecutorial discretion by ICE, which
11  included release from custody and/or a stay of their
12  removal proceedings.  So not status, but not removal
13  from the United States.
14         We later found out that that policy survived
15  the Trump administration.  That Trump's ICE director
16  confirmed in 2018 that that policy was still in place.
17  And so under governing and current government policy,
18  those folks may have, depending on what they had to
19  say, some avenue for prosecutorial discretion.
20         And moreover, there's the reality that,
21  given the severity of these allegations, these folks
22  could potentially have had a prima facie case to be
23  survivors of crimes, witnesses to crimes, victims of
24  crimes, and under the immigration laws, there are
25  forms of relief for folks who survive certain

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 66..69

Page 66

1  qualifying crimes and then provide information to law
2  enforcement.
3      Q.   Prior to the time that innovative -- strike
4  that.
5           Prior to the time that Innovation Law Lab
6  was onsite at Irwin County Detention Center, within a
7  few days, five days or so after September 14th, 2020,
8  had you been involved in a group that had a similar
9  presence at Irwin County Detention Center ever before?
10     A.   No.
11          MR. TOBIN:  Object to the form of the
12     question.
13          THE WITNESS:  Sorry.
14          No.
15     Q.   (By Ms. Evans)  Have you ever used the term
16 "rebellious lawyering"?
17     A.   I have.
18     Q.   What does that mean to you?
19     A.   It means that law and justice are not
20 necessarily synonymous.  Some of the most egregious
21 and harmful acts in human history have been carried
22 out under the sanction of law, including the
23 Holocaust, including human enslavement, including Jim
24 Crow, and we can either choose to be functionaries of
25 that injustice or we can choose to use the law as a

Page 67

1  tool for justice, and sometimes that means we have to
2  rebel against oppressive status quos and try to use
3  this tool as, you know, a peaceful tool to facilitate
4  people changing those unjust status quos.
5      Q.   When you say this tool, what are you
6  referring to?
7      A.   Legal advocacy.
8      Q.   Do you believe that litigation is a tool?
9      A.   Yes.
10     Q.   Do you believe that litigation is a tool to
11 secure the release of people in detention?
12     A.   It can be.
13     Q.   Have you used it?
14     A.   Yes.  When people are being illegally
15 detained, that's sort of, in many respects, one of
16 their only avenues to get out.
17     Q.   When Innovat- -- I can't get that right.
18     A.   You can just call it Law Lab.  That's what
19 we call it.
20     Q.   Okay.  When Law Lab was onsite at Irwin
21 County Detention Center, how did the group let
22 detainees -- strike that.
23          Whenever Law Lab was onsite at Irwin County
24 Detention Center, how did the group let people in
25 detention know that they were there?

Page 68

1      A.   So there were some pre-existing
2  relationships with folks, either through their counsel
3  or through SPLC, and I think it was word of mouth,
4  letting folks know that we're going to be here; we're
5  going to visit.  Just because COVID is happening and
6  you feel like you've been abandoned does not mean that
7  that is the reality.
8           Several months prior, there actually had
9  been a video of women at Irwin inviting the world to
10 come and see what they were suffering, and at the
11 time, what they were suffering was COVID without masks
12 and being told to use dirty, used underwear to cover
13 their faces.
14          We saw ourselves, including me, but
15 certainly Law Lab as well and the volunteers who
16 worked there and other people, as answering that call,
17 as trying to honor what those folks were saying.
18 Those women wrote a letter and we had folks reading
19 it.
20          And so the idea was to come to those folks
21 and say, We've heard you.  We're here.  What do you
22 need?
23     Q.   When was that video?
24     A.   I think it was in April of 2020.  Maybe it
25 was May.

Page 69

1      Q.   At any point between April 2020 and
2  September 2020 -- or strike that.
3           At any point between April 2020 and prior to
4  September 14th, 2020, had anyone from Law Lab or
5  anywhere else -- anywhere else, to your knowledge,
6  gone onsite to speak to people in detention at Irwin
7  County Detention Center?
8           MR. TOBIN:  Object to the form.
9           THE WITNESS:  Yeah, the short answer
10     is I don't know.
11     Q.   (By Ms. Evans)  I think you told me earlier
12 that you weren't aware of any other effort like what
13 you were involved in with Law Lab going onsite at
14 Irwin County Detention Center; is that true?
15     A.   No, that's right.
16     Q.   So then between April 2020 and prior to
17 September 14th, 2020, neither Law Lab or anyone else
18 that you're aware of went to visit women at Irwin
19 County Detention Center; is that right?
20     A.   No, that's not right.  That's not what I've
21 said.  I've said I don't know.  And when you say an
22 effort like your effort, our effort was responsive to
23 the allegations of people, and those allegations came
24 out in September of 2020.  And so that's -- that was
25 the reason we were there.  That was the effort.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 70..73

Page 70

1    Q.   Between April 2020 and prior to
2  September 14th, 2020, were you involved with any group
3  that had gone onsite to visit women at Irwin County
4  Detention Center?
5    A.   Not that I know of.  I think it's possible
6  that Project South was onsite, but I don't think so.
7  I don't -- I don't know for sure.  I think it's
8  possible that SPLC had folks onsite because the
9  Southeast Immigrant Freedom Initiative had lawyers
10 representing folks and making Farihat requests.
11 Involved, yeah.  I mean, I'm -- I've been co-counsel
12 with SPLC in the southeast and Project South.  So
13 involved, but not involved on that particular project,
14 if that's your question and I think it is.
15   Q.   To your knowledge, had anyone from Law Lab
16 been onsite at Irwin County Detention Center between
17 April 2020 and prior to September 14th, 2020?
18   A.   I don't know.
19   Q.   At some point, do you recall reaching out to
20 individuals who were either members of Congress or
21 staff members of Congress regarding Irwin County
22 Detention Center?
23   A.   I do.
24   Q.   And when did that effort start?
25   A.   September 14th or 15th.

Page 71

1    Q.   And who was the first person that you
2  reached out to?
3    A.   I don't recall.
4    Q.   Did you reach out to any members of
5  Congress?
6    A.   Directly you mean or...
7    Q.   Yeah, we can start there.  Directly.
8    A.   Yeah, no, I don't -- I think I reached out
9  through staff.
10   Q.   Whose staff do you recall reaching out to?
11   A.   Representative Jayapal, Chairwoman Lofgren,
12 Senator Merkley, Congressman Cooper, Congressman
13 Johnson, Congressman Espaillat, Congresswoman
14 Ocasio-Cortez, Representative Jackson Lee.  And I'm
15 not time limiting this.  I'm kind of doing it over a
16 number of representatives with the Congressional
17 Hispanic Caucus.  So Representative Barragan,
18 Representative Gomez.  Those are staff interactions.
19 Representative Thompson as chair of the House
20 homeland, staff for House government oversight, staff
21 for House Homeland Approps.  It's Lucille
22 Roybal-Allard's committee, or was.  At some point,
23 Senators Ossoff and -- just Ossoff, I think, but that
24 was so far afterward.
25       I think you're just talking about September,

Page 72

1  October, that --
2    Q.   Sure.  That's fine.
3    A.   Yeah.
4    Q.   Do you know Joshua Breisblatt?
5    A.   I do.
6    Q.   What member of Congress does that person
7  work for?
8    A.   Right now, I'm not sure.  Zoe Lofgren would
9  have been Josh's boss, I think.
10   Q.   Did you have a relationship with Josh prior
11 to September 2020?
12   A.   I did.
13   Q.   And Lofgren is from where?
14   A.   California.
15   Q.   Do you recall speaking -- strike that.
16       Is it -- is Breisblatt -- am I saying it the
17 right way?
18   A.   Yes.
19   Q.   Did you speak with Mr. Breisblatt about
20 obtaining either halts or outright releases?
21   A.   Yeah.
22   Q.   And were you successful?
23   A.   Sort of.
24   Q.   What do you mean?
25   A.   They still deported people after ICE

Page 73

1  promised they wouldn't.
2    Q.   Did Congressperson Lofgren make requests to
3  stop deportations that you're aware of?
4    A.   I don't recall whether it was -- actually,
5  yes, she did.
6    Q.   Do you recall how many requests she made or
7  how many people?
8    A.   I don't think it was people at first.  I
9  think it was asking director of FAM -- or acting
10 director of FAM to commit to ICE honoring -- honoring
11 its own policy.  I know specifically about Ms. Binam.
12 That was, I think, the first one, but that was mostly
13 through Representative Jackson Lee.  And I think
14 Representative Jackson Lee and Chairwoman Lofgren had
15 a conversation after Representative Jackson Lee had to
16 pull Pauline off a plane that was on a tarmac in
17 Chicago, notwithstanding the assurances of the ICE
18 field staff in Texas.  And I think that was the
19 precipitating event for Representative Lofgren to
20 insist with ICE that they follow their policy.
21   Q.   When you say honoring its own policy, what
22 are you referring to?
23   A.   The 2011 victim women's plaintiffs' memo
24 that I referenced earlier.
25       THE WITNESS:  Are we at a good

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                    Pages 74..77

Page 74

1    stopping point for a break?
2         MS. EVANS:  Yeah, let's take a break,
3    and then we can come back --
4         THE WITNESS:  I just need to use the
5    restroom.
6         VIDEOGRAPHER:  This is the end of --
7    this is the end of Media 1.  The time is
8    11:12 a.m.  We're now off the record.
9         (A recess was taken.)
10        VIDEOGRAPHER:  This is the beginning
11   of Media 2.  The time is 11:24 a.m.  We're
12   back on the record.
13   Q.   (By Ms. Evans)  Mr. Free, do you recall at
14   some point that the women -- or strike that.
15        Do you recall at some point some group of
16   women -- I don't mean to say that it was every woman
17   at Irwin County Detention Center, but some group there
18   collectively voted about who was in most need of
19   release?
20   A.   I do.
21   Q.   Was Law Lab present for that?
22        MR. TOBIN:  Object to form.
23        THE WITNESS:  No.
24   Q.   (By Ms. Evans)  If you know.
25   A.   No.

Page 75

1    Q.   Did Law Lab -- or strike that.
2         Do you know how that effort came to be?
3    A.   The effort to sort of get people out or...
4    Q.   Let me ask another question.
5         Do you know how the women decided to vote on
6    who was in most need of release?
7         MS. MCNAMARA:  Objection to form.
8         THE WITNESS:  I'll tell you what, I'll
9    tell you why and not how because I don't
10   know how.  I don't know the -- okay?
11   Q.   (By Ms. Evans)  Sure.
12   A.   At some point they took the vote on the day
13   of a debate, the same day that then president said he
14   would not honor -- he would not commit to honoring the
15   results of the vote.  I recall that those things
16   happened the same day or at least I found out about
17   them the same day.
18        MR. TOBIN:  Are you referring to
19   President Trump?
20        THE WITNESS:  Yeah.
21        MR. TOBIN:  Sorry.
22   Q.   (By Ms. Evans)  It's okay.
23   A.   At some point it became clear that there was
24   not going to be support from the agency, OIG, DOJ,
25   Congress, to meet the demand to release people.  And

Page 76

1    then the question -- this is what we were talking
2    about earlier -- is, like, if you can't end the harm
3    by getting everyone out of the facility, then let's
4    think about how to mitigate harm.
5         And so the question was, in these
6    conversations, who is at most risk of serious harm if
7    they stayed.  And rather than us making that
8    determination as outsiders who weren't locked inside
9    the place, ultimately, what happened is that people
10   inside did so.  And I think that that was prompted by
11   us being asked by Congressional folks, Josh, maybe
12   Amin, other folks, who is most vulnerable right now;
13   which cases do you want us to elevate to the agency.
14        And so I think that that vote happened
15   because that question came to us as the
16   interlocutories with Congress.
17   Q.   And most vulnerable how?
18   A.   So there were folks with chronic conditions,
19   folks who were suffering injuries that they had
20   experienced because of guards at Irwin, at least one
21   person.  There were folks with serious mental health
22   conditions, and there were folks who were suffering
23   the lingering effects of the shots that they had been
24   given by Dr. Amin and other ongoing harms.
25        It was not just the non-consensual and basic

Page 77

1    gynecologic procedures for which there was no real
2    informed consent.  It was also that people were not
3    seeing medical treatment providers when they needed
4    it.  Folks who had -- I mean, dental was the big one.
5    It was folks who were suffering from teeth rotting out
6    of their mouths.  Because you could only -- only, it
7    seemed at the time, get a referral out to a
8    gynecologist, but these folks had other serious
9    medical concerns, particularly given COVID, asthma,
10   high blood pressure, diabetes.  It was back pain and
11   the injury, the herniated discs that Andrea suffered.
12        And so that was really the -- the thrust of
13   it is, like, who is most at risk of not surviving this
14   place or are suffering acute harm while they're here.
15   Let's identify those folks and get them to a place --
16   ultimately, what they -- what the women inside asked
17   for was a -- the freedom to heal in a place where
18   healing is possible.  And so if you're not going to do
19   it all at one time, we have to order it and -- or
20   structure it in a sequence, and the vote was about who
21   would be at the front of the line.
22   Q.   And when you said that the then president
23   was in a debate, are you talking about a presidential
24   debate?
25   A.   Yeah.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 78..81

Page 78

1    Q.   And he said that he would not honor -- or
2    strike that.
3            You said that he had said during that debate
4    that he would not honor the vote.  What are you
5    referring to?
6    A.   So it's a vague recollection, but I just
7    remember that they happened at the same time.  You
8    know, what -- I think he said something implying that
9    if the vote was rigged, then he wouldn't acknowledge
10   the legitimacy of the vote if he lost.  I think he was
11   asked a question, will you step down if you lose or
12   something like that.  I don't remember the exact
13   question.
14   Q.   You're talking --
15   A.   I just remember the impression of the leader
16   of the, quote/unquote, free world saying maybe the
17   people vote and maybe I honor it and maybe I don't,
18   and then the people who are locked inside this place
19   in the so-called free world saying, no, we're going to
20   vote and that's going to determine who is going to get
21   freed.
22           And I just remember having an impression
23   about that and sharing it with members of Congress,
24   because it was so disturbing that the president would
25   indicate a willingness not to honor the results of the

Page 79

1    democratic free and fair election, which, as the
2    district attorney announced last night, he didn't.
3    Q.   It's funny that we're talking about it
4    today.
5    A.   Yeah, today in Atlanta down the street.
6    Q.   I know.  Thank you.  I just wanted to make
7    sure I understood and I think I do.
8            You're not referring to the then president
9    referring to his unwillingness to potentially honor a
10   vote regarding something specific with regard to ICE?
11   A.   No.  That's correct.  It was just generally
12   American politics.
13   Q.   Right.
14   A.   Maybe you vote, maybe I leave, maybe I
15   don't.  And so it was just a juxtaposition that stays
16   with me to this day.
17   Q.   Understood.
18           I'm going to hand you, and I also have a
19   copy for your counsel and Ms. McNamara of a document
20   that I'm marking as Exhibit 124.
21           (Plaintiff's Exhibit 124 was marked
22         for identification.)
23           THE WITNESS:  I can take one and pass
24       it down if you want.
25           MR. TOBIN:  We're going do that from

Page 80

1    now on.
2            THE WITNESS:  You don't have to get
3    up.
4            MR. TOBIN:  Thank you for that.
5            MS. MCNAMARA:  Thank you.
6    Q.   (By Ms. Evans)  Exhibit 124 is a document
7    that was produced to us by your counsel.  It's an
8    e-mail from Joshua Breisblatt to you and Jennifer Chan
9    dated September 25th, 2020.
10           Do you recognize it as such?
11   A.   I do.
12   Q.   And Jennifer Chan also worked for
13   Congressperson Lofgren?
14   A.   I think Representative Jayapal was on the
15   House Judiciary immigration sub.  And Jennifer Chan
16   was Congresswoman Jayapal's legislative director, I
17   think.  I think she was on this committee.
18   Q.   The first e-mail on Exhibit 124 is the one
19   at the bottom, September 25th, 2020 at 8:20 a.m.
20           Do you see that?
21   A.   I do.
22   Q.   And this was you sending a list of nine
23   individuals identified by the women of ICDC as in most
24   desperate need of immediate release.
25           Do you see that?

Page 81

1    A.   I do.
2    Q.   And is this list the result of the vote that
3    we were discussing earlier by the women in Irwin
4    County Detention Center?
5    A.   It is.
6    Q.   Are any of these nine women identified here
7    in Exhibit 124, were they clients of yours?
8    A.   Yes.
9    Q.   All of them?
10   A.   Yes.
11   Q.   You told me about Andrea, who is No. 4
12   there, as having herniated discs; right?
13   A.   Yes.
14   Q.   Could you tell me what it was about -- is it
15   Ms. Valle?
16   A.   Valle Digna.
17   Q.   The first -- the first one then listed, yes.
18   What was her condition that -- that you believe had
19   her on the list of the most desperate in need of
20   immediate release?
21   A.   Yeah, I don't recall her exact condition.  I
22   do recall that the general consensus was she was
23   suffering on a daily basis and being denied the care
24   that she needed.  I want to say that it was a
25   combination of a couple of different conditions that

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                  Pages 82..85

Page 82

1  put her at an acute risk for dying if she got COVID.
2          And I also want to say that she was a
3  subject of the communal care that women inside were
4  providing to each other in the absence of effective
5  and timely medical treatment.  My recollection is that
6  several of these women had to be cared for by folks
7  inside the dorm because the other option, if you
8  sought treatment, including these specific folks, was
9  you had to sign something that said that if -- if you
10 want treatment, you need -- you're going to go to
11 solitary confinement.  It was medical isolation, but
12 it was a room by yourself so you were being
13 disconnected from all the people around who could care
14 for you and you were being put in a box by yourself
15 for an indeterminate period of time.
16         And if you said no to that, then you were
17 handed -- these women -- several of these women were
18 handed refusal to -- to accept treatment forms, which
19 was just basically dishonest, you know.  They're not
20 refusing to accept treatment.  They're saying, We
21 don't want to trade being in the general population
22 for getting medical treatment.
23         There was -- I can tell you about specific
24 instances of folks on this list to whom that happened
25 and -- and we documented it in real-time with members

Page 83

1  of Congress.
2      Q.   When you say that if women sought care they
3  were put into solitary confinement, are you referring
4  to if they sought treatment for COVID or anything?
5      A.   Anything.  So -- and anything is maybe too
6  broad, but the care that I'm aware of them seeking --
7  like, I don't know about anything-anything.  But I'm
8  thinking of a specific instance in which Angela Rojas
9  and Jennifer Moya Lopez, who were two women from the
10 Dominican Republic.  They had been interdicted by U.S.
11 forces going from the DR to Puerto Rico.  They had
12 been detained in Puerto Rico, and for reasons
13 unexplained, they were brought to Irwin, we think by
14 way of Guantanamo Bay.  They were then in prison
15 there, despite having already gotten an expedited
16 removal and accepting it weeks and I think maybe
17 months earlier.
18         And then they -- you know, Jennifer was
19 given -- she was sent to the doctor -- to Dr. Amin.
20 Either Jennifer or Angela had asthma, and there was a
21 night when women inside called the on-the-ground team,
22 the Law Lab team, and said she's having an asthma
23 attack and we are concerned that she's not going to be
24 able to breathe.
25         Asthma, as you know, is a COVID no-no.  It's

Page 84

1  a comorbidity that puts you at greater risk.  And in
2  response to that, she was handed a form by the call
3  nurse basically saying you're going to come with us to
4  this medical isolation area.  We're going to say that
5  you've refused treatment.
6          And just figuring out that form for
7  someone -- a person -- because it wasn't, as I recall,
8  in Spanish, was the first challenge.  She was
9  decompensating.  I'm asthmatic, so I grew up having
10 asthma attacks and feeling like I had to breathe
11 through a straw.  And the people inside were caring
12 for her.
13         Representative Espaillat, who is Dominican,
14 I believe spoke with the Dominican ambassador and
15 called the facility.  He or his staff called the
16 facility.  But he called personally at some point and
17 he was hung up on by the warden, Warden Paulk, or one
18 of his representatives.
19         He tried to get answers from ICE and they
20 assured Representative Espaillat that -- whether it
21 was Jennifer or Angela, I honestly can't remember at
22 this point, but that they were getting all the care
23 that they needed.  And when these women inside were
24 documenting in real-time, no, that's not what's
25 happening, we were able to push back.

Page 85

1          Ultimately, both Jennifer and Angela, and I
2  believe it was three other Dominican women, asked to
3  be deported.
4      Q.   So has Angela and Jennifer -- they're --
5  they're no longer in the United States?
6      A.   No.  They're in -- I don't know where they
7  are now, but they're not -- they -- they were
8  deported.
9      Q.   At their request?  I mean, I know -- I
10 understand what you're saying about the conditions,
11 but I'm trying to --
12     A.   Sure.
13     Q.   Let me just ask a question.  They're -- Ms.
14 Rojas and Ms. Lopez were -- were not able to stay in
15 the United States, not because their requests were
16 denied, but because they ultimately, for whatever
17 reason, requested to be sent back to their home
18 countries?
19     A.   Sort of.  I would say we were not able to
20 follow legal processes to their fruition because doing
21 that was contingent upon their continued detention and
22 that was a condition that they were simply unwilling
23 to accept.  They reached a point where they saw that
24 continuing to press the legal aspects of their claims
25 could kill them and it certainly would require

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                          Pages 86..89

Page 86

1   additional suffering for them. And so they asked to
2   be deported.
3        I mean, they didn't even ask to be brought
4   to Irwin. They were given expedited removal in Puerto
5   Rico. They could have just been brought back to the
6   Dominican Republic, but they ultimately instructed us
7   not to resist their removal or to take any other legal
8   action that would support their ability to stay and be
9   and remain in the United States and get care here.
10  And the ask that they asked us to convey to
11  Representative Espaillat and to the Dominican Embassy
12  and the ambassador row folks was please expedite us
13  getting out of here. And this is the part where
14  freedom to heal in a place where healing is possible,
15  they just concluded healing was not possible in the
16  United States.
17       Q.   You referred a moment ago to a form that
18  they had to fill out to get medical care that was not
19  in Spanish. Are you referring to a form at Irwin
20  County Detention Center?
21       A.   Yes.
22       Q.   And you said you can't recall whether it was
23  Ms. Rojas or Ms. Lopez who had asthma, but it was one
24  of those two.
25       A.   As I sit here today, I cannot recall whether

Page 87

1   it was Angela helping Jennifer or Jennifer helping
2   Angela. I'm leaning on the latter. Like, I think
3   it's Angela who was having the asthma attack, but I'm
4   not certain.
5        Q.   Do you recall what the -- strike that.
6             For the women -- strike that.
7             As between Ms. Rojas and Ms. Lopez, for the
8   woman who was not asthmatic, do you recall as between
9   those two women what the other condition was that put
10  them on the -- top nine list?
11       A.   I think they had each seen Dr. Amin. I
12  think each was suffering both physical and emotional
13  aftereffects of those visits. And I think each had
14  been detained for certainly longer than they wanted to
15  be, obviously, but they had been detained to the point
16  where their mental health and their ability to survive
17  or do the things you need to do to survive in custody
18  was depleted.
19       Q.   Ms. Perez was No. 2 on this list.
20       A.   Yeah. Blanca was another person's client as
21  I recall, so I was less involved in that one. I mean,
22  a primary immigration client is what I mean. So that
23  person had a pre-existing relationship with Blanca, I
24  think, and I don't remember which condition she was
25  suffering from.

Page 88

1        Q.   What about Ms. Santos?
2        A.   Yeah, Ms. Santos was sent to the facility
3   psychiatrist after refusing a surgery with Dr. Amin.
4   She said that she did not understand why she had to
5   have surgery. She said that she had seen other people
6   suffering after having come back from surgery. There
7   was a communal care process where people who had been
8   sent back from the Irwin County Hospital bleeding were
9   taking care of each other often because they had not
10  been given any sort of continuity of care medications.
11       Inna was the most vocal and fearless,
12  potentially with the exception of Andrea, among these
13  women. She was a person who was willing to stick her
14  neck out and have guards beat her up or lock her in a
15  room for two weeks in order to protect folks.
16       Inna was experiencing the aftereffects of
17  having had this man, in -- in her mind, give her a
18  gynecologic exam which was highly irregular, and then
19  send her to the facility psychiatrist who can put her
20  in solitary confinement if she says the wrong thing,
21  and it's her word against the psychiatrist's.
22       Inna testified to the Department of Justice
23  and DHS, OIJ, and maybe GBI, certainly the U.S.
24  Attorney's Office in a video hearing or video
25  testimony at the facility, and within six hours, she

Page 89

1   was removed in the middle of the night and put on a
2   plane and deported to El Salvador.
3        Q.   Is that where she is now?
4        A.   I don't know.
5        Q.   To your knowledge, she's not here in the
6   United States?
7        A.   Yeah, I don't know where she is.
8             So Inna, I think, was on this list not
9   because of the acuity of her -- her medical condition,
10  you know. I don't think she was on death's door like
11  Blanca or Digna. She was there because each of the
12  women who voted knew that she would not forget them
13  when she got out and that she would not rest until
14  they got out, too.
15       Q.   What about Ms. -- is it Dinges, No. 5?
16       A.   Shelley.
17       Q.   Shelley.
18       A.   Yeah, that was another attorney's client.
19  I'm trying to remember if Shelley was the U.S.
20  citizen. I think she might have been. I think she
21  was from the Philippines. I could be getting this
22  wrong because she wasn't my immigration client.
23            That might have been Alma. Yeah, I'm not --
24  I do not, as I sit here today, recall what her
25  condition was.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 90..93

Page 90

1    Q.   That's fine.
2    A.   I do recall that she was a person that, when
3  folks asked during visits who -- who is it that might
4  need a medical intervention or who is it that might
5  need to be prioritized to speak with people, to speak
6  with investigators or things like that, Shelley was
7  consistently mentioned.
8    Q.   No. 7, I don't --
9    A.   Sorry.
10    Q.   Yes.  Do you know what her condition was
11  that had her on this list?
12    A.   Not as I sit here today, no.
13    Q.   And what about Ms. Batan?
14    A.   Marcia Mendoza Batan.  So that's Sarah --
15  that was Sarah Owings' client.  That was probably why,
16  all things being equal, I got involved in the way that
17  I did, because Sarah had taken -- maybe at my
18  request -- I don't recall the time -- the actual
19  tick-tock of the thing, but Sarah had taken on this
20  case at the request of Immigrant Families Together,
21  which was a nonprofit that I did a lot of work with,
22  both on COVID advocacy and on family separation.
23  Immigrant Families Together was kind of formed around
24  family separation in 2018.
25              Marcia had been complaining of medical

Page 91

1  problems for the preceding several months before
2  September of 2020, and she had been told that she
3  needed surgery, gynecologic surgery or a gynecologic
4  procedure.  And she tried expressing to Sarah, I
5  didn't try to go to the gynecologist.  I needed
6  somebody for gastritis or a gastrointestinal problem.
7  She didn't know why she was sent -- when she asked for
8  problems with her stomach, why she was sent to
9  Dr. Amin, but that's where Irwin sent her.
10              Dr. Amin didn't ask her about her gastritis,
11  as far as I know.  He said, you know, I'm not that
12  kind of doctor.  And unlike basically every facility
13  in the country that I've ever dealt with where you
14  can't get an outside medical referral -- that's why a
15  lot of the folks that we work with had family members
16  die, beginning with Jean Jimenez at Stewart, is
17  because there was not an outside medical referral.
18              I know that both I and Sarah hold a lot of
19  guilt for not listening to Marcia over the summer.
20  And just assuming, well, if a doctor said you need a
21  surgery, then you probably need a surgery, you know.
22  Why would you -- why would you assume anything
23  different.  And it destroyed the, I think, trust for
24  not just us as advocates, but for a lot of other
25  immigration lawyers to have your client telling you

Page 92

1  there's this thing wrong, and then us saying, Eh,
2  we're talking about your immigration case.
3              She was suffering -- she was still suffering
4  the effects of this stomach issue while this was going
5  on, despite having been to Dr. Amin and told she
6  needed surgery.
7    Q.   The information that you have about
8  Ms. Batan --
9    A.   Uh-huh (affirmative).
10    Q.   -- was any of that told to you from
11  Ms. Batan or was it all through Ms. Owings?
12    A.   So I was in -- I'm not going to talk about
13  our conversations.  I would say that that's
14  privileged.  The information I just shared with you, I
15  think, was actually shared in a declaration with
16  the -- with the exception of, like, how Sarah felt
17  about it and the trust issues.  You know, but this
18  basic layout of the timeline, I think she actually
19  signed a declaration about that.
20    Q.   Have you ever spoken directly with
21  Ms. Batan?
22    A.   I have.  I mean, directly being on a video
23  link from -- you know, not in Irwin, but through --
24  through a screen.
25    Q.   Sure.  I just mean talking to her either on

Page 93

1  the phone, on the video --
2    A.   Yes.  Yes, I have.
3    Q.   Not necessarily limited to in person.
4    A.   Yeah, I have.
5    Q.   And did you prepare -- or strike that.
6              Did you work with Ms. Batan to prepare the
7  declaration that you referred to?
8    A.   Yes.
9    Q.   And was that as a result of her answering
10  questions that you had and then you typed it up and
11  she looked at it?
12    A.   So I want to be really clear.  I --
13              MR. TOBIN:  Only talk about the
14        process.
15              THE WITNESS:  Yeah.  Oh, yeah, I
16        worked with Ms. Owings to help her prepare
17        her client's declaration.  And really the
18        engagement or the -- the specific thing
19        that I worked on was, you know, you're
20        going to have an opportunity to speak with
21        federal investigators, and that was the
22        context in which I touched the declaration.
23              But Sarah was the primary person who
24        collected that information because she had
25        been representing her.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                           Pages 94..97

Page 94

1    Q.   (By Ms. Evans)  Have you had any
2  communications with the Georgia Composite Medical
3  Board regarding Dr. Amin?
4    A.   No.
5    Q.   Have you had any communications with the
6  Department of Justice regarding Dr. Amin?
7    A.   I have.
8    Q.   In person?
9    A.   No.
10   Q.   Video or Zoom?
11   A.   Yes.
12   Q.   Telephone?
13   A.   Yes.
14   Q.   How many total communications with DOJ have
15 you had?
16   A.   I don't know the total number.
17   Q.   More than one?
18   A.   Yes.
19   Q.   More than two?
20   A.   Yes.
21   Q.   More than three?
22   A.   Yes.
23   Q.   More than five?
24   A.   I'd say it's probably more than ten.  I'd
25 put them into a couple of categories, just kind of

Page 95

1  helping you through it.  There's some phone calls with
2  Kate Gilbert at DOJ Civil Rights.  First of those
3  phone calls I think happened on October 2nd.  That's
4  my son's birthday.  I remember that day.  We were
5  biking around in Piedmont Park and she called.
6       I subsequently had conversations about
7  witness preparation, like, getting witnesses who were
8  either locked inside Irwin or who had been released
9  from Irwin or who had been deported who might be
10 willing to speak with the DOJ.  So that's the Civil
11 Rights Division.
12       There was also some communication with I
13 believe it was Southern District.  I think the Middle
14 District was recused or eventually they were declared
15 to find themselves recused about specific interviews,
16 but I think that Ms. Gilbert led those conversations.
17 I don't think that those conversations happened with
18 other, like, AUSAs, you know, being the primaries.  I
19 think they were just on the communication chains.
20       And then the communications with DOJ who are
21 not Ms. Gilbert, AUSA, there were some folks in some
22 of these interviews with women that were being
23 conducted.  I think some folks were actually at the
24 facility with DOJ and FBI, potentially OIG, and then
25 some folks like Ms. Gilbert and others were on the

Page 96

1  Zoom and I was, too.  Or maybe it was Teams, you know,
2  a video communication.  That's what I recall.  But
3  those -- those would have been multiple e-mails.  I
4  don't know the number, but multiple phone calls.
5       After Irwin was being announced by Secretary
6  Mayorkas as being closed, Ms. Gilbert reached out to
7  me and asked if we wanted -- the DOJ wanted to restart
8  investigative interviews, which had stopped
9  essentially, if there were witnesses.  So who would be
10 available.  So that would have been, like, May of
11 2021, something like that.
12   Q.   And did interviews take place after
13 May 2021?
14   A.   I don't know.  I informed Ms. Gilbert that I
15 had taken a step back much earlier actually and that
16 she could speak with those folks' counsel.  So that's,
17 you know, the folks that they ultimately retained to
18 help, you know, file habeas cases and then file other
19 litigation and that's who they would need to speak
20 with.
21   Q.   When you say you had taken a step back, do
22 you mean from Irwin County Detention Center matters or
23 the law or --
24   A.   Specifically, Irwin County Detention Center.
25 I was in the throes of resolving a death matter in

Page 97

1  early 2021, doing depositions in February and
2  resolution in March, April.  And it was sort of
3  those -- those months that the burnout of Irwin really
4  started to become apparent to me.  And so, you know,
5  just in terms of, like, having so much going on.  It
6  was a big undertaking in September and October.
7    Q.   To your knowledge, how many women actually
8  had a hysterectomy performed by Dr. Amin who were at
9  Irwin County Detention Center?
10   A.   Two.
11   Q.   And who were those?
12   A.   Barbara and B.J.'s other client, I think.
13 I'm not sure who that person was, as I sit here today.
14   Q.   You mentioned earlier that there were women
15 who had said that they had hysterectomies and then it
16 turned out that they hadn't.  Do you recall that?
17   A.   Yes.  I think I said that they thought they
18 had hysterectomies, that that's what they understood
19 their procedure was.
20   Q.   How many women would you say fall into that
21 category?
22   A.   You know, in the early days, it was a lot.
23 I mean, it was more than half a dozen folks.  We can
24 talk about why I think that happened.  I think it's
25 been documented that sometimes Irwin staff were

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                Pages 98..101

Page 98

1  telling people they were going for a hysterectomy. I
2  don't think I documented that with the Senate.
3  Cystectomy sounds a lot like hysterectomy, and I think
4  if you're not given an interpreter in your
5  consultation with a gynecologist, if you're in chains,
6  if you've got a guard sitting next to you while
7  they're shoving a wand inside of you and you're not
8  given any paperwork in the language of, you know, your
9  fluency, it's tough to know what happened, especially
10 when there's basically no postop protocol where folks
11 are being given care after they're put under the
12 knife.
13        I should say he was the only gynecologist
14 who was regularly treating women at Irwin, and I do
15 know that either Warden Paulk or Dr. McMahan said
16 there were actually three who had hysterectomies, and
17 moreover, that there were six who were scheduled for
18 hysterectomies from 2017 to 2020 according to ICE and
19 that Amin was the doctor who, according to the ICE
20 records, was seeking those hysterectomies.
21        For context, there have only been 14 in the
22 total ICE system and he only saw 4 percent of the
23 female detained population and 6 percent of the
24 gynecological patients.  So on 6 percent of the
25 gynecological patients between 2017 and 2020, Irwin

Page 99

1  ICE records show that six hysterectomies had been
2  scheduled.
3        Some of those hysterectomies didn't happen
4  because folks got deported.  At least one didn't.  And
5  some of them hadn't because people refused.  I think
6  unsuccessfully attempting a surgery that a woman
7  didn't consent to, you know, I think it's misleading
8  to say, I only did two if the reason you only did two
9  is because people actually refused.
10      **Q.   There's no jury here, Mr. Free.  I've been**
11 **very -- I've been trying to be respectful and let you**
12 **tell me anything you want to tell me, but a lot of**
13 **this is not responsive to my questions and I am**
14 **limited in time.  So at some point, I am going to**
15 **start objecting as nonresponsive and -- and talk to**
16 **your counsel about cutting you off because I can't let**
17 **you just give a closing argument to a jury.**
18      MR. TOBIN:  And I object to your
19 instructions to my client.  He's trying to
20 answer your question.
21      MS. EVANS:  And I'm trying to be nice
22 about him not doing it.
23      MR. TOBIN:  He's completely doing his
24 best to answer.
25      MS. EVANS:  Well, he's -- I asked him

Page 100

1  a specific question and I got --
2      THE WITNESS:  I'm sorry.  I want to
3  make sure I do not do that again.  What was
4  the question you asked me so I can
5  understand?
6      MR. TOBIN:  Answer and let's move on
7  to the next question.
8      THE WITNESS:  I mean --
9      **Q.   (By Ms. Evans)  I think you answered my**
10 **question, and then you did a lot more than that.**
11      **Did you have any direct communication -- and**
12 **by direct communication, I mean either in person, on a**
13 **video discussion or on the phone -- with any woman who**
14 **told you that she thought she had a hysterectomy**
15 **performed on her?**
16      A.  Yes.
17      **Q.   For any of those women, did you ask them**
18 **whether they were still having their menstrual cycles?**
19      A.  I think that asking about menstruation was
20 within -- again, you're asking about my conversations
21 with my clients.  But I think that the -- I think that
22 that was within the set of questions that we asked.
23 We asked about bleeding.  Actually, let me just answer
24 your question.
25      I think so is my answer to your question.

Page 101

1      **Q.   And did any of those women tell you yes?**
2      A.  I don't recall.
3      **Q.   When Law Lab went onsite at Irwin County**
4  **Detention Center, do you know if they collected**
5  **information from the clients -- or strike that.**
6      **When Law Lab went onsite at Irwin County**
7  **Detention Center, do you know if they collected**
8  **information from women who were detained there in**
9  **writing?**
10      A.  I do.
11      **Q.   And -- and how did they do that?**
12      A.  How did they do what?
13      **Q.   Get information from the women in writing.**
14 **Did they have a form of some kind?**
15      A.  Yes.
16      **Q.   Did you help prepare that form?**
17      A.  I did.
18      (Plaintiff's Exhibit 125 was marked
19      for identification.)
20      **Q.   (By Ms. Evans)  I'm going to hand you and a**
21 **copy for your counsel and Ms. McNamara what I'm**
22 **marking as Exhibit 125.**
23      **Is Exhibit 125 an example of one of those**
24 **forms?**
25      A.  This is one example of forms that went to

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                   Pages 102..105

Page 102

1  women, but this happened a little bit later.  This was
2  a little bit farther out from September 14th to 25th
3  or something like that.
4      Q.   When did it happen?
5      A.   I would say early October, maybe late
6  Sep- -- late September, maybe early October.
7      Q.   But during the time period that Law Lab was
8  onsite at Irwin County Detention Center?
9      A.   Yes.
10     Q.   You can see about middle ways through the
11 page where it says, "You can also call" -- and then it
12 gives a phone number -- "to fill out this survey on
13 the phone if you are more comfortable."
14          Do you see that?
15     A.   I do.
16     Q.   Do you know where that phone number went to?
17     A.   I think the line above it says, "Call
18 Caitlin from the legal team at the same number."
19     Q.   And is Caitlin at Law Lab?
20     A.   No.
21     Q.   Where is she?
22     A.   Caitlin was a third-year law student at
23 Columbia.
24     Q.   When the women -- strike that.
25          If a woman who was at Irwin County Detention

Page 103

1  Center chose to fill this out as opposed to calling
2  the number, do you know if they filled it out with
3  representatives from Law Lab present or whether they
4  were filling it out on their own?
5      A.   I don't know.  I think I can actually -- my
6  answer to your question is I don't know.
7      Q.   Did you have any discussions with anyone at
8  Law Lab about how the process of filling out forms
9  happened or should have happened at Irwin County
10 Detention Center?
11          MR. TOBIN:  Do you have any -- I'm
12     just going to explore a privilege issue.
13          MS. EVANS:  Sure.  Sure.
14          MR. TOBIN:  Do you have any
15     information that you could share with her
16     that you did not learn outside of an
17     attorney-client context?
18          THE WITNESS:  No.
19          MR. TOBIN:  Okay.  Then on the basis
20     of that answer, I'm going to instruct him
21     not to answer your question.
22     Q.   (By Ms. Evans)  Do you have a -- or strike
23 that.
24          Did you -- and I'm going to see if I get the
25 same objection.  I don't know if I will.

Page 104

1          Did you have any conversations with
2  Mr. Prado regarding how the process would work for
3  women to fill out the forms?
4          MR. TOBIN:  Would you have the same
5     concerns if -- to that question,
6     attorney-client privilege?
7          THE WITNESS:  Conversations regarding,
8     yeah.
9          MR. TOBIN:  Okay.  On the same basis,
10    we're going to decline to answer your
11    question.
12     Q.   (By Ms. Evans) Is that on the basis of a --
13 some kind of joint defense agreement with Mr. Prado?
14     A.   So you -- you're asking me or you're asking
15 the legal basis or...
16     Q.   No, I'm asking you.  Did you have -- well,
17 let me ask a different question.
18          Do you have a joint defense or common
19 interest -- strike that.
20          Do you claim that you have a joint defense
21 or common interest privilege with Mr. Prado?
22     A.   I do.
23     Q.   And is that in writing?
24     A.   I think so.  I'm not positive.
25     Q.   If it's in writing, it would have been

Page 105

1  turned over to your counsel; right?
2      A.   Yes, if I had a copy of it.  It -- let me --
3  let me clarify one other thing that's not information
4  related to the representation.  Mr. Prado was also
5  working as a BIA accredited rep.  So it's a person
6  that's been authorized by the Department of Justice to
7  have privileged conversations with folks and was
8  working with Sarah and I to gather information from
9  folks inside.  So it's not solely on the basis of a
10 common interest or joint defense.  This is a person
11 who is working as a legal professional.
12          So what you're asking is for information
13 regarding how we were formulating a -- a legal
14 questionnaire, and I think I'm going to stand on the
15 objection or stand on the privilege and decline to
16 answer.
17     Q.   When you refer to him being a person
18 authorized by the Department of Justice, are you
19 talking about the Civil Rights Division?
20     A.   No.
21     Q.   What are you talking about?
22     A.   The Executive Office for Immigration Review.
23     Q.   But -- strike that.
24          Are you referring to something that existed
25 prior to September 14th, 2020?

**Page 106**

1    A.    Yes.

██████████████████████████████

██████████████████████

████████████████████

6    Q.    Was the 615 number a cell phone or a
7    landline or something else?
8    A.    It goes through a trunk, you know.  It's
9    like a -- you have a number and then you rope it
10   through a -- maybe Ring Central or Jive or whatever
11   the office phone system is.
12   Q.    And what about the 770 number?
13   A.    That's a cell phone.  It's my cell phone.
14   Q.    And the 844 number?
15   A.    That was the office phone.
16   Q.    Was?
17   A.    Yeah, I don't have a law office anymore.  I
18   don't practice.
19   Q.    That was in Nashville?
20   A.    Yeah.
21   Q.    The new bachelorette party capital of the
22   world, Nashville.  That's what I understand.
23         MR. TOBIN:  I was just there and can
24   bear witness to that.
25         MS. EVANS:  In their tiaras.

**Page 107**

1          MR. TOBIN:  Traipsing all over
2    Broadway in their tiaras.
3          THE WITNESS:  The Nashville scene
4    calls them woo girls.  That's the sound
5    that's coming from them.
6          MR. TOBIN:  Right.
7          MS. EVANS:  Nice.  "How I Met Your
8    Mother," that's what I always think of when
9    I hear woo girls.
10   Q.    (By Ms. Evans)  Okay.  On either -- or
11   strike that.
12   A.    Can I -- if you're at a stopping place and
13   I'm not going to break your train of thought, but I do
14   need to run to the restroom.  I drank water during the
15   last break.
16   Q.    Yeah, that's fine.  Take a quick break.
17         MR. TOBIN:  Take a quick five-minute
18   break.
19         THE WITNESS:  Yeah, it will be quick.
20         MS. EVANS:  Yeah.  Sure.
21         THE WITNESS:  Thanks.
22         VIDEOGRAPHER:  The time is 12:07 p.m.
23   We're now off the record.
24         (A recess was taken.)
25         VIDEOGRAPHER:  The time is 12:11 p.m.

**Page 108**

1    We're back on the record.
2    Q.    (By Ms. Evans)  I will represent to you that
3    there has been testimony in this case from Ms. Ainsley
4    that there were conversations with you either by her
5    or Mr. Soboroff on September 15th, 2020.  Would you
6    have any reason to believe that's not true?
7    A.    No.
8    Q.    Did you put Ms. Ainsley or Mr. Soboroff --
9    or strike that.
10         Do you recall putting individuals at MSNBC
11   into contact with other lawyers?
12         MS. MCNAMARA:  Objection to form; lack
13   of foundation.  They don't work for MSNBC,
14   Julia and Jacob.  That's why I'm objecting.
15   Q.    (By Ms. Evans)  Let me ask a different
16   question.
17         Do you recall putting individuals either at
18   NBCUniversal or NBC -- NBC News or MSNBC in touch with
19   other lawyers?
20   A.    I do.
21   Q.    What do you recall about that?
22   A.    I think that they wanted to speak with the
23   attorneys for specific women who had experiences with
24   Dr. Amin, and I think that I facilitated those
25   discussions happening, whether by giving them a

**Page 109**

1    telephone number.  I don't have specific recollection
2    of this, but I probably would have asked the lawyer
3    before giving the reporter their number if that was
4    okay, if they would be willing to talk to them just so
5    we don't waste everybody's time.
6          Like I said, I don't -- sitting here today,
7    I don't remember doing that, but I think I probably
8    would have.
9    Q.    Sitting here today, you don't recall if you
10   specifically asked for permission?
11         MR. TOBIN:  Permission from whom?
12         THE WITNESS:  What do you mean?
13   Q.    (By Ms. Evans)  I just want to -- I'm -- I'm
14   trying to clarify that sitting here today, you do
15   recall putting individuals at either MSNBC, NBC News
16   or NBCUniversal in touch with lawyers.  What you don't
17   recall specifically is whether you asked those lawyers
18   specifically whether you could share their numbers
19   before you did.
20   A.    No.  I said I think I probably would have,
21   but I don't have, like, independent recollection of --
22   recollection of a conversation where that happened.
23   So it's not that I don't recall.  I'm still
24   speculating and I'm telling you I don't have recall of
25   those conversations.  I'm just kind of -- again, and

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 110..113

Page 110

1  I'm answering the question that you didn't ask, so
2  I'll shut up.
3      Q.   No, it's fine.  Well, I -- no.  And I think
4  we're fine.  I just want to make sure I understand.
5          You're -- you're speculating.  You don't
6  have a specific recall of those conversations refers
7  to your conversations with the other attorneys, not
8  that you talked to representatives at MSNBC,
9  NBCUniversal or NBC News to put them in touch with the
10 attorneys.
11     A.   You're right.
12     Q.   Okay.  Thank you.
13          Do you recall -- or strike that.
14          I know earlier you said you couldn't
15 recall -- never mind.  Strike that.
16          Do you recall if you connected those other
17 attorneys to Julia or to Jacob?
18     A.   I don't recall one way or the other.
19     Q.   You think it was one of those two?
20     A.   I think it was probably Julia.
21     Q.   Did you ever have any conversations with
22 Julia Ainsley or Jacob Soboroff at the same time that
23 one of the other lawyers was on the line?
24     A.   Maybe.
25     Q.   Do you have any specific recollection of

Page 111

1  anything like that?
2      A.   No.
3      Q.   Which attorneys did you put into contact
4  with either Julia Ainsley or Jacob Soboroff?
5      A.   I can't give you an exhaustive list.  I can
6  tell you the ones I can remember sitting here today.
7  Sarah, Mr. Osorio, maybe Elizabeth Matherne, maybe
8  Kimberlee Payton Jones.  I think there are more, but I
9  cannot remember all of them.
10     Q.   Do you recall putting lawyers into contact
11 with Xander Price at some point?
12     A.   No.  I'm not saying it didn't happen.  I
13 just don't remember it.
14     Q.   Do you recall if he asked you to connect him
15 to other attorneys?
16     A.   No.
17     Q.   Did Ms. Ainsley ever ask you if she could
18 speak to any of your clients?
19     A.   I don't remember.
20     Q.   What about Mr. Soboroff?
21     A.   Don't remember.
22     Q.   What about Mr. Price?
23     A.   I don't remember.
24     Q.   Do you recall your conversation -- or strike
25 that.

Page 112

1          When you spoke to either Ms. Ainsley or
2  Mr. Soboroff on September 15th, 2020, did you insist
3  that your conversation with them be on background?
4      A.   Insist is a strong word.  The standard
5  conversation that I have with reporters is on
6  background.
7      Q.   Why is that?
8      A.   Because I'm in the practice of trying to
9  share information that people can report out as
10 opposed to trying to get quoted and, you know, soak up
11 the sort of attention that that happened -- you know,
12 happens to bring.
13     Q.   And what -- what kind of attention is that?
14     A.   I think that as a matter of, like, media
15 narrative and framing, there's a certain way you can
16 tell a story where the person who's at the center of
17 the harm is the person whose voice is coming out or
18 the person who is closest to the harm is the person
19 whose voice is coming out, and that has a certain
20 impact on the audience, has certain implications for
21 the reason you're telling the story.  And there's
22 another way to do it where attorney says, you know,
23 lawyers are the sole people providing the information,
24 and I prefer the first one.
25     Q.   Did you share any names of clients with

Page 113

1  Ms. Ainsley or Mr. Soboroff that you recall?
2      A.   I think so.
3      Q.   Who?
4      A.   During which period of time?
5      Q.   September 15th, 2020.
6      A.   Barbara, Marcia, Sarah's client.  Can't
7  recall when the engagement with Pauline began, whether
8  it was the 15th or later.  I definitely shared
9  Pauline's name, Pauline Binam.  Those are the ones
10 that I can remember right now.
11     Q.   You had a relationship with -- or strike
12 that.
13          You had worked with Julia -- both Julia
14 Ainsley and Jacob Soboroff prior to September 2020;
15 right?
16     A.   Yes.
17     Q.   And you knew they were affiliated with NBC;
18 is that right?
19     A.   I did.
20     Q.   And you know now and knew then that
21 Mr. Hayes was also affiliated with NBC?
22     A.   I did.
23     Q.   Do you recall at some point speaking with
24 Xander Price?
25     A.   Yes.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 114..117

Page 114

1    Q.  And you were put in touch with Mr. Price by
2    Mr. Hayes; is that right?
3    A.  I think so.
4    Q.  Did you ever tell Mr. Free that you --
5    you're Mr. Free -- strike that.
6        Did you ever tell Mr. Price that you had
7    been in contact with Julia Ainsley or Jacob Soboroff?
8    A.  I don't remember.
9    Q.  Any particular reason?
10   A.  That I don't remember?
11   Q.  Any particular reason -- well, if you don't
12   recall, I'll ask another question.
13       MR. TOBIN:  Thank you.
14   Q.  (By Ms. Evans)  Do you -- you recall having
15   a conversation at some point with Mr. Price; true?
16   A.  True.
17   Q.  And that was on September 16th, 2020?
18   A.  I don't know the date.
19   Q.  Have you ever seen a transcript of your call
20   with Mr. Price?
21   A.  I have not.
22   Q.  I'm sorry?
23   A.  I have not.
24   Q.  Have you ever had a transcript of your call
25   with Mr. Price -- or strike that.

Page 115

1        Are you aware that there is a transcript of
2    your call with Mr. Price?
3    A.  Based on the last question, I'd say yes.
4    Q.  Have you had -- ever had any portions of
5    that transcript read to you?
6        MR. TOBIN:  I'm going to instruct you
7        not to touch on anything you may have
8        discussed with your attorneys.  If you can
9        answer the question outside of that
10       attorney-client privilege setting, please
11       go ahead.
12       THE WITNESS:  Outside of the
13       attorney-client privilege setting, no.
14   Q.  (By Ms. Evans)  I just want to clarify for
15   the record.  You are raising the attorney-client
16   privilege as a reason not to answer the question about
17   whether you have ever had any portions of a transcript
18   of a call from you and Xander Price read to you; is
19   that right?
20       MR. TOBIN:  That's not entirely
21       accurate.
22       MS. EVANS:  Tell me where I'm wrong.
23       MR. TOBIN:  He is not going to answer
24       any question that would -- he is not going
25       to disclose any information that he may

Page 116

1    have learned during a conversation with his
2    counsel.  He's free to answer the question
3    outside of that context.  That was the
4    purpose for the instruction and that's the
5    basis for the objection.
6    Q.  (By Ms. Evans)  Can you answer the question
7    about whether you've ever had any portions of a
8    transcript of a call between you and Xander Price read
9    to you, without violating your attorney's instruction?
10   A.  I can answer it.  The answer is no, outside
11   of the context -- context of the attorney-client
12   privilege.
13   Q.  I'm going to hand you -- and a copy for your
14   counsel and Ms. McNamara -- what's been previously
15   marked as Exhibit 67.
16       MR. TOBIN:  Looks like it's a 35-page
17       document.  So if Ms. Evans is going to ask
18       you questions about it, I would suggest
19       that you read it.
20       THE WITNESS:  Is this separate from
21       the September 16th transcript that you're
22       referring to?
23   Q.  (By Ms. Evans)  I'm sorry?
24   A.  You said earlier there was a September 16th
25   transcript.

Page 117

1    Q.  Yeah.
2    A.  This is September 15th.  Is there something
3    different?
4    Q.  Oh, I'm sorry.  No.  That's right.  This
5    call was on September 15th, 2020.
6        MR. TOBIN:  Go ahead and review.
7    Q.  (By Ms. Evans)  I'm not aware of another
8    transcript.  I just misspoke on the date.
9        MR. TOBIN:  Appreciate that.
10       MS. EVANS:  The time is 12:23.  Your
11       client -- or strike that.
12       The witness wants to read this
13       transcript.
14       MR. TOBIN:  Well, I've advised the
15       witness to read the transcript.
16       MS. EVANS:  I'll note for the record
17       that it appears that the witness is
18       familiar with the transcript, but I will
19       indulge the request to read it.
20       MR. TOBIN:  Well, for the record, he
21       testified very clearly he's never seen the
22       transcript.
23       THE WITNESS:  Yeah, what's the
24       appearance --
25       MR. TOBIN:  It's my job, Andrew.  Let

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 118..121

Page 118

1    me do my job and --
2           MS. MCNAMARA:  Objection;
3    misrepresentation.
4           THE WITNESS:  Okay.
5       Q.  (By Ms. Evans)  Have you had a chance to
6    review Exhibit 67?
7       A.  I have.
8           MR. TOBIN:  For the record, it's
9    12:40.
10          MS. EVANS:  You took the words out of
11   my mouth.
12          MR. TOBIN:  I think there was a
13   question.
14          THE WITNESS:  What was it?
15      Q.  (By Ms. Evans)  No, I think you answered it.
16   I asked if you had a chance to look at Exhibit 67?
17      A.  I have.  Thank you.
18      Q.  And then Mr. Tobin took the words out of my
19   mouth when he said the time is 12:40.
20          Have you heard a -- strike that.
21          Have you heard an audio recording of what's
22   reflected in Exhibit 67?
23      A.  I have not.
24      Q.  I have, and I can represent to you that the
25   call was 33 minutes and 59 seconds.  I'll say

Page 119

1    34 minutes.  And it took you about half that time to
2    read it.
3           Do you see on the second page -- if you
4    could turn to the second page of Exhibit 67, please.
5       A.  Sure.
6       Q.  You see there on Line 23 where it starts, "I
7    can just."  Do you see that?  I just want to make sure
8    we're at the same place.
9       A.  The line that I'm seeing starts with "If you
10   should reach out."  I do see, "I can just do a" --
11      Q.  Yeah.
12      A.  Yeah, 23.  Yeah.
13      Q.  "I can just do a full brain dump and then we
14   can think about next steps in terms of story and
15   sourcing."
16          You see that?
17      A.  Yes.
18      Q.  And that was after referencing that you had
19   a relationship with Chris?
20      A.  Right.
21      Q.  And that's Chris Hayes?
22      A.  Yes.
23      Q.  Why not mention that you had spoken with
24   Julia Ainsley or Jacob Soboroff if you had spoken with
25   them?

Page 120

1           MR. TOBIN:  Object to form.
2           THE WITNESS:  Are you -- what do you
3    mean why not?
4       Q.  (By Ms. Evans)  I'm -- I'm asking you why
5    not.
6       A.  We talk -- we talk about Jacob later in the
7    transcript.
8       Q.  You talk about talking to him?
9       A.  You can read it yourself.  It says Jacob in
10   it.
11      Q.  What page?
12      A.  I think --
13          MR. TOBIN:  There's an index in the
14   back, if that helps you answer her
15   question.
16          THE WITNESS:  12 at Line 25 and 27 at
17   Line 24.
18      Q.  (By Ms. Evans)  If you can flip to Page 12.
19      A.  Okay.
20      Q.  Starting at the end of Line 24, do you see
21   where it says, "You know"?
22      A.  Yes.
23      Q.  And you can flip back to the prior page and
24   see that that is you talking.
25      A.  Yep.

Page 121

1       Q.  "You know and I think Jacob interviewed
2    Dawn."
3           Do you see that?
4       A.  Yes.
5       Q.  And that refers to Dawn Wooten?
6       A.  Yes.
7       Q.  Have you ever met Dawn Wooten?
8       A.  I have.
9       Q.  Have you ever spoken with her?
10      A.  I have.
11      Q.  How many times?
12      A.  I don't recall.
13      Q.  More than --
14      A.  More than once.
15      Q.  More than five?
16      A.  Probably not.
17      Q.  When did you talk to Dawn Wooten?
18      A.  During the September/October period of 2020.
19      Q.  Did she share with you any names of any
20   women who had been detained who claimed that they had
21   hysterectomies performed by Dr. Amin?
22      A.  Not that I can recall.
23      Q.  Did she share with you any names of any
24   women who had been detained at Irwin County Detention
25   Center who claimed they had heard of women having had

Page 122

1  hysterectomies performed on them by Dr. Amin?
2      A.   Not that I can recall.
3      Q.   Did you ask her those questions?
4      A.   No, that's not the context in which we were
5  having conversations.
6      Q.   Why were you talking to her?
7      A.   To prepare for the provision of testimony to
8  members of Congress.
9      Q.   Her testimony?
10     A.   Hers and the folks inside.
11     Q.   Any other reasons that you have spoken with
12  Ms. Wooten other than the provision of testimony to
13  members of Congress?
14     A.   And just generally regarding the
15  whistleblower allegations.  I don't have a specific
16  conversation in mind right now.
17     Q.   And during any of those conversations that
18  you had with Ms. Wooten regarding, in your words, the
19  whistleblower allegations, did she share with you the
20  names of any women who had been detained at Irwin
21  County Detention Center who had a hysterectomy
22  allegedly performed on them by Dr. Amin?
23     A.   I don't recall.
24     Q.   And during any of those conversations that
25  you had with Ms. Wooten regarding, in your words, the

Page 123

1  whistleblower allegations, did she share with you the
2  names of any women detained at Irwin County Detention
3  Center who told her that they had heard from other
4  women that they had hysterectomies performed on them
5  by Dr. Amin?
6      A.   Can you say that again?
7      Q.   Sure.  Because B.J. is awesome I can.
8          During any of the conversations that you had
9  with Ms. Wooten regarding, in your words,
10  whistleblower allegations, did she share with you the
11  names of any women detained at Irwin County Detention
12  Center who she says told her that they had heard from
13  other women who had hysterectomies performed on them
14  by Dr. Amin?
15     A.   If I understand that question, I think the
16  answer is no.
17     Q.   And -- well, let me -- I want to make
18  sure --
19     A.   At least I can't remember.
20     Q.   Yeah.  Is it your testimony that in your
21  conversation with Dr. -- strike that.
22          Is it your testimony that during your
23  conversations with Ms. Wooten regarding, in your
24  words, whistleblower allegations, you can't recall if
25  she shared the names of either women who claimed they

Page 124

1  had hysterectomies performed by Dr. Amin or had heard
2  of other women who had hysterectomies performed by
3  Dr. Amin?
4      A.   You're asking me my testimony is that I
5  don't recall?
6      Q.   Yes.
7      A.   That's my testimony.
8      Q.   Do you see on Page 27 -- if you could flip
9  there for me.
10     A.   Okay.  I'm there.
11     Q.   Do you see on Line 16 where you say, "I've
12  got some others who will go on the record"?
13     A.   Yes.
14     Q.   You say, "Ben has agreed."
15          Do you see that?
16     A.   Uh-huh (affirmative).  I do.
17     Q.   And that's Mr. Osorio?
18     A.   Yes.
19     Q.   And then Elizabeth Matherne?
20     A.   Yes.
21     Q.   And then you said you're going to send their
22  contacts to Mr. Price; right?
23     A.   Yes.
24     Q.   And then you said you were trying to get
25  Chris as many sources as you might; right?

Page 125

1      A.   Right.  I would suspect that if you listen
2  to the audio of this, just knowing my cadence, I think
3  that Line 19, it probably is, I'm not saying you have
4  to talk to them.  I don't think I would have said, I'm
5  saying you have to talk to them, but -- and there's
6  some other --
7          MR. TOBIN:  Actually, what it says
8  here is, I'm saying you have to take them.
9          THE WITNESS:  You have to take them.
10     And again -- but yeah, that -- I see it,
11     yes.
12     Q.   (By Ms. Evans)  And then on Page 27, also
13  that same page, on Line 23 and 24, you say -- it's
14  sort of a continuation of what's above -- "I was
15  trying to get Chris as many sources as you might want
16  to report it out because I wasn't sure what Jacob and
17  other people were doing."
18          Do you see that?
19     A.   Yep.
20     Q.   And what are you referring to there?
21     A.   I mean, at this point, I would be
22  speculating.  It's almost three years later.  I think
23  based on context, I wasn't sure what part of the story
24  Jacob was covering.
25     Q.   Were you aware at some point of an article

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 126..129

Page 126

1  that was put out by NBC News regarding Irwin County
2  Detention Center on September 15th, 2020.
3      A.   Yes.
4      Q.   Okay.  Were you -- did you get a copy of
5  that -- or strike that.
6           Did anyone alert you when that story went
7  public, to your knowledge?
8      A.   So you're talking about one story?
9      Q.   Yeah.
10     A.   I don't have an independent recollection of
11 which story you're talking about.  I was watching all
12 of the coverage about this just to make sure that I
13 can stay abreast of the situation.  Which -- is there
14 a specific one that you're talking about?  My answer
15 to your question is no.  Like, I don't remember.
16     Q.   Do you recall seeing a news article from NBC
17 News prior to speaking with Mr. Price on
18 September 15th, 2020?
19     A.   No, I don't have a recollection of that.
20     Q.   Did Mr. -- or strike that.  I can read the
21 transcript and know that.
22          I think if you look at the word index with
23 me, you can look for the word "Julia" and you won't
24 find it.  Do you agree with me?
25     A.   I mean, I don't know what's underneath that

Page 127

1  redaction, but I'm going to take your word for it that
2  doesn't say "Julia" in between "judgment and justice."
3  Although, that might be where "Julia" belongs.
4      Q.   And then if you go on Page 1 of the word
5  index.
6      A.   Okay.
7      Q.   Do you agree with me that you don't see the
8  word "Ainsley"?
9      A.   I do.
10     Q.   If you could flip over to Page 4.
11     A.   Yep.
12     Q.   Up at the top, you refer to a -- or strike
13 that.
14          Up at the top, you refer to Ms. Owings and a
15 client she had.
16     A.   Yep.
17     Q.   And on Line 9, you reference that this woman
18 has seen this doctor three times.
19     A.   Yes.
20     Q.   So "We've all confirmed it's the same
21 doctor."  Do you see that?
22     A.   Yes.
23     Q.   And what are you referring to there?  "We've
24 all" -- and -- and let me ask more specifically.  Who
25 is "we" and "it's the same doctor" as what other

Page 128

1  doctor?
2      A.   It's Mahendra Amin.  "We" would be me and
3  Sarah.  And I'm not sure, as I sit here today, who
4  else I was talking about when I made this statement to
5  Xander over three years ago.
6      Q.   Had you ever spoken to this client of
7  Ms. Owings that's referred to here?
8      A.   I don't remember the first time I spoke with
9  Marcia, whether it was before September 15th, after
10 September 15th.  I have spoken with her.  I don't
11 remember the sort of sequencing of these things.
12     Q.   And on Line 20, do you see where the
13 sentence starts "And then"?
14     A.   Yep.
15     Q.   "And then this Law & Crime thing comes out
16 and everybody was a little suspicious because the
17 sterilization is not in The Intercept piece from
18 yesterday."
19          Do you see that?
20     A.   I do.
21     Q.   What are you referring to there when you --
22 when you say "everyone was a little suspicious because
23 the sterilization is not in The Intercept piece"?
24     A.   I think The Intercept piece focused on
25 COVID, and there was a different angle that Law &

Page 129

1  Crime took.
2      Q.   And Law & Crime took the angle of what?
3      A.   Focusing on, you know, alleged --
4  allegations of hysterectomies and sterilizations.
5      Q.   Are those two things different in your mind?
6      A.   COVID and sterilizations?
7      Q.   No, hyster- --
8           MR. TOBIN:  Object to form.
9      Q.   (By Ms. Evans)  Hysterectomies and
10 sterilizations.
11     A.   So yeah, I mean, I think there's sterilizing
12 procedures -- I mean, now I know.  I didn't know all
13 the gynecological terminology.  I don't think I would
14 have known as well.  I think I had a basic working
15 knowledge, but I probably couldn't have differentiated
16 between oophorectomy and a salpingectomy.  But I
17 understand that all of those procedures can be
18 sterilizing potentially.
19     Q.   And so here when you're referring to
20 sterilizations, you're referring to hysterectomies?
21          MS. MCNAMARA:  Objection;
22     mischaracterization.
23          THE WITNESS:  That's not what I'm
24     saying.
25     Q.   (By Ms. Evans)  I know.  I'm asking you.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 130..133

Page 130

1     A.   You're asking me what I was referring to
2  then and I'm telling you I don't recall specifically
3  then what I'm referring to.  Now, I can tell you what
4  I understand this to mean; right?  But you're asking
5  me -- you're referring to -- I mean, that's me three
6  years ago; right?
7     Q.   Before you --
8     A.   Talked to you under oath.
9     Q.   Well, that's not my question, but thank you
10 for trying.
11    A.   You're welcome.
12    Q.   You said that you have come to, in your
13 words, understand that certain procedures can be
14 sterilizing, and that's different than what you
15 believed at the time of this phone call on
16 September 15th, 2020?
17    A.   I didn't say that.
18    Q.   So then it's the same, sterilizations is
19 hysterectomies?
20         MR. TOBIN:  Object to the form of the
21    question, mischaracterizes his testimony.
22    Q.   (By Ms. Evans)  Well, tell me how.  That's a
23 question.
24         MR. TOBIN:  What is the question,
25    please?

Page 131

1     Q.   (By Ms. Evans)  At the time of this call on
2  September 15th, 2020 when you're using the word
3  "sterilizations," you're referring to hysterectomies?
4     A.   I don't think so.
5     Q.   Based on what?
6     A.   Based on my understanding that there could
7  be sterilizing procedures.  I might not have known the
8  entire taxonomy of what those sterilizing procedures
9  could be, but you can chemically sterilize someone
10 without actually giving them a hysterectomy.  You can
11 do it through means other than removing a woman's
12 uterus.
13    Q.   But didn't you tell me you didn't know that
14 until after you got to know the terminology?
15         MR. TOBIN:  Objection;
16    mischaracterizes his testimony.
17         THE WITNESS:  I did not tell you that.
18    It's good we have people writing things
19    down.
20    Q.   (By Ms. Evans)  It is a good thing we have
21 people writing things down.
22         MR. TOBIN:  Just answer her question.
23    Q.   (By Ms. Evans)  I think it will support what
24 I'm saying you're telling me.
25    A.   Yeah, but you told me I didn't mention

Page 132

1  Jacob.  So you're misrepresenting what the transcript
2  says, and then telling me that I told you things that
3  I did not tell you, and I'm just calling that out so
4  that you understand that I see what's happening.
5     Q.   For the record, I said that you didn't
6  reference a conversation with Jacob and that turns out
7  to be true, but let me ask the question --
8     A.   Why did you --
9         MR. TOBIN:  I'm going to -- hey,
10    hey --
11    Q.   (By Ms. Evans)  Let your lawyer be the
12 lawyer and we'll all be able to get out of here at a
13 decent hour today.
14    A.   I'm happy to stay as long as it takes.
15         MR. TOBIN:  And -- and answer --
16    answer her questions, please.
17         MS. EVANS:  Noted.
18    Q.   (By Ms. Evans)  On Page 5, starting at
19 Line 7, do you see where it says "So in"?
20    A.   Yes.
21    Q.   And you can look back and see this is you
22 talking.  "So in the last 24 hours, I have heard from
23 five different immigration lawyers with multiple
24 clients who have either had hysterectomies for which
25 they did not get informed consent or who have medical

Page 133

1  battery accused by this physician."
2         Do you see that?
3     A.   I do.
4     Q.   Who are those five different immigration
5  lawyers?
6     A.   As sit here today, I don't recall.  I could
7  tell you who I think they are, but I am not sure.
8     Q.   Mr. Osorio?
9     A.   One.
10    Q.   Ms. Matherne?
11    A.   Yes.
12    Q.   Ms. Owings?
13    A.   Yes.
14    Q.   Are you including yourself in that number?
15    A.   No.  Ms. Klinke.
16    Q.   Ms. Klinke?
17    A.   Uh-huh (affirmative).
18    Q.   And Ms. Sharazi?
19    A.   I think Sarah had heard from Ms. Sharazi.
20 Sarah was meeting with Elizabeth as well.  I think
21 that there may have been more in that set.  I just
22 don't remember exactly when people got connected with
23 relation to this conversation, as I sit here today.
24    Q.   So when you say in this telephone call with
25 Mr. Price on September 15th of 2020 that you have

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                     Pages 134..137

Page 134

1    heard from five different immigration lawyers, it
2    really means that either you've heard from them or
3    others have heard from them and told you that they
4    heard from them; is that accurate?
5        A.   I think that's accurate.
6        Q.   But you didn't make that distinction with
7    Mr. Price?
8            MR. TOBIN:  Objection.  The transcript
9        speaks for itself.
10           THE WITNESS:  I mean, had I heard from
11       them?
12           MR. TOBIN:  Answer the question.
13           THE WITNESS:  I think I had.  I think
14       I heard from Elizabeth Matherne.  Did
15       Elizabeth Matherne speak directly to me?
16       You know, I don't remember the tick-tock.
17       I do not remember the, like,
18       second-by-second, moment-by-moment sequence
19       in which this happened.
20           So that's my answer.
21       Q.   (By Ms. Evans)  Do you know Ms. Sharazi?
22       A.   No.
23       Q.   Have you ever spoken with Ms. Sharazi
24    directly?
25       A.   I think she e-mailed me.

Page 135

1        Q.   That would have been this year; right?
2        A.   I think so.
3        Q.   Prior to this year, have you ever had any
4    direct communication, whether in person, on a video
5    screen, on a phone call or via e-mail or other
6    messaging service with Ms. Sharazi?
7        A.   I don't recall.
8        Q.   On Page 6, if you could flip there for me,
9    please.
10       A.   Uh-huh (affirmative).
11       Q.   On Line 17, you see where it says, "My
12    clients"?
13       A.   Yes.
14       Q.   And you can flip back and confirm this is
15    you talking.
16       A.   Yep.
17       Q.   "My clients, one of them is in" -- and I
18    think that just means one of them is in El Salvador.
19           Do you see that?
20       A.   I do.
21       Q.   And who does that refer to?
22       A.   That's the person -- the second person that
23    Ben came forward with.
24       Q.   And do you remember her name?
25       A.   I thought it was Claudia.  As I told you

Page 136

1    before, I cannot remember that second person's full
2    name.
3        Q.   Is it Maria?
4        A.   Maybe, yeah.  Maybe.
5        Q.   Do you recall that this client that's being
6    referred to here as being in El Salvador, it turns out
7    that that person never saw Dr. Amin?
8        A.   I didn't know.
9        Q.   No one ever told you that?
10       A.   No.
11       Q.   And --
12       A.   And I want to -- I don't know that it's
13    Maria.  So I didn't know the person's name so I can't
14    know that the person had not seen Dr. Amin.
15       Q.   And whether the person's name is Maria or
16    not, the person that you're referring to here that's
17    in El Salvador, have you ever heard that that person
18    did not see Dr. Amin?
19       A.   I don't think so, not that I can remember.
20       Q.   Then you see on Line 25 where you say, "The
21    other one"?
22       A.   Uh-huh (affirmative).
23       Q.   "The other one is in the United States."
24       A.   Right.
25       Q.   "She's in" -- and it's blacked out -- "and

Page 137

1    she's still in removal proceedings so we need to
2    anonymize these women so that they're not put at
3    risk."
4            Do you see that?
5        A.   That's right.
6        Q.   And that other one that you're referring to
7    there is Barbara Rua?
8        A.   Yes.
9        Q.   With regard to Tracie -- is it Klinke?
10       A.   Klinke.
11       Q.   Klinke.  Did you speak -- speak to her
12    directly or is that someone else that you heard about
13    from Ms. Owings?
14       A.   So to clarify, some of the calls that
15    Ms. Owings was having with people are on speakerphone,
16    and I have said again I do not remember those
17    individual conversations.  I have no recollection of
18    them as I sit here today or the sequence of them.  If
19    that changes, I'll let you know, but that's...
20       Q.   If you could flip over to Page 11.
21       A.   Yep.
22       Q.   Starting on Line 9.
23       A.   Uh-huh (affirmative).
24       Q.   You say, "I happen to, in a previous life,
25    live with an OB/GYN resident."

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                    Pages 138..141

Page 138

1    A.   Yep.
2    Q.   Who is that?
3    A.   Dr. Sarah Krantz.
4    Q.   How do you spell that last name?
5    A.   K-R-A-N-T-Z.
6    Q.   Sarah, S-A-R-A-H?
7    A.   Yep.
8    Q.   Where does she practice?
9    A.   Kenya, last time I heard.
10   Q.   Was she in Kenya in September of 2020?
11   A.   I don't know.
12   Q.   If you could flip to Page 16.
13   A.   Okay.
14   Q.   On Line 7, you say, "And so we've put an
15   outreach out and we've said, hey, do you know someone
16   or are you affected by this, and so far, since that
17   happened early this morning, we're looking at
18   something like 14 or 15 individuals that we've
19   identified."
20        Do you see that?
21   A.   I do.
22   Q.   Those identifications came to you how?
23   A.   A combination of ways, the -- the
24   discussions that we just talked about with Sarah,
25   discussions with SPLC.  On September 15th, I still

Page 139

1    think that we had sort of generalized identifications
2    rather than names, discussions with folks who had
3    reached out, like Ben.
4         I should mention Cat Hoyos, H-O-Y-O-S, who I
5    neglected to mention before.  Actually, Cat was one of
6    the five.  I know that for sure.  When you were asking
7    earlier about the five people, Yuridia's case was one
8    of the very first people and that was Cat Hoyos'
9    client.  And that's Yuridia Jamarioo Jamarillo,
10   J-A-M-A-R-I-L-L-O, Rocha, R-O-C-H-A.
11        I think Project South as well had been in
12   touch with Jaromy, with Wendy, potentially with some
13   other folks.  Those are the ones that I can recall in
14   this moment.  Kimberlee Payton Jones.  I'm sorry.  I
15   don't remember when we heard from Kimberlee.  That's
16   with an E-E.
17   Q.   Uh-huh (affirmative).
18   A.   I just don't remember the sequencing, like,
19   what time this call was and what date it -- you know.
20   Q.   Other than -- or strike that.
21        Did you have the names of any specific
22   clients -- or strike that.
23        Did you have the names of any specific women
24   that were included within this No. 14 or 15 that you
25   shared with Mr. Price on September 15th, 2020?

Page 140

1    A.   I did.
2    Q.   I -- I just didn't hear you.  Sorry.
3    A.   I did.
4    Q.   And what names were those?
5    A.   I don't remember.  I can tell you the ones
6    that I'm pretty sure they would have been in that
7    group.
8    Q.   Sure.
9    A.   So it's been Ben's two clients, Marcia,
10   Yuridia, Jaromy.  I'm trying to remember the names of
11   Elizabeth Matherne's clients who she had identified at
12   that point.  Maybe Shelley Dinges.  Yeah, I -- the
13   names and when those names came in, I'm not -- I don't
14   have recall on.
15   Q.   Let's at least nail down what you've just
16   told me.  So we got Ben's two clients?
17   A.   Yep.
18   Q.   Marcia?
19   A.   Uh-huh (affirmative).
20   Q.   What's Marcia's last name?
21   A.   Mendoza.
22   Q.   Can you spell that for us?
23   A.   Yeah.  It's M-E-N-D-O-Z-A.  Batan, B-A-T-A-N
24   is her second last name.  That's Sarah's one, the one
25   we talked about on the list of nine.

Page 141

1    Q.   Maria Mendoza Batan?
2    A.   Marcia.
3    Q.   Marcia.
4    A.   Yeah.
5    Q.   And then we've got Yuridia?
6    A.   Y-U-R-I-D-I-A.
7    Q.   Last name?
8    A.   Jamarioo, J-A-M-A-R-I-O-O, Rocha, R-O-C-H-A.
9    Q.   And then we've got -- is it Jaromy Navarro?
10   A.   Jaromy, yeah,
11   Q.   And you said maybe Shelley Dingus?
12   A.   For -- for Elizabeth Matherne.  I can't
13   remember when Elizabeth talked about Shelley.  I think
14   that there -- the ones that I can remember as having
15   been sort of immediate, like -- yeah, I'm not going to
16   speculate.  I think those are the ones that I'm sure
17   that as of this call, they were in that group of 14 or
18   15 names that I can remember, you know.
19   Q.   Okay.  If you can flip over to Page 19.
20   A.   Uh-huh (affirmative).
21   Q.   Starting on Line 15, you say, "Everything
22   I'm saying is based on either an immigration lawyer
23   telling me that their client had this happening and
24   they've seen the documents or I've seen the documents
25   myself."

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 142..145

```
1              Do you see that?
2      A.   I do.
3      Q.   What documents had you seen?
4      A.   Medical records.
5      Q.   Of who?
6      A.   I don't remember.  Certainly Marcia.  Well,
7  I don't even know if they all gave all of Marcia's
8  medical records at that point.  I mean -- I
9  don't know.  I know that we did get them and I know
10 that we had some of them.  I just don't remember,
11 like, identifying one to one as of September 15th when
12 I had this call.
13     Q.   And then how were you confident in saying
14 that any immigration lawyer that was telling you about
15 their clients had seen the documents?
16     A.   They told me they had seen them or they had
17 them already in their file from before.
18          And are you reading from something where I'm
19 saying I'm confident or you're just asking?
20     Q.   No.  I mean, I assume you wouldn't have said
21 that if you weren't confident.
22     A.   Yeah, no.  I just want to make sure.  Yeah.
23     Q.   I mean, is that right?  Is that a fair
24 assumption?
25     A.   Yeah.  Yeah.  I didn't see it in the quote
```

```
1  that you were reading.
2      Q.   On Page 20 on Line 3 --
3          MS. MCNAMARA:  Line what?
4          MS. EVANS:  I'm sorry?
5          MS. MCNAMARA:  Line what?
6          MR. TOBIN:  Line 3.
7          MS. EVANS:  Line 3.
8      Q.   (By Ms. Evans)  You say, "Okay.  Because
9  we're not going to win on anecdotes.  We've been
10 trying for ten years.  It didn't work."
11          Do you see that?
12     A.   I do.
13     Q.   What are you referring to there?
14     A.   Being able to identify a harm as it's
15 happening and have the government respond in a way
16 that not only halts the harm, but prevents it from
17 happening again.  Get people protected and ensure that
18 you don't have to protect them going forward.
19     Q.   I want to make sure I understand what you're
20 telling me.  You're saying that you had been trying
21 for ten years to identify a harm as it's happening and
22 have the government respond in a way that not only
23 halts the harm, but prevents it from happening again?
24     A.   (Witness nods head affirmatively.)
25          MR. TOBIN:  You have to answer out
```

```
1  loud.
2          THE WITNESS:  Yes.
3          Thanks.
4          MR. TOBIN:  Yep.
5      Q.   (By Ms. Evans)  On Page 25, on Line 16.
6      A.   Yes.
7      Q.   Line 16.
8      A.   I see it.
9      Q.   I'm just thinking about my question.
10          This is Mr. Price saying, "So this has been
11 going on for longer than just this administration,
12 then," question mark.
13          And then y'all had a connection issue, it
14 sounds like.
15     A.   Yeah.
16     Q.   And then you start talking again.  "This is
17 insane."  I think referring to the connection issues
18 because y'all had had a number of them.
19          You say, "But yeah, no, I need to triple
20 check the date."
21          Do you see that?
22     A.   I do.
23     Q.   And then you say, "Ben Osorio will be able
24 to say what year it was."
25     A.   Yes.
```

```
1      Q.   Did anyone ever follow up with you to find
2  out about the dates that y'all are questioning here on
3  Page 25?
4      A.   "Anyone," what do you mean?
5      Q.   Did Mr. Price ever follow up with you?
6      A.   I don't recall.
7      Q.   On Page 34, if you could go to Line 14.
8      A.   I'm there.
9      Q.   You say, "We're going to get more facts.
10 We're going to have more information.  I'll share that
11 information with you in, like, an open fire hydrant if
12 you want or I can just, when you ping me, I'll ping
13 you back."
14          Do you see that?
15     A.   I do.
16     Q.   Do you recall sending more information to
17 Mr. Price?
18     A.   Not specifically.  I think he may have been
19 moving to, like -- I think that there were other
20 producers involved, so I don't know if he was the only
21 one.  And I -- I don't have a recollection of sharing
22 anything further with him.
23     Q.   Before we take a break for lunch, could you
24 pull back up Exhibit 124?
25     A.   Sure.
```

Page 146

1    Q.   This was the e-mail we were discussing
2    earlier where you had identified nine individuals that
3    the women of ICDC saw as in most desperate need of
4    immediate release.
5    A.   Yeah.
6    Q.   Mr. Breisblatt had thanked you for the
7    information and had gone on to ask if it was possible
8    to get a one-sentence description on each of these --
9    these women.
10        Do you see that there?
11   A.   I do.
12   Q.   Did you ever provide any descriptions,
13   whether they were one sentence or otherwise, regarding
14   these women to Mr. Breisblatt?
15   A.   I don't recall.
16   Q.   Have you seen any evidence of that in your
17   review of documents?
18   A.   Yeah, I mean, the conversations with
19   Mr. Breisblatt and others in the House around this
20   group of folks kind of expanded, the universe
21   expanded.  And I think that the mode that information
22   was passed subsequent -- I mean, the dates, I think
23   that the 24th was the first time people actually
24   testified in front of a closed-door meeting of the
25   House.  I can't -- I cannot remember the specific

Page 147

1    dates on which we provided background briefings to
2    House and Senate members, but I do know that short
3    descriptions of people had been provided.  Yeah.
4    Q.   The closed-door meeting that you're
5    referring to was actually a Democratic House Caucus
6    meeting, right, it wasn't the whole House?
7    A.   Right.
8    Q.   Did you ever have a closed-door meeting with
9    the whole House?
10   A.   No.
11   Q.   A looking at Exhibit 124 and the list of
12   nine women, would you have been able to tell
13   Mr. Breisblatt in response to his question that all
14   nine of these women had been seen by Dr. Amin?
15   A.   I would not have been able to tell him that,
16   no.
17        MS. EVANS:  Can we take a break for
18   lunch?
19        MR. TOBIN:  Let's do it.
20        VIDEOGRAPHER:  This is the end of
21   Media 2.  The time is 1:15 p.m.  We're now
22   off the record.
23        (A lunch recess was taken at 1:15 p.m.
24   and the deposition reconvened at 1:51 p.m.)
25        VIDEOGRAPHER:  This is the beginning

Page 148

1    of Media 3.  The time is 1:51 p.m.  We're
2    back on the record.
3    Q.   (By Ms. Evans)  Mr. Free, I'm going to hand
4    you and your counsel with a copy for Ms. McNamara a
5    document that I've previously marked as Exhibit 68.
6    A.   Okay.  Thanks.
7    Q.   I understand from Mr. Price's deposition
8    that this Exhibit 68 reflects part of a text or Signal
9    exchange between you and him.
10        Do you agree?
11   A.   I don't know.  If you tell me this is
12   between me and Mr. Price --
13        MR. TOBIN:  Can -- can I just suggest
14   take a minute and read it.
15        THE WITNESS:  I did.
16        MR. TOBIN:  Oh, okay.  Never mind.
17        THE WITNESS:  It doesn't have the
18   sender on it, but there's no indication.
19   But if you tell me this is Mr. Price and me
20   communicating, then I'll take your word for
21   it.
22        MR. TOBIN:  We'll assume for purposes
23   of your question.
24        THE WITNESS:  Yeah.
25   Q.   (By Ms. Evans)  Okay.  Well, you see date on

Page 149

1    the text as September 15th, 2020?
2    A.   Yes.
3    Q.   And then you see there's a timestamp on the
4    first bubble on this text stream at 6:11 p.m.?
5    A.   I do.
6    Q.   And then the next text says, "Can we
7    characterize what you told me by saying tonight we
8    spoke with a lawyer who represents two women who had
9    this procedure done and tells us that as many as 15
10   women were given hysterectomies and that number is
11   growing?"
12        You see that?
13   A.   I do.
14   Q.   Does that support the conclusion that this
15   is a text exchange between you and Mr. Price?
16        MS. MCNAMARA:  Objection;
17   mischaracterization.
18        THE WITNESS:  You haven't said
19   anything -- like I said, I'm not disputing
20   it is, but none of this indicates that this
21   is Mr. Price.
22   Q.   (By Ms. Evans)  Okay.
23   A.   Other than what you've said and I take your
24   word for it.
25   Q.   Do you recall what time you spoke with

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                      Pages 150..153

<!-- Page 150 -->
Page 150

1   Mr. Price on September 15th, 2020?
2       A.  No.
3       Q.  I'm going to hand you and your counsel
4   what's been previously marked as Exhibit 64, and
5   there's a copy there for Ms. McNamara.
6           Andrew F. is you?
7       A.  I assume so.
8       Q.  Can you read what is in the bubble right
9   there under September 15th, 2020?
10      A.  I can.
11      Q.  Will you read it?
12      A.  I did.  Out loud?
13      Q.  Will you read it out loud, please?
14      A.  Sure.
15          "Hello.  My name is Xander Price.  I'm a
16  producer on Chris Hayes'" --
17      Q.  Hold on.  B.J. is an amazing woman, but just
18  remember she's trying to type as you read, so try to
19  read a little regular.  Yeah.
20      A.  Okay.
21          "Hello.  My name is Xander Price.  I'm a
22  producer on Chris Hayes' MSNBC show.  We are doing a
23  segment on the ICE whistleblower complaint tonight.
24  Chris said you might have relevant information on this
25  and I wanted to see if you have any time today to

<!-- Page 151 -->
Page 151

1   speak with me.  4:18 p.m."
2       Q.  Does that sound like an exchange that you
3   had with Xander Price on September 15th, 2020?
4       A.  It does.
5       Q.  I'm going to hand you and your counsel
6   what's been previously marked as Exhibit 65.  This is
7   a continuation of the messaging, which I think is by
8   Signal; is that right?
9       A.  That's what it looks like.
10      Q.  And you say, "Hi, Xander, want to get a call
11  at 5:30 East?"  Do you see that?
12      A.  Yes.
13      Q.  And then there's a little bit of exchange,
14  and then at the bottom you can see little phone icons.
15  Do you see that?
16      A.  Yes.
17      Q.  It looks like phone calls and then phone
18  calls again after perhaps calls dropped.  Is that what
19  it looks like to you?
20      A.  Yep.
21      Q.  You see the first phone call is at
22  5:30 p.m.?
23      A.  I do.
24      Q.  And it looks like the last callback is at
25  5:55 p.m.  Do you see that?

<!-- Page 152 -->
Page 152

1       A.  Yes.
2       Q.  I'm handing your counsel what's been
3   previously marked as Exhibit 60.  This is a
4   continuation of the message exchange.  Do you see
5   where it looks like you forwarded contact cards for
6   Elizabeth Matherne and Benjamin Osorio?
7       A.  I do.
8       Q.  And it looks like there was one more dropped
9   call and you called back at 6:01 p.m.?
10      A.  That's what it looks like.
11      Q.  Then Mr. Price asks whether everything you
12  told him was on record or on background.  Do you see
13  that?
14      A.  Yes.
15      Q.  And then you say "background"; right?
16      A.  I say, "Thanks for confirming.  Background."
17      Q.  You indicate to him that you want everything
18  you told him to be on background; right?
19      A.  Yes.
20      Q.  And then if you could pull back up
21  Exhibit 68.
22      A.  Okay.
23      Q.  You agree with me now that this is part of a
24  message exchange with you and Mr. Price?
25      A.  I do.

<!-- Page 153 -->
Page 153

1       Q.  He asks the question, "Can we characterize
2   what you told me by saying 'Tonight we spoke with a
3   lawyer who represents two women who had this procedure
4   done and tells us that as many as 15 women were given
5   hysterectomies and that number is growing.'"
6           Do you see that?
7       A.  I do.
8       Q.  And what is your response?
9       A.  "Not hysts," quote, "full or partial hysts
10  or other procedures for which no medical indication
11  existed."
12      Q.  And what do you mean by "partial hysts"?
13      A.  I don't know what I meant at the time.
14      Q.  What does that term mean to you?
15      A.  That there was a partial hysterectomy.
16      Q.  What does that mean?
17      A.  I think that it means there has been some
18  form of sterilizing procedure that affects the uterus,
19  potentially affects menstruation, potentially affects
20  the ability to procreate if they are young.
21          I think -- I'm guessing that's what I meant,
22  but that's what it means to me as I sit here today.
23      Q.  And where did you get that understanding?
24      A.  I don't know.
25      Q.  Was it from a medical professional?

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 154..157

Page 154

1    A.  I don't recall.
2    Q.  Was it from a lawyer?
3    A.  Like I said, I don't know where I got it, so
4  I can't tell you.
5    Q.  Well, I'm entitled to try to figure out if I
6  can refresh your recollection about where you heard it
7  from, so --
8       MR. TOBIN:  Answer her question.
9    Q.  (By Ms. Evans)  Not a doctor that you can
10  recall?
11   A.  I didn't say that.
12   Q.  Tell me -- well, let me ask -- just ask the
13  question again.
14      I asked where did you get that
15  understanding.  You said, "I don't know"; right?
16   A.  I cannot recall where I got that
17  understanding.
18   Q.  Well, you said, "I don't know."  Which --
19  what answer do you want to give?
20      MS. MCNAMARA:  Objection to the form.
21      THE WITNESS:  I cannot --
22      MR. TOBIN:  Join in the objection.
23      THE WITNESS:  I cannot recall.
24   Q.  (By Ms. Evans)  Did you get that
25  understanding from a medical professional?

Page 155

1    A.  Because I do not know where I got it, I
2  can't tell you whether I got it from a medical
3  professional.
4    Q.  Are you at least attempting to recall as I
5  ask you these questions?
6    A.  Yeah, I am.  If I -- if I knew, I'd tell
7  you.  I can't.
8    Q.  Did you get your understanding from a
9  lawyer?
10      MR. TOBIN:  Objection --
11      THE WITNESS:  Same answer I just gave.
12      MR. TOBIN:  -- asked and answered.
13   Q.  (By Ms. Evans)  I just didn't hear your
14  answer.
15   A.  Same answer I just gave you.
16   Q.  Which is that you can't recall?
17   A.  Yes.
18   Q.  Did you get that understanding from anyone
19  in the media?
20      MR. TOBIN:  Objection; asked and
21  answered.
22      Answer again.
23      THE WITNESS:  I'll give you the
24  answer.  I can't recall where I got this
25  understanding, so I don't know if it was a

Page 156

1  medical professional, lawyer, media; okay?
2    Q.  (By Ms. Evans)  Thank you.
3      Would it surprise you to learn that the term
4  "partial hysterectomy" is not a medical term?
5    A.  I'll take your representation that that's
6  true.
7    Q.  I'm going to hand you and your counsel
8  what's been previously marked as Exhibit 69.  This is
9  a continuation of the messaging between you and
10  Mr. Price.  Do you recognize it as such?
11   A.  Yes.
12   Q.  It looks like you're attaching a picture of
13  part of a medical record for Barbara Rua.  Do you see
14  that?
15   A.  I do.
16   Q.  And you say, "I'm be on the hook for one
17  hyst so far, and that's the one I can prove."
18      Do you see that?
19   A.  Right.
20   Q.  Those were your words?
21   A.  Yes.
22   Q.  And you're referring to Ms. Rua?
23   A.  Yes.
24      MS. MCNAMARA:  And for the record, I
25  note that the medical record refers to

Page 157

1  partial hysterectomy.
2      MR. TOBIN:  I'm sorry.  Which exhibit
3  are you looking at?
4      MS. MCNAMARA:  At Exhibit 69.
5      MR. TOBIN:  Thank you for that.
6    Q.  (By Ms. Evans)  If you can flip back for me
7  to Exhibit --
8    A.  Actually, let me refresh -- now that I
9  understand.  This is where I got that.
10   Q.  Got what?
11   A.  Where did you know -- where did you hear the
12  term "partial hyst."
13   Q.  You got it where?
14   A.  From this record.
15   Q.  What are you -- what is this?
16      MR. TOBIN:  What are you pointing to?
17      THE WITNESS:  Let me read it to you,
18  Exhibit 69, Page 145.  The plan is to
19  schedule for, per report, a partial
20  hysterectomy.  This is on Mahendra G. Amin,
21  M.D., Obstetrics and Gynecology, 1150
22  Kirkland Lane, Douglas, Georgia 31- -- I
23  can't remember the ZIP.  It's got his phone
24  number.
25   Q.  (By Ms. Evans)  The fact that you can read

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                              Pages 158..161

Page 158

1    that is surprising.
2        A.   Notes, patient had a D&C scope on --
3    pathology or biopsy came back abnormal.  I can't
4    really read the parens, something carcinoma NC2.  She
5    came in for a follow-up on and results and treatment
6    were discussed.  The plan is to schedule her for a
7    partial hysterectomy.
8        I guess --
9        Q.   What does it say right under that?
10       A.   "She understands and agrees to the
11   procedure.  Procedure will be inpatient."
12       She agreed to the procedure that you just
13   told me doesn't exist.
14       Q.   Okay.  We don't know who wrote that, do we?
15       MR. TOBIN:  We know whose letterhead
16   it's on.
17       THE WITNESS:  We know whose record it
18   is.
19       MR. TOBIN:  We know whose office it
20   came from.
21       MS. EVANS:  All right.  Score.  I
22   mean, I don't understand what the point of
23   this little cheer session is, and with --
24       MR. TOBIN:  Responding to your --
25       MS. EVANS:  -- Ms. -- Ms. McNamara's

Page 159

1    testifying -- I simply asked if he would be
2    surprised to learn that the term was not a
3    medical term.
4        THE WITNESS:  I am surprised because
5    your client said in the record that he --
6    would have had to review whether the -- you
7    know, to do this work that she was going to
8    get a partial hysterectomy.  It's unclear
9    to me how she would have agreed to a
10   procedure that doesn't exist.
11       Q.   (By Ms. Evans)  Could you pull up
12   Exhibit 67, please.
13       A.   I see it.
14       Q.   Could you flip to Page 16.
15       A.   I'm there.
16       Q.   Could you go to Line 9.
17       A.   I'm there.
18       Q.   And we looked at this a little bit earlier.
19   But you say here, "And so far, since that happened" --
20   well, strike that.
21       Starting on Line 7, you say, "And so we've
22   put an outreach out and we said, Hey, do you know
23   someone or are you affected by this?  And so far since
24   that happened early this morning, we're looking at
25   something like 14 or 15 individuals that we've

Page 160

1    identified."
2        Do you see that?
3        A.   I do.
4        Q.   What efforts did you take at the time of
5    this or at any time since to confirm whether those 14
6    or 15 individuals actually saw Dr. Amin?
7        A.   We asked his office for their records.  We
8    asked LaSalle for their records.  We asked the
9    attorneys who shared with us their clients'
10   experiences if they would get their clients'
11   permission to allow us to review those records.
12       I do need to go back and add another person
13   that I think we had information from.  That's Erin
14   Anderson -- or excuse me -- Erin Argueta, who is with
15   SPLC who didn't have a current retained client who was
16   an Amin patient, but who had complained in writing to
17   the warden in the past about Dr. Amin.
18       And so we sought to validate and
19   substantiate that they had seen him and that they had
20   been given treatment and that that treatment had been
21   received, what that treatment was.
22       Q.   And Erin is a lawyer?
23       A.   I think so.  I'm not positive.
24       Q.   Not a -- not a person who was detained at
25   Irwin County Detention Center.

Page 161

1        A.   That's right.
2        Q.   Okay.  So when you say you thought of one
3    more person, you're talking about one more person that
4    you could identify as the five lawyers you referred
5    to, not as someone you could -- you can identify as
6    one of the 14 or 15 individuals who were at Irwin
7    County Detention Center?
8        A.   No.  That's not correct.  Erin's is a
9    separate case that I just didn't recall earlier.  So
10   Erin Argueta had a client who was not represented in
11   the testimony I gave earlier.  Does that make sense?
12       Q.   Are you saying that Erin's client is part of
13   the 14 or 15 individuals?
14       A.   Yeah.
15       Q.   Okay.  But you don't know --
16       A.   But Erin is an additional -- I'm sorry, I
17   didn't mean to talk over you.
18       Q.   But you don't know Erin's client's name?  I
19   mean, I'm just asking --
20       A.   Not -- not sitting here today.
21       Q.   Right.
22       A.   No.
23       Q.   Okay.
24       A.   No.
25       Q.   And so then Erin Argueta is one of the

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                      Pages 162..165

1  lawyers that you were referring to when you talked to
2  Mr. Price about lawyers?
3      A.  She -- she very well could be, I think.
4  Yeah.
5      Q.  Okay.  So you said you reached out to
6  Dr. Amin's office for medical records.  Do you recall
7  telling me that just a moment ago?
8      A.  I do.
9      Q.  When did you do that?
10     A.  I know Sarah -- and by "I," I think I need
11 to be really clear that this was a team effort.  I do
12 not have an independent recollection of calling
13 Dr. Amin's office.  I think we helped try and figure
14 out did -- what kind of HIPAA forms did he need.  Did
15 he have his own HIPAA form that he would honor; did he
16 need a clearance from ICE to get the records.
17         So that was -- when I'm saying I reached
18 out, part of it is a federal regulation that prevents
19 you, if you're involved in the detention of
20 non-citizens, from releasing information on those
21 non-citizens.  It's 8 CFR 236.6.  And so trying to
22 understand what would it be that we could ask his
23 office and LaSalle and the Irwin County Hospital or
24 any other hospital that would get these records.
25 That's just sort of a clarification.

1          I think that that outreach started happening
2  on the 14th, like, after people talked to each other
3  and realized same doctor, same pattern.  I know that
4  it was an ongoing effort of the team.  There were
5  faxes that were being sent to the normal medical
6  records request fax number.  I know Mr. Osorio was
7  seeking to shore up the records that, you know, his
8  clients were able to provide by speaking both with
9  their family members and with their care provider and
10 there were other efforts underway.  So that's what I
11 meant.
12     Q.  Your testimony is that you were in the
13 process of September 15th of reaching out or your team
14 reaching out to Dr. Amin's office to obtain copies of
15 medical records?
16     A.  As far as I can recall.
17     Q.  And also you were already in the process of
18 reaching out, your team was, of reaching out to Irwin
19 County Hospital for medical records?
20     A.  My team would be the -- like, not
21 possessive, but the group of us who were trying to
22 respond to this report, people were reaching out to
23 Irwin County Hospital as well.  What we were getting
24 back from both ICE and LaSalle was, You're not -- we
25 don't have those records.  You're going to have to

1  talk to the outside care provider.
2      Q.  And when you -- strike that.
3          Did you eventually get records from Irwin
4  County Hospital?
5      A.  We did.
6      Q.  When did you get those?
7      A.  I don't remember.
8      Q.  Did you share those with anyone at NBC News,
9  NBCUniversal or MSNBC?
10     A.  I think so, but it wouldn't have been in the
11 September 15th time period.
12     Q.  Would it have been in September of 2020?
13     A.  I think so, but I'm not sure.
14     Q.  And whatever records you have, you would
15 have shared with your counsel?
16         MR. TOBIN:  Object to the form of the
17     question.
18     Q.  (By Ms. Evans)  What was the answer?
19     A.  Correct.
20     Q.  Do you recall speaking to a reporter at
21 Univision named Teresa Rodriguez at some point,
22 communicating with her?
23     A.  At some point, yes.
24     Q.  Did she ultimately write a story regarding
25 Irwin County Detention Center?

1      A.  You know, I was thinking of Tiffany Roberts,
2  who was Telemundo.  I do not remember Teresa
3  Rodriguez's conversation.
4          (Plaintiff's Exhibit 126 was marked
5      for identification.)
6      Q.  (By Ms. Evans)  I'm going to hand you and
7  your counsel with a copy for Ms. McNamara a document
8  I'm marking as Exhibit 126.
9          MR. TOBIN:  Since it's a multipage
10     document, take a minute and read it,
11     please.
12     Q.  (By Ms. Evans)  By -- strike that.  Strike
13 that.
14         By multipage document, Mr. Tobin means a
15 two-and-a-half-page e-mail.  But please, Mr. Free,
16 take all the time you need to read Exhibit 126.
17         MR. TOBIN:  Technically, there were
18     three pages, but I won't argue with your
19     characterization.
20         MS. EVANS:  There's only text on two
21     and a half.
22         MR. TOBIN:  I understand.  I didn't
23     say multipage document -- I didn't
24     characterize the text and I'm going to stop
25     talking now.

MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC
Andrew Free on 08/15/2023                                    Pages 166..169

Page 166

1        THE WITNESS:  Okay.
2    Q.   (By Ms. Evans)  Have you had a chance to
3   review Exhibit 126?
4    A.   I have.
5    Q.   Exhibit 126 is an e-mail text stream
6   produced to us by your counsel.  At the top, it
7   reflects an e-mail exchange between you and Teresa
8   Rodriguez with Christine Chen copied, September 30th,
9   2020.
10       Do you see that?
11   A.   I do.
12   Q.   Does this refresh -- refresh your
13  recollection as to whether you, at some point,
14  communicated with Teresa Rodriguez at Univision --
15   A.   It does.
16   Q.   -- regarding ICDC?
17   A.   Sorry.  It does.
18   Q.   Do you know if Ms. Rodriguez ended up doing
19  a story regarding Irwin County Detention Center?
20   A.   No, I don't.
21   Q.   Have you seen one?
22   A.   No, or at least I don't remember if I have.
23   Q.   Back on Exhibit 126 for just a second.  Do
24  you see the last page of the exhibit, it shows that
25  Ms. Rodriguez e-mailed you on September 18th, 2020?

Page 167

1    A.   I do.
2    Q.   And she was expressing interest in speaking
3   with some of the women from Irwin County Detention
4   Center; is that right?
5    A.   Yes.
6    Q.   I'm sorry?
7    A.   Yes.
8    Q.   And then you, looks like four days later,
9   put her in contact with some of the attorneys with
10  clients who were detained at Irwin County Detention
11  Center.
12   A.   That's what it looks like.
13   Q.   And then up on the front page of
14  Exhibit 126, on September 30th, you had connected
15  Ms. Rodriguez with Christine Chen?
16   A.   That's right.
17   Q.   Who is Christine Chen?
18   A.   I think she was a comms professional who was
19  working with the Justice Action Center to try and
20  handle some of the inquiries like this so that we
21  could do more of the documentation work.
22       (Plaintiff's Exhibit 127 was marked
23    for identification.)
24   Q.   (By Ms. Evans)  I'm going to hand you and
25  your counsel with a copy for Ms. McNamara a document

Page 168

1   I've marked as Exhibit 127.  Do you want to take a
2   moment and look at this one-page document?
3        MR. TOBIN:  One-page document.
4        THE WITNESS:  Yes, please.
5        MS. MCNAMARA:  Actually, I think it
6    goes over to the second page --
7        MS. EVANS:  Well, there is a -- an
8    address line on the second page.  You are
9    correct.
10       MS. MCNAMARA:  Okay.
11       THE WITNESS:  Okay.
12   Q.   (By Ms. Evans)  Exhibit 127 is a document
13  produced to us by your counsel, more of the exchange
14  between you and Ms. Rodriguez.  This one dated
15  September 23rd, 2020.  Do you see that?
16   A.   I do.
17   Q.   And if you could look back just briefly at
18  Exhibit 126 while we -- I just want to go through the
19  timeline here.
20       Ms. Rodriguez reaches out to you on
21  September 18th, 2020; true?
22   A.   That's true.
23   Q.   And then on September 22nd, she's been
24  connected to some of the other attorneys; right?
25   A.   That's what it looks like.  Yes.

Page 169

1    Q.   And then Exhibit 127 reflects that on
2   September 23rd, 2020, Ms. Rodriguez sends you an
3   e-mail at the bottom that says, "This is disgusting,"
4   three explanation points.  "So horrific."
5        Do you see that?
6    A.   I do.
7    Q.   Do you know what it was that she was
8   referring to there?  Is there, like, a specific event
9   that happened?
10   A.   I don't.
11   Q.   And then you write her back and say,
12  "Teresa, because I have a good sense from our phone
13  call of who you are as a person, I'm going to just put
14  this out there.  You don't have to do this."
15       Do you see that?
16   A.   I do.
17   Q.   Did you have a phone call with
18  Ms. Rodriguez?
19   A.   I don't remember it, but it seems like I
20  did.
21   Q.   Do you have any recollection of the
22  substance of that phone call?
23   A.   I don't.
24   Q.   Okay.  And then would you -- well, I'll --
25  I'll just read.  You see where it says, "The stuff

MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC
Andrew Free on 08/15/2023                                    Pages 170..173

Page 170

1   we're going to show you, if you do this work, is going
2   to leave you hollowed out a little.  There's no
3   unseeing or unhearing what we're going to show you.
4   It's the absolute depth of humanity in its evil.  It's
5   worse than simple mass killings because the women are
6   left to live with the emotional death visited upon
7   them by this torture."
8         Do you see that?
9   A.   I do.
10    Q.   What are you talking about there?
11    A.   What your client did and what the system at
12  Irwin did to them, what we as citizens allowed to
13  happen and continue to allow to happen.
14    Q.   Did you share this warning or admonition,
15  whatever you would call it, with anyone at NBC News,
16  NBCUniversal or MSNBC?
17         MR. TOBIN:  Object to the form.
18         THE WITNESS:  I think that by
19         September 23rd, when it looks like I wrote
20         this, I think I had actually spoken and
21         taken detailed testimony from many, many
22         more people, women, and looked at records.
23         So I have no recollection of sharing my
24         response to what your client had done
25         before I had done that.  I don't think I

Page 171

1   did.
2     Q.   (By Ms. Evans)  Do you see in response,
3   about four lines down from the bottom of
4   Ms. Rodriguez's response to you, where the word
5   "unfortunately" appears?  Do you see that?
6     A.   Where?
7     Q.   Four lines up.
8     A.   "Unfortunately I will need some
9   documentation as far as far as their testimonies are
10  concerned"?
11    Q.   Yeah.  Could you just read that whole
12  sentence, "Unfortunately..."
13    A.   Sure.  You didn't want me to read the part
14  below, though.
15    Q.   I didn't want you to read what?
16    A.   "There's no unseeing or unhearing what we're
17  going to show you.  It's the absolute depth of
18  humanity in its evil.  It's worse than simple mass
19  killings because women are left to live with the
20  emotional death visited upon them by this torture,"
21  that part.
22         The part you wanted me to read was,
23  "Unfortunately I will need some documentation as far
24  as their testimonies are concerned as per our
25  attorneys, but I am ready for the challenge and most

Page 172

1   importantly to give these women a voice.  They deserve
2   to be heard and given the same rights as anyone else.
3   There is a reason I reached out to you.  We will make
4   this happen."
5     Q.   And did you share documentation with
6   Ms. Rodriguez?
7     A.   I don't recall.
8     Q.   Isn't it true that you couldn't share
9   documentation with Ms. Rodriguez to support the
10  allegation that there was forced mass hysterectomies
11  on women at Irwin County Detention Center because you
12  only knew of, at most, two hysterectomies?
13         MR. TOBIN:  Object to the form of the
14         question.
15         MS. MCNAMARA:  Objection to the form.
16         MR. TOBIN:  Okay.  Answer as best you
17         can.
18         THE WITNESS:  So was she asking for
19         that?
20    Q.   (By Ms. Evans)  I'm asking.  Is that why you
21  didn't respond to her is because you could not support
22  the allegations of mass hysterectomies at Irwin County
23  Detention Center?
24    A.   I see any --
25         MS. MCNAMARA:  Objection; lack of

Page 173

1   foundation.
2          MR. TOBIN:  I join the objection.
3          THE WITNESS:  -- what these folks
4          said, and show me where you're talking
5          about that's what I couldn't show her.
6     Q.   (By Ms. Evans)  I'm asking you.  Well, let
7   me just ask you the question --
8     A.   Because here, what you're doing is you're
9   saying that I didn't provide something that she had
10  asked me for without showing me where she asks me for
11  it.
12    Q.   Let me ask a new question.
13         Do you agree that Ms. Rodriguez is asking
14  you for documentation as far as the testimonies of the
15  women of Irwin County Detention Center?
16    A.   I do.
17    Q.   Did you send her any documentation?
18    A.   I do not recall.
19    Q.   Do you have -- have you seen anything that
20  leads you to believe that you led -- strike that.
21         Have you seen anything to lead you to
22  believe that you provided even a single shred of
23  documentation that was requested by Mrs. Rodriguez?
24    A.   I don't remember.
25    Q.   Don't you think you would remember something

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 174..177

Page 174

1  like that?
2          MR. TOBIN:  Object to form.
3          THE WITNESS:  Something like what?
4      Q.  (By Ms. Evans)  Whether you sent
5  documentation to a woman that was clearly very
6  passionate about the issue and wanted to share the
7  stories of these women that she wanted to give a voice
8  to and that I think you wanted to give a voice to.
9          MR. TOBIN:  Object to form.
10         THE WITNESS:  So yeah, since you've
11     asked, I mean, she was one among truly
12     dozens of reporters from all over the
13     country who wanted to tell these stories
14     and who wanted to do it from the
15     perspective of people inside and who wanted
16     to do it in a time-driven way.
17         We are, in that moment, the time from
18     the 14th to the 23rd when I send this,
19     drinking in the lived experiences of this
20     population and trying to document them as
21     we are also trying to deal with the
22     emotional responses of the women to being
23     retraumatized by having to tell these
24     stories, to having to deal with the fear of
25     being retaliated against for telling these

Page 175

1      stories, to having to deal with the fear of
2      being disappeared like many other people
3      who had told these stories.  And we were
4      trying to tamp down misinformation so that
5      the press would get it right.
6          And I was not capable of doing all of
7      that at the same time for the more than 60
8      people that he saw and who -- I mean,
9      40-something surgeries, Depo-Provera shots,
10     94 percent of the ICE population, and that
11     is what we were living into.
12         So no, I don't think that I would
13     remember that is the answer to your
14     question.  The context of that horror that
15     I described and the lived experiences of
16     having to take on what your client was
17     doing, lay back, open your legs; I don't
18     understand what's happening to me.  Be
19     quiet, was what was in the Senate report.
20     While you're in chains, while a guard is
21     sitting there.  Yuridia having been
22     separated from her children, six children
23     born here in Georgia.
24     Q.  (By Ms. Evans)  Are you claiming that
25  Dr. Amin separated any patient from their children?

Page 176

1      A.  I was not finished with my answer.
2      Q.  Well, it's not -- it's nonresponsive.  So
3  I --
4          MR. TOBIN:  He's -- he's entitled to
5      finish his answer.
6          MS. EVANS:  No, it's not -- we're way
7      beyond the answer to my question and I'm
8      going to put an end to this.  I'm going to
9      ask a new question.
10         THE WITNESS:  You -- okay.  I was -- I
11     thought that I was answering --
12     Q.  (By Ms. Evans)  I said I'm going to ask a
13  new question.
14         MR. TOBIN:  Please with don't yell at
15     my client.
16         THE WITNESS:  Yeah.
17         MS. EVANS:  Well, I am sick of -- of
18     the closing arguments over here.  It --
19     none of that is even supported by the
20     evidence in this case, but --
21         THE WITNESS:  Which part?
22         MS. EVANS:  Oh, my gosh.
23         THE WITNESS:  There's a Senate report.
24     It's 108 pages long.
25         MR. TOBIN:  Andrew -- Andrew, I'm

Page 177

1      going to --
2          THE WITNESS:  Everything that I just
3      said has paper.
4          MR. TOBIN:  Andrew, you can answer the
5      question.
6      Q.  (By Ms. Evans)  Can you pull up Exhibit 126?
7      A.  It's right here.
8      Q.  Do you see on September 30th, Ms. Rodriguez
9  reaches out to you again saying that she looks forward
10 to working on a story?
11     A.  I do.
12     Q.  Do you recall sending any information to
13 Ms. Rodriguez after this additional follow-up that she
14 did seven days later?
15     A.  I do not.  Because in the e-mail below, I
16     put her in touch with Christine Chen who was going to
17     help take care of -- take some of the comm stuff off
18     my plate and work with you in connecting and
19     scheduling a time with the women of Irwin.
20     Q.  Do you know if Ms. Chen did that?
21     A.  I do not.
22         I think I would like to take five minutes if
23     that's okay.
24     Q.  Sure.
25     A.  Thanks.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                           Pages 178..181

Page 178

1      MR. TOBIN:  Go off the record.
2      VIDEOGRAPHER:  The time is 2:27 p.m.
3   We're now off the record.
4      (A recess was taken.)
5      VIDEOGRAPHER:  The time is 2:34 p.m.
6   We're back on the record.
7      MR. TOBIN:  Stacey, I don't know if
8   you heard, but we're back on the record.
9      MS. EVANS:  Yeah.  I'm just trying to
10   look at something and I can't find it.
11   Q.   (By Ms. Evans)  Mr. Free, who is Adam
12  Snyder?
13   A.   He's a Human South lawyer in Chicago.
14   Q.   Is he a doctor?
15   A.   No.
16   Q.   Did he arrange for the medical review team?
17   A.   What do you mean?
18   Q.   At some point, was there a medical review
19  team of doctors that was assembled to look at certain
20  medical records?
21   A.   Yes.
22   Q.   Was Mr. Snyder the one who put that team
23  together?
24   A.   Yes.
25   Q.   Did you work with Mr. Snyder on that

Page 179

1   project?
2   A.   Yes.
3   Q.   What was your role vis-à-vis Mr. Snyder's?
4   A.   What do you mean?
5   Q.   How did y'all work together to do this?
6   A.   What do you mean?
7   Q.   Did you contact Mr. Snyder or did he contact
8   you and say, I want to put together this medical
9   review team?
10   A.   Neither.
11   Q.   Tell me how the medical review team came to
12  be.
13   A.   Mr. Snyder reached out to me by -- I want to
14  say e-mail in the wake of the whistleblower
15  allegations indicating this is his specialty, and in
16  addition to his practice, he also had the All Good
17  Foundation, which would be available to help academic
18  medical specialists to review records if that were
19  needed.
20   Q.   And I presume you said, Let's do it, or
21  something to that effect.
22   A.   Is there a question?
23   Q.   Did --
24      MR. TOBIN:  Could you rephrase the
25   question?

Page 180

1      MS. EVANS:  Sure.
2   Q.   (By Ms. Evans)  Mr. Free, did you tell
3   Mr. Snyder that you didn't want him to help in any
4   way?
5   A.   No.
6   Q.   Did you tell him that you wanted him to
7   help?
8   A.   Yes.
9   Q.   And that you -- did you ultimately lead to
10  this medical review team, that conversation?
11   A.   Yes.
12   Q.   And how did Mr. Snyder -- or strike that.
13      Did Mr. Snyder provide medical records to
14  the medical review team?
15   A.   Yes.
16   Q.   Did Mr. Snyder -- strike that.
17      How did Mr. Snyder get the medical records
18  that he provided to the medical review team?
19   A.   From us.
20   Q.   And "from us," you mean who?
21   A.   The people who were working with your
22  client's victims.
23   Q.   Is that lawyers, people?
24   A.   Some of them.
25   Q.   So it included you; right?

Page 181

1   A.   Right.
2   Q.   It included Ms. Matherne?
3   A.   I don't know who all of the people who
4   provided records were.  I was a point of contact.  I
5   gathered the records that Mr. Snyder provided to the
6   medical review team.  I think he arranged for a
7   digital Dropbox where we could share them, and he also
8   made it known that if other women or their counsel
9   wanted to add or just have their records reviewed,
10  that his firm would send prepaid FedEx and HIPAA
11  waivers to the right -- relevant providers.
12   Q.   Do you know if that second option was
13  utilized?
14   A.   I think so.  I'm not sure.
15   Q.   Did you provide -- or strike that.
16      Is it your understanding that you provided
17  the bulk of the medical records that were reviewed by
18  the medical review team?
19   A.   Yes.
20   Q.   Were some of the records that were reviewed
21  by the medical review team of women who were not at
22  some point detained at Irwin County Detention Center?
23   A.   Can you restate --
24      MR. TOBIN:  Object to the form.
25      THE WITNESS:  Can you restate the

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                Pages 182..185

Page 182

1    question, please.
2        Q.   (By Ms. Evans)  Is it your understanding
3    that the medical review team looked at records for
4    some women who were not at some point detained at
5    Irwin County Detention Center?
6        A.   No.
7        Q.   Is it your understanding that the medical
8    review team looked at 19 -- or strike that.
9             Is it your understanding that the medical
10   review team looked at medical records for 19 women?
11       A.   Something like that.
12       Q.   And is it your understanding that every
13   single one of the women for whom their medical records
14   were reviewed by the medical review team had been
15   detained at Irwin County Detention Center?
16       A.   Yes.
17       Q.   Was the -- or strike that.
18            Were the results of the medical review
19   team's work ultimately shared with Congress?
20       A.   Yes.
21       Q.   Did you provide that information to
22   Congress?
23       A.   Yes.
24       Q.   Do you know a reporter with the Wall Street
25   Journal named Michelle Hackman?

Page 183

1        A.   I do.
2        Q.   How do you know Ms. Hackman?
3        A.   She's a reporter with the Wall Street
4    Journal.  I've spoken with her in that capacity.
5        Q.   Did you know her prior to September 14th,
6    2020?
7        A.   Yes.
8        Q.   Had you worked with her on other immigration
9    stories?
10       A.   Yes.
11            (Plaintiff's Exhibit 128 was marked
12        for identification.)
13       Q.   (By Ms. Evans)  I'm going to hand you and
14   your counsel what I've marked as Exhibit 128.  There's
15   a copy for your counsel and for Ms. McNamara.
16            MR. TOBIN:  Thank you.
17       Q.   (By Ms. Evans)  I will represent for the
18   record that Exhibit 128 is somewhat of a compilation
19   exhibit, but not too much.
20            The -- the first e-mail, September 18th,
21   2020, where Ms. Hackman reaches out to you, you
22   respond and it sounds like y'all have a phone call,
23   and then it looks like you forwarded her some
24   documents.
25            Actually, this is not a compilation.  I

Page 184

1    think this is exactly how it was.  I'm thinking of
2    something else.  So strike everything I just said.
3            Take a moment and review Exhibit 128 and
4    then I have some questions for you.
5        A.   I'm ready.
6            MS. MCNAMARA:  This is the actual
7        original.  So we should maybe exchange.
8            MR. TOBIN:  Andrew, would you hand Liz
9        your copy and let her give you the one that
10       she has.
11           MS. MCNAMARA:  Thank you.
12       Q.   (By Ms. Evans)  Did you at some point have a
13   telephone conversation with Ms. Hackman in response to
14   her reaching out to you on September 18th, 2020?
15       A.   I don't remember, but I think so.
16       Q.   Does this e-mail reflect that that's what
17   occurred?
18       A.   Where?
19       Q.   Where she says she just tried calling you.
20       A.   The e-mail does not reflect that that
21   occurred.
22       Q.   Do you see in the middle of the page where
23   you told Michelle that you just tried to call her on
24   September 18th, 2020?
25       A.   I do.

Page 185

1        Q.   Do you know if she called you back?
2        A.   No, not as I sit here today.
3        Q.   Do you see that later on September 18th,
4    2020 -- strike that.
5            Do you see that 17 minutes after you told
6    Michelle that you just tried to call her that you
7    forwarded her four documents as reflected in
8    Exhibit 128?
9        A.   Yes.
10       Q.   Does that lead you to believe that perhaps
11   you talked to her and that this was sent in follow-up
12   to that phone conversation?
13           MR. TOBIN:  Object to form; asked and
14       answered.
15           THE WITNESS:  It's possible.
16       Q.   (By Ms. Evans)  What is reflected in the
17   second page of Exhibit 128, Bates-labeled Free 1255?
18       A.   What do you mean?
19       Q.   What is this information that I'm looking at
20   here?
21       A.   These are medical referrals in ICE detention
22   centers during 2018 and '19.
23       Q.   Where did the information that is reflected
24   in Page 2 of Exhibit 128 come from?
25       A.   Data is publicly available from

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 186..189

Page 186

1   ice.gov/facility-inspections.
2       Q.    Is it your testimony that the bar graph at
3   the bottom of Page 2 of Exhibit 128 was obtained
4   from -- directly from the ICE website that you just
5   read?
6       A.    No, it is not.
7       Q.    Does it reflect -- strike that.
8             Does the bar graph at the bottom of Page 2
9   of Exhibit 128 reflect a compilation of information
10  available on the ICE website?
11      A.    Yes.
12      Q.    Did you compile that information?
13      A.    Yes.
14      Q.    Did you create this bar chart?
15      A.    I think so.
16      Q.    Is this a PowerPoint slide of some kind?
17      A.    No.
18      Q.    What is it?
19      A.    What do you mean what is it?
20      Q.    I mean, what format -- this isn't -- this
21  doesn't look like a Word document, or is it?  I mean,
22  what -- I'm just asking what is the format of this
23  document.  If I were to be looking at it in electronic
24  format, what it would -- would it look like?
25      A.    This is a screenshot.  It's an image, .img

Page 187

1   or .jpeg, and I think that the screenshot that it came
2   from was the top, kind of the preface to this data.  I
3   think the data came out of spreadsheets that the data
4   from the ICE website had been entered into.  So I
5   think the top one and the very last one may have been,
6   like, a slide.  So not PowerPoint but, like, Google
7   slide or something.  I don't --
8       Q.    If you could flip --
9       A.    I don't know.
10      Q.    If you could flip to the next page of
11  Exhibit 128.
12      A.    I'm there.
13      Q.    Is the information -- or strike that.
14            Is the bar graph at the top of the third
15  page of Exhibit 128 a compilation of data obtained
16  from the ICE website?
17      A.    Yes.
18      Q.    Did you compile that data?
19      A.    I worked with a team of folks to compile it,
20  yes.
21      Q.    Who was the team?
22      A.    Some volunteers from Georgia Tech's IT.  I
23  honestly couldn't tell you who they are.  Somebody
24  reached out and said, We'd like to help; how can we
25  help.

Page 188

1       Q.    Is that also true for the page that we
2   looked at before this?
3       A.    Yes.
4       Q.    Would the same thing be true for the line
5   graph at the bottom of this page?
6       A.    Yes.
7       Q.    And by this page, I mean the one
8   Bates-numbered Free 1256.
9       A.    Yes.
10      Q.    Is it also true that you and some volunteers
11  from Georgia Tech's IT department compiled data
12  available on the ICE website to create the line graph
13  appearing on the page labeled 1257 of Exhibit 128?
14      A.    No.
15            And if I said it was from Georgia Tech's IT
16  department, I misspoke.  These were IT folks who -- or
17  tech folks who go -- who had some affiliation with
18  Georgia Tech.  There was no formal Georgia Tech
19  association.  So I do not want my testimony reflecting
20  that's what I said.
21      Q.    Understood and I appreciate it.  I'll ask
22  one more time just to make clear.
23            Is it true that you and some volunteers who
24  were students at Georgia Tech --
25      A.    Either students or grad students.  I'm not

Page 189

1   sure.
2       Q.    Okay.  Let me try again.
3             Is it true that you and some volunteer
4   students from Georgia Tech compiled data available on
5   the ICE website to create the line graphs reflected in
6   Exhibit 128 on the page Bates-numbered 1257?
7       A.    Or grad students.  I don't know who actually
8   scraped the data from each inspection report, but I
9   do -- do know that that Georgia Tech contact was my
10  contact.
11      Q.    Was it one or multiple?
12      A.    I think it was just one person on e-mail.
13      Q.    Who is that?
14      A.    I don't remember.
15      Q.    The last page of Exhibit 128 is titled "Open
16  questions/to do."
17            Do you see that?
18      A.    I do.
19      Q.    Is this something that you created?
20      A.    I think so.
21      Q.    What was the purpose?
22      A.    To identify the questions that were left
23  open by this preliminary data scrape.
24      Q.    And who were these -- or strike that.
25            Who -- strike that.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 190..193

Page 190

1           Were you hoping that someone would ask these
2    questions?
3        A.   Yes.
4        Q.   Who were you hoping would ask these
5    questions?
6        A.   Anybody with the ability to get the answers.
7        Q.   Did you share these questions with Congress?
8        A.   I think so.
9        Q.   Did you share the charts that are reflected
10   in Exhibit 128 with Congress?
11       A.   I don't recall.
12       Q.   Do you think you did?
13       A.   Probably.
14           MR. TOBIN:  Object to the form.
15       Q.   (By Ms. Evans)  Did you ever talk with any
16   Congressional staffer about how to compile information
17   similar to what you and the person from Georgia Tech
18   did as reflected in Exhibit 128?
19       A.   Yes.
20       Q.   Who?
21       A.   That I can recall, Meeran Ahn, who is on
22   Senator Ossoff's staff.  It's M-E-E-R-A-N, A-N-H or
23   H-N.  I'm not sure.  Bob Joachim, J-O-A-C-H-I-M.  He's
24   with Representative or Chairwoman at the time
25   Roybal-Allard's office, and then also Appropriations

Page 191

1    Homeland subcommittee.
2        Q.   Who was the Congress --
3        A.   I wasn't finished.
4        Q.   Well, I -- I know, but we're -- we're
5    getting a bad record --
6        A.   I'm not finished with my answer.
7        Q.   I need --
8        A.   If you'd just let me finish my answer, I'd
9    appreciate it.
10           Josh Breisblatt, maybe not the data but
11   certainly the questions to ask.  I think we shared it
12   with the Congressional Hispanic Caucus chief of staff.
13   I also shared it with Congressman Cooper's -- I don't
14   know if he's his chief of staff or LD, Jimmy -- in
15   advance of a call that Congressman Cooper had with
16   OIG.  I believe we shared it with Hank Johnson's
17   staff, at least some of this information.  Certainly
18   Representative Jayapal, certainly Senator Merkley's
19   staff.  And that's all I can remember right now.  May
20   be more.
21       Q.   Who is the second congressperson that you
22   mentioned?  It was Bob someone?
23       A.   It's not a congressperson.  It's a staffer.
24   Bob Joachim, J-O-A-H -- excuse me -- J-O-A-C-H-I-M.
25   He worked for Representative, Chairwoman at the time,

Page 192

1    Lucille Roybal-Allard, who was the chair of the House
2    Appropriations Homeland subcommittee.
3        Q.   Can you please say that name again slowly
4    and spell it?
5        A.   For the third time, Bob, B-O-B,
6    J-O-A-C-H-I-M.
7           MR. TOBIN:  Is that the name you
8        wanted or did you want the Congressperson?
9           MS. EVANS:  No, I want the name of the
10       Congressperson.
11           MR. TOBIN:  Andrew, the
12       Congressperson.
13           THE WITNESS:  Lucille, L-U-C-I-L-L-E,
14       Roybal, R-O-Y-B-A-L, hyphen, Allard,
15       A-L-L-A-R-D.
16       Q.   (By Ms. Evans)  Did you share with Michelle
17   Hackman at the Wall Street Journal how to compile
18   information similar to what you did with the Georgia
19   Tech person?
20       A.   I did.
21       Q.   Why did you do that?
22       A.   Because I believed that anecdotal or even
23   one-off incidences and testimonies from women would
24   not be nearly as persuasive as the data.  I believed
25   that if the data supported Dr. Amin being an outlier,

Page 193

1    in terms of procedures performed, in terms of patients
2    seen, in terms of complaints received, that this would
3    corroborate some of the stories of the women against
4    folks who would say that what they have said is not
5    true.
6           I believed that in a -- an intimate setting
7    where it's his word against theirs, he would always
8    win, and the only way that they could corroborate the
9    treatment that they were receiving would be if
10   sufficient data were mustered that would corroborate a
11   pattern.
12           And so I believe that Michelle, I believe,
13   had previously been at AP and had recently
14   transitioned to the Journal at the time that I spoke
15   with her was the sort of person who could do that, not
16   at least because it's a money story.  The med PARS,
17   medical payment authorization request system, or
18   whatever it is, was a thing that I thought maybe media
19   would be willing to file a FOIA for, and we simply did
20   not have the capacity to do that operating as we were
21   on volunteer.
22       Q.   If you'll look back at Exhibit 128 for me
23   quickly.  I just want to confirm that you sent the
24   charts that you compiled with the Georgia Tech person
25   to Ms. Hackman; right?

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 194..197

Page 194

1    A.   I don't understand.
2    Q.   Am I right that Exhibit 128 reflects that
3  you shared the charts that you prepared with the
4  Georgia Tech graduate student or student using
5  information obtained from the ICE website?
6    A.   I think so.  It says "attachments" and then
7  has these pages behind it, so I think it kind of
8  speaks for itself.
9    Q.   So if you provided the information as
10 compiled and put into charts by you and the Georgia
11 Tech grad student, why did you need to tell
12 Ms. Hackman how to compile the information on her own?
13   A.   Because the documents that you would find if
14 you went to ice.gov/facility-inspections were
15 documents that, first of all, you'd have to know what
16 you're looking for.  You'd have to know where to look.
17 Specifically, within the documents are -- it's G-324
18 forms that ICE inspectors carry into the detention
19 center and fill out have significant incident
20 summaries, and in my experience, reporters are not
21 well-versed in reading those significant incident
22 summaries.  So showing her, like, where to look for
23 medical referrals out of the facilities and then also
24 to try and control for similar population sets, you're
25 not going to have medical referrals out to a

Page 195

1  gynecologist in all-male facilities like Stewart.  So
2  just to kind of control for some of the denominators
3  as they were analyzing the data and to treat like
4  cases alike.
5         So just to contextualize what we were
6  looking at, what we had found when we looked, and then
7  how a more expansive effort would, you know, unfold if
8  somebody had the time and resources to do it.
9    Q.   Did she tell you that she couldn't take your
10 word for it, that she had to see the data for herself?
11   A.   I don't remember.
12   Q.   Well, I understand what you're telling me
13 about someone that just goes on the ICE website that
14 you referenced might not understand what they're
15 looking at.  I'm trying to figure out why did she have
16 to go there in the first place.
17        MR. TOBIN:  Object to form.
18   Q.   (By Ms. Evans)  If you know.
19   A.   Because ICE doesn't publish this data
20 affirmatively.
21   Q.   ICE doesn't publish what data affirmatively?
22   A.   Comparative medical referrals out of each
23 facility.  They don't compile it, so you have to go
24 and you have to scrape it.  You have to know what
25 you're looking at and then you have to control and

Page 196

1  regularize information so that you're treating like
2  cases alike and you have a comparative.
3    Q.   Isn't that what you and the Georgia Tech
4  grad student had done as reflected in Exhibit 128?
5    A.   Yes.
6    Q.   So why did Ms. Hackman need to know how to
7  do it?
8    A.   So that she could expand the work and get
9  a -- larger dataset to make sure that we hadn't
10 missed, you know, big facilities or to make sure
11 that -- I mean, I represent in the e-mail that this is
12 an incomplete representation of all of the facilities.
13 And I think I said it's, like, 70 out of -- I don't
14 remember.  And she didn't have to.  This is something
15 I was hoping that folks would do.  I had the same
16 conversation with Alan Judd at the AJC.
17   Q.   Do you know if Ms. Hackman ultimately
18 compiled any data from the ICE website or anyone
19 working on her behalf at the Wall Street Journal?
20   A.   No.  I don't know.
21   Q.   Did Ms. Hackman ever represent to you that
22 an incomplete representation of the facilities was not
23 enough for her to do any further reporting?
24   A.   I don't think so, but I don't recall.
25        MR. TOBIN:  Object to form.

Page 197

1    Q.   (By Ms. Evans)  Did Mr. Judd do any
2  compiling of data from the ICE website that you're
3  aware of?
4    A.   I don't recall how Mr. Judd did the story
5  that came out on the second of that weekend.  He did
6  compile some payment data as I recall, and he found
7  more things out about the numbers, but I don't know
8  how he did it.
9        (Plaintiff's Exhibit 129 was marked
10        for identification.)
11   Q.   (By Ms. Evans)  I'm going to hand you and
12 your counsel what I'm marking as Exhibit 129, and
13 there's a copy for your counsel and for Ms. McNamara.
14        MR. TOBIN:  Thanks.
15   Q.   (By Ms. Evans)  Exhibit 129 is a document
16 produced to us by your counsel.  It's an exchange
17 between you and Meeran Ahn from Senator Ossoff's
18 office; is that right?
19   A.   That's right.
20   Q.   You testified earlier that you had shared
21 the work of the medical review team with Meeran Ahn
22 and I think this e-mail confirms that.  Would you
23 agree with that?
24   A.   Yes.
25   Q.   After you had provided that information --

Page 198

1   is -- is Meeran a he or a she?
2       A.   It's a woman.
3       Q.   After you had provided the information to
4   Ms. Ahn, she wrote to you and says, "I hope you are
5   well.  Thanks again for providing the independent
6   medical review team document and connecting us to Adam
7   Snyder.  We are actually speaking with Adam tomorrow.
8   During our conversation, you mentioned that you might
9   be able to provide other documents you have related to
10  ICDC and the allegations against Dr. Amin.  Are you
11  still comfortable providing this information to the
12  subcommittee?  I would be happy to discuss over the
13  phone if it would be helpful."
14           Do you see that?
15      A.   I do.
16      Q.   Did you send further information to Ms. Ahn?
17      A.   I provided additional information to Ms. Ahn
18  in a request -- a subsequent -- subsequent
19  conversation with her explaining that I thought that
20  any additional records would be more appropriate
21  coming from women's counsel, the people who were
22  actually representing them in the litigation that was
23  pending, so as not to blindside them.
24           I also told her that as a result of my
25  experience during the two-month investigation process

Page 199

1   where I was deeply involved from September to October
2   of 2020, I thought that she had access to everything
3   from that -- those folks.  If the Senate needed
4   anything from me that was independent of those folks,
5   then they could get it, but let her know that I did
6   not intend to recreate what we did, essentially.
7       Q.   That you had provided some information prior
8   in time to June of 2021 --
9       A.   No --
10      Q.   -- and you didn't want to send it again?
11      A.   No, that's not what I said.
12      Q.   Well, I -- I'm just having a hard time
13  understanding what you're saying, so maybe try it
14  again.  I'm -- I'm slow.
15           MR. TOBIN:  Could you re-ask the
16      question, please?
17      Q.   (By Ms. Evans)  Well, Mr. Free, you said
18  that you said, "As a result of my experience during
19  the two-month investigation process where I was deeply
20  involved from September to October 2020, I thought
21  that she had access to everything, that -- those
22  folks, if the Senate needed anything from me that was
23  independent of those folks, then they could get it,
24  but that I did not intend to recreate what we did,
25  essentially."

Page 200

1       A.   That's right.
2       Q.   And I'm just trying to figure out what you
3   mean by that and I -- that's why I was asking did
4   you -- had you provided information prior in time and
5   you just weren't going to provide it again, or are you
6   saying, I gave you access to the people that will be
7   able to give you information, and I'm not going to
8   give you anything else, or did you mean something
9   else?
10      A.   I meant what I said when I answered.  I had
11  forwarded all of the work that we had done on behalf
12  of these women to the people who ended up representing
13  them in litigation in their immigration proceedings
14  and I thought that it was more appropriate that those
15  folks be the ones to inter- -- interface with this
16  subcommittee.
17      Q.   Just to make sure I understand, you
18  forwarded work that you had done on behalf of the
19  women to the folks that ended up representing them in
20  the litigation and that if Ms. Ahn wanted that
21  information, she should talk to those lawyers; is that
22  accurate?
23      A.   That's -- that's right.
24      Q.   Okay.  You also said that -- or strike that.
25           When I asked you -- in response to Ms. Ahn's

Page 201

1   e-mail reflected in Exhibit 129, I asked you if you
2   had sent her further information, and I think you
3   said, I provided additional information to Ms. Ahn's
4   request and then that was going to be it.
5           Did I hear that right?
6       A.   You did.
7       Q.   You did provide some additional information?
8       A.   Yes.
9       Q.   And what was that additional information?
10      A.   In advance of the November 2022 hearing,
11  Ms. Ahn and some other Senate counsel from PSI asked
12  me to confirm certain facts that referenced me that
13  were going to be in the Senate PSI report.  I believe
14  those facts appear in Footnote 509.  I listened and
15  let them know that that was accurate.
16      Q.   Other than confirming the information in
17  November of -- or strike.
18           Other than confirming information ahead of
19  the November 2022 hearings, did you provide any
20  information to Ms. Ahn after the e-mail reflected in
21  Exhibit 129?
22      A.   Not that I can recall.
23      Q.   What information did you send to the counsel
24  that ended up representing the women after the time of
25  the e-mail in Exhibit 129?

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                Pages 202..205

1      MR. TOBIN:  My client is looking at me
2  because I think you're asking him a
3  question that would require him to reveal
4  conversations with co-counsel in pursuit of
5  a common client interests.
6      Let me just ask, is that accurate?
7      THE WITNESS:  And work product and
8  joint defense and common interests.
9      MR. TOBIN:  On those bases, he's going
10  to not answer your question under my
11  instruction.
12     Q.  (By Ms. Evans)  What was the time period
13  when you shared this information with that counsel?
14     A.  Beginning in late September and continuing
15  until mid-October with check-ins and follow-ups and
16  get-backs proceeding well into early 2021 to ensure
17  that every piece of record, documentation that we had,
18  they had access to and that they were able to
19  adequately represent the clients that they had taken
20  on.
21     Q.  When you say beginning in late September and
22  continuing until mid-October, is that 2020?
23     A.  Yes.
24     Q.  At some point, did you come to doubt the
25  allegations made by Dawn Wooten regarding the number

1  of hysterectomies performed on women at Irwin County
2  Detention Center?
3      A.  What do you mean?
4      Q.  Do you know what the word "doubt" means?
5      A.  I do.
6      Q.  What does it mean to you?
7      A.  That's not what I was asking.  I want to ask
8  for a better clarification.
9      MR. TOBIN:  Is that the question?
10     THE WITNESS:  You said the numbers of
11  hysterectomies.  I never heard Dawn say a
12  number.
13     Q.  (By Ms. Evans)  At some point, did you come
14  to doubt the allegations made by Dawn Wooten regarding
15  hysterectomies performed on women at Irwin County
16  Detention Center?
17     A.  I think she said high rates and I think the
18  facts have borne that out.
19     Q.  At -- so at some point -- strike that.
20     So is your testimony that you -- at --
21  strike that.
22     Is your testimony that you don't have any
23  reason to doubt the allegations made by Dawn Wooten
24  regarding hysterectomies performed on women at Irwin
25  County Detention Center?

1      MR. TOBIN:  Object to the form of the
2  question.
3      Go ahead and answer as best you can.
4      THE WITNESS:  What allegations?
5      Q.  (By Ms. Evans)  Allegations that she made
6  regarding hysterectomies performed on women at Irwin
7  County Detention Center.
8      A.  Tell me the allegations.
9      Q.  If you could pull up Exhibit 2.
10     A.  I got it.
11     Q.  If you could flip to the page that's Page 19
12  of 28 as indicated across the top.
13     A.  Okay.  I'm there.
14     Q.  Do you see where it has Subsection D there
15  toward the middle of the page?
16     A.  I do.
17     Q.  Subsection D says, "Detained immigrants and
18  ICDC nurses report high rates of hysterectomies done
19  to immigrant women."
20     Do you see that?
21     A.  I do.
22     Q.  Did you ever come to doubt the statement
23  reflected in Exhibit 2 on Page 19 of 28 that reads,
24  "Detained immigrants and ICDC nurses report high rates
25  of hysterectomies done to immigrant women"?

1      A.  I think I doubted it, but I think that it's
2  been borne out by the facts.
3      Q.  You think it has been borne out by the
4  facts?
5      A.  I do.  He did 100 percent more than the next
6  doctor.  Those are the ones he got to.  There were six
7  that we know about that had his name on it.  According
8  to ICE's own e-mails that they asked for in October of
9  2020, there was a letter sent to Senator Harris from
10  then acting Secretary McAleenan in 2020 saying five,
11  and then on Page 75 of the Senate report, you have
12  Howard McMahan not being able to explain why
13  Dr. Cherouny saw more procedures than ICE provided
14  records for.
15     The explanation, both there and on Page 100,
16  involves the reality that Irwin County Hospital was
17  bill bundling some of the procedures that Dr.
18  Cherouny, who was hired by the Senate, engaged in.
19  Mahendra Amin was the medical or clinical director of
20  Irwin County Hospital.  He previously operated the
21  hospital.
22     So yes, I think that if there were 14 total
23  in the entire ICE system and this man scheduled six of
24  them, did two of them, he did 100 percent more than
25  the next closest person, and several of the ones that

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 206..209

Page 206

1  didn't happen didn't happen because people refused,
2  like Wendy Dowe.  So high rates of hysterectomies, you
3  know, what's the end?  What's the denominator?
4        Q.   Are you done?
5        A.   Yes.
6        Q.   Do you see the sentence under Subsection D,
7  five lines down that starts "More recently"?
8        A.   Yes.
9        Q.   This page -- strike that.
10             On Page 19 of 28 of Exhibit 2, it reads,
11  "More recently, a detained immigrant told Project
12  South that she talked to five different women detained
13  at ICDC between October and December of 2019 who had a
14  hysterectomy done."
15        A.   Yes.
16        Q.   Do you see that?
17        A.   Yes.
18        Q.   Do you have any reason to doubt the
19  truthfulness of that statement?
20        A.   No.  I think she did talk to those five
21  women and I think those five women probably believed
22  that they had a hysterectomy done.  I think when you
23  don't tell your clients what you -- they're going --
24  you're going to do to them and you don't provide them
25  written records of what you've done to them and when

Page 207

1  you're not speaking to them in a language that you
2  understand and the nurses are informing people that
3  they are getting a hysterectomy when they are not, all
4  of these things can be true and the records can also
5  reflect that he only performed two.
6        Q.   Did you speak to any nurses who allegedly --
7  strike that.
8             Did you speak to any nurses who you claim
9  told women that they had a hysterectomy when they did
10  not?
11        A.   No.
12        Q.   Could you flip over to the page of
13  Exhibit 128 labeled Page 20 of 28 at the top.
14        A.   I'm there.
15        Q.   Do you see the indented paragraph there?
16        A.   Yes.
17        Q.   You see right above it where it says,
18  "Ms. Wooten explained"?
19        A.   Yes.
20        Q.   I'm going to read from this page.
21  "Ms. Wooten explained everybody he sees has a
22  hysterectomy, just about everybody."
23             Do you see that?
24        A.   I do.
25        Q.   Do you have any reason to doubt the

Page 208

1  truthfulness of that statement?
2        A.   Yeah.  Everybody he saw did not have a
3  hysterectomy and not just about everybody he saw had a
4  hysterectomy.
5        Q.   At some point, do you recall telling Jacob
6  Soboroff that you had heard mixed things about Dawn
7  Wooten?
8        A.   Yes.
9        Q.   What did you mean by that?
10        A.   That I had heard mixed things about Dawn
11  Wooten.
12        Q.   What mixed things had you heard?
13        A.   That some of the people who had been locked
14  inside Irwin had had negative experience with Nurse
15  Wooten when they sought care.
16        Q.   Negative experience in what way?
17        A.   They didn't get the care that they sought
18  and they were treated in a way that left them feeling
19  like the person who was trying to provide the care
20  didn't take seriously the requests that they were
21  making.
22        Q.   Did you ever hear of any -- strike that.
23             Either to you personally or to any attorney
24  that you had communications with, are you aware of any
25  woman who was ever detained at Irwin County Detention

Page 209

1  Center calling Dr. Amin the uterus collector?
2        A.   Yes.
3        Q.   Who?
4        A.   Jaromy Navarro.
5        Q.   Ms. Navarro called Dr. Amin the uterus
6  collector?
7        A.   I think she said that that's what people
8  there called him.  He was collecting uteruses and that
9  she described to the Senate in her testimony that
10  that's how he was understood within the facility.
11        Q.   Does that seem like an accurate way to
12  describe Dr. Amin based on the number of
13  hysterectomies that you know were performed?
14             MR. TOBIN:  Object to the form of the
15        question.
16             THE WITNESS:  I don't think he
17        physically collected any uteruses.  I don't
18        think that he put them on a shelf and
19        looked at them, but I do believe that there
20        are a number of people who were given
21        Depo-Provera shots that were not indicated
22        that could have had problems.  If you had
23        your uterus collected, I think it's the
24        sort of thing that you understand as
25        describing a phenomenon where people feel

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 210..213

Page 210

1  like they've had invasive procedures or
2  invasive treatment that could be
3  sterilizing or could affect -- it certainly
4  was leading people to bleed vaginally when
5  they hadn't been before and that there were
6  women who were having laparoscopic surgery,
7  The Women of the Three Points, a group of
8  people were showing each other their scars
9  and saying, Oh, you had it too.
10      And the women were caring for each
11  other after they returned postop without
12  medication.  So I do not have a uterus and
13  I don't know if I did whether I would
14  consider giving me a drug I didn't need
15  without my consent that could sterilize me
16  to be collecting my uterus, but it
17  certainly could impact my menstrual cycle
18  or my ability to bear children.
19      And similarly, I mean, he -- he
20  literally was collecting tissue from
21  uteruses through LEEP procedures.  He was
22  doing it horrifically incompetently,
23  according to Dr. Cherouny.  I think he got
24  a good sample in one out of seven
25  procedures.  He did not refund the

Page 211

1       government for any of those seven, but he
2       was collecting tissue and he was
3       collect- -- he was supposed to have been
4       collecting samples when he removed things
5       from the insides of folks.  And in those
6       early days, I think that's how we were
7       understanding this.
8       Q.  (By Ms. Evans)  Do you contend that a
9   Depo-Povo shot is part of a surgery?
10      A.  I don't know what a Depo-Povo shot is.
11          MR. TOBIN:  Depo-Provera?  Is that
12      what you mean?
13          MS. EVANS:  Yes.
14          THE WITNESS:  You're talking about
15      Depo-Provera.
16      Q.  (By Ms. Evans)  Yes.
17      A.  And you're saying what?
18      Q.  Do you contend that that is part of a
19  surgical procedure?
20      A.  No.  It's what he gave them so that he could
21  justify the surgeries.
22      Q.  And that is based on what?
23      A.  The records and women's testimonies.
24      Q.  Of any medical professionals?
25      A.  Yes.  The doctor -- excuse me.  The

Page 212

1  independent medical team, Maggie Mueller.  He was
2  noting bleeding as the cause for scheduling the
3  surgery without giving the six months that you would
4  need to assess the effectiveness of Depo-Provera
5  shots, and he was doing it over and over and over
6  again to the point where he constituted, when ICE
7  provided the data to the Senate, in some cases, 94, 92
8  percent, all the surgeries at ICE on a population of
9  four percent of the women, Depo was the first step.
10  You either put a transvaginal -- I'm sorry.  I'll wait
11  until you're done.
12      Q.  No.  I'm listening to you.
13          MR. TOBIN:  Go ahead.  Continue.
14          THE WITNESS:  Okay.  I'm going to put
15      a transvaginal ultrasound in, I'm going to
16      find cysts, and then I'm going to schedule
17      you for an exploratory D&C or a
18      laparoscopy, and then we'll get there,
19      perhaps there's a cystectomy.  Perhaps
20      there's a oophorectomy.  Perhaps there's a
21      salpingectomy.  Perhaps there's a
22      hysterectomy.
23      Q.  (By Ms. Evans)  That's your characterization
24  of what you believe happened?
25      A.  Yes.

Page 213

1       Q.  Do you have any medical training?
2       A.  No.
3       Q.  Have you ever met Dr. -- is it Cherouny?
4   How do you say his name?
5       A.  Cherouny?
6       Q.  Yeah.
7       A.  No.
8       Q.  Have you ever spoken with him?
9       A.  No.
10      Q.  On the phone or video or otherwise?
11      A.  Never.
12      Q.  Have you ever messaged with him?
13      A.  Never.
14      Q.  Do you know how he came to be involved with
15  the Senate report?
16      A.  I know what I read in the Senate report.
17      Q.  You don't know anything else about him?
18      A.  I know what Senator Ossoff said during the
19  hearing as well and I know that he has grown ill since
20  then.
21      Q.  Do you know if he was recommended to the
22  Senate by any member of the medical team put together
23  by Mr. Snyder?
24      A.  I don't know, but I don't think so.
25      Q.  When you say you think he's grown ill, what

MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC
Andrew Free on 08/15/2023                                    Pages 214..217

Page 214

1  do you mean?
2      A.   Dr. Cherouny has cancer.
3      Q.   Do you know when he was diagnosed?
4      A.   Sometime in the neighborhood of when he --
5  like, post when he testified in November of 2022. I
6  don't know if he had the diagnosis already, but I know
7  it's known that he has not been in contact.
8      Q.   Hasn't been in contact with?
9      A.   I don't know.  I think in the wake of the --
10 the November 2022 hearing, November 15th, I think
11 folks that I had spoken with in the media after the
12 initial whistleblower report were saying, like, We'd
13 like to interview this guy.  He testified in front of
14 the House -- in front of the Senate and I think that
15 he was not reachable.
16         I don't remember where I heard that, but
17 that's my recollection.
18     Q.   You wouldn't have been expecting him to
19 reach out to you?
20     A.   No.
21     Q.   Because you never talked to him, according
22 to your testimony.
23     A.   Correct.  According to earth as well, I
24 never talked to him.
25     Q.   According to what?

Page 215

1      A.   Earth, like, this reality that we live in.
2  I have not talked to Peter Cherouny.  He was brought
3  in to find why this would be okay.  He was brought in
4  by the bipartisan Senate from the subcommittee on
5  investigations.
6      Q.   Do you know if he's still -- or strike that.
7          Was he practicing medicine at the time that
8  he provided testimony to the Senate?
9      A.   I don't know.
10     Q.   Do you know if he's practicing medicine
11 today?
12     A.   No.  I don't know.
13     Q.   Do you know Haywood Brown, Dr. Haywood
14 Brown?
15     A.   I know who he is.
16     Q.   Who is he?
17     A.   He's a physician at I think University of
18 Florida Medical Center.  He's a board-certified
19 OB/GYN, and I think he was one of the folks who either
20 gave testimony or provided medical records review with
21 the All Good team.
22     Q.   As part of this -- the effort involving Adam
23 Snyder?
24     A.   Yes.
25         MS. EVANS:  Let the record reflect

Page 216

1  that the witness' counsel just did an
2  obscene gesture by doing the gator chop in
3  front of the double dawg.
4          MR. TOBIN:  The witness' counsel did a
5  gator chop to another gator in the room to
6  reflect our pride of being from the
7  University of Florida.
8          MS. EVANS:  Too bad Amanda is not
9  here.  Y'all could have a big party.
10         THE WITNESS:  You're just going to sit
11 here silently?  This is a half Seminole,
12 half gator --
13         MS. MCNAMARA:  This is totally -- this
14 is totally beyond me.
15         MS. EVANS:  It's hard for them to say
16 anything, Liz, when they're talking to a
17 lawyer who attended, twice, the school
18 where they are the back-to-back national
19 championship team.
20         THE WITNESS:  That's Alabama or...
21         MS. EVANS:  The University of Georgia.
22         THE WITNESS:  Not LSU.
23         MS. EVANS:  Not LSU.
24     Q.   (By Ms. Evans)  Mr. Free, do you know who is
25 Ted Anderson?

Page 217

1      A.   I do.
2      Q.   Who is he?
3      A.   He is a former head of the American College
4  of Obstetrics and Gynecology.  He is a board-certified
5  OB/GYN.  He's on the faculty at Vanderbilt.
6      Q.   Was he part of the medical review team put
7  together by Mr. Snyder?
8      A.   He was.
9      Q.   And do you know Margaret Mueller?
10     A.   Yes.
11     Q.   Who is Margaret Mueller?
12     A.   She is the physician who testified at the
13 Senate permanent subcommittee on investigations
14 hearing about the records review.
15     Q.   Was she part of the medical review team put
16 together by Mr. Snyder?
17     A.   She was.
18     Q.   You mentioned a little while ago the three
19 surgical scars memo.
20         Do you recall that?
21     A.   Three surgical scars memo?
22     Q.   Well, you -- you -- I think you referred to
23 three surgical stars -- scars.
24     A.   I said three points.
25     Q.   Are those two different things?

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 218..221

Page 218

1    A.  Well, you said -- you said something and I
2  didn't say it and so I'm saying what I said again.
3  What I said was there were three points where there
4  were ports where the laparoscopy has gone in.  That's
5  what I meant.
6    Q.  You're talking about three points --
7    A.  Three wounds, yes.
8    Q.  On a -- well, let me finish my question.
9        You're talking about three points on the
10 body?
11   A.  Yes.
12   Q.  And are those, in your mind, scars?
13   A.  I don't know.  That's not what I said, so I
14 don't know --
15   Q.  I'm asking --
16   A.  -- what you're talking about.  I don't know.
17       On my laparoscopy, I have a scar, yes.
18   Q.  Have you ever heard of the three surgical
19 scars memo?
20   A.  No.
21       (Plaintiff's Exhibit 130 was marked
22       for identification.)
23   Q.  (By Ms. Evans)  I'm going to hand you and
24 your counsel what I've marked as Exhibit 130, with a
25 copy for Ms. McNamara and your counsel.  Exhibit 130

Page 219

1  is a document produced to us by your counsel.  At the
2  top, it says, "ICE's continued detention and removal
3  of survivors impedes efforts to investigate."
4        You see that?
5    A.  Yes.
6    Q.  You can take a moment to look through this
7  and my question is just does this refresh your
8  recollection about whether you've ever heard of the
9  three surgical scars memo?
10   A.  Is that what we're calling it?
11   Q.  I'm sorry?
12   A.  Is that what we're calling it?
13   Q.  I think that's -- well, strike that.
14       Do you speak Spanish?
15   A.  Yes.
16   Q.  What is the Spanish phrase right under the
17 date on this document?  What does that say?
18   A.  It says, "Las Mujeres de Las Tres Puntas."
19 It is Footnote 1.
20   Q.  What does that mean?
21   A.  Footnote 1 says, "It's The Women of the
22 Three Points."
23   Q.  What does that mean?
24   A.  Women, three or points or all together?
25   Q.  What's the phrase "the women of three

Page 220

1  points" mean?
2    A.  This is what people inside were sharing with
3  each other after they had seen your client.
4    Q.  And who prepared this document reflected in
5  Exhibit 130?
6    A.  I did.
7    Q.  And did you present this at a meeting of the
8  Democratic Caucus for the Senate?
9    A.  What do you mean "present"?
10   Q.  What does the word "present" mean to you?
11   A.  Well, it could mean that I hold it up and I
12 say, I present to you the three scars memo, or it
13 could mean that I put it into a package of documents
14 that went to staff that then they shared with the
15 caucus.  It's the second one.
16   Q.  Did you ever speak to the Democratic Caucus
17 of the United States Senate?
18   A.  I think I spoke -- spoke with folks in it.
19 I don't think the whole Democratic Caucus was there.
20   Q.  Did you speak to a closed session of the
21 Democratic Caucus of the United States Senate whether
22 all members were present or not?
23   A.  You know, I think I said words at the
24 beginning, but I think that this, if I remember
25 correctly, was mostly providers and women.  So I think

Page 221

1  I might have been explaining who folks were going to
2  hear from.  I don't really remember this -- this
3  interaction.
4    Q.  Is it -- or strike that.
5        Were you present at the closed session
6  briefing for the Democratic Caucus of the United
7  States Senate, whether all members were present or
8  not?
9    A.  Yeah, I think it was on Zoom.  I think I was
10 on that Zoom.
11   Q.  You testified earlier about some of the
12 restrictions on receiving medical records, IPAA
13 waivers, and then there may -- I think you were
14 telling me about something specific for women in
15 detention or people in detention; correct?
16   A.  Yes.
17   Q.  To -- to allow there to be access to medical
18 records, generally, you have to have a HIPAA release;
19 is that right?
20   A.  Not in ICE custody, no.  You don't have to
21 have a HIPAA release for your own records.  The
22 Performance-Based National Detention Standards, the
23 medical care section of the PBNDS simply state that
24 you need to make a request, and they also say that you
25 can't deny a woman's request for her medical records

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                              Pages 222..225

Page 222

1  or a person who is in detention's request for medical
2  records because they didn't use the form that you
3  wanted.  So you do not need a specific HIPAA waiver to
4  request your own records.
5    Q.   **In order to receive your medical records if**
6  **you are a person in ICE custody, you have to make some**
7  **sort of request to a medical provider; is that right?**
8    A.   Well, actually, no, there's a separate IHSC.
9  So it's the ICE Health Services Corps standard that
10 requires providers to provide you with a continuity of
11 care package of documents that explains what care
12 you've received and what care you're going to need,
13 either when you're transferring between facilities or
14 when you're being removed or released, whether it's in
15 the United States or being deported.  And ICE is
16 supposed to do that regardless.
17          Moreover, many of the facilities that I've
18 worked in involve -- particularly for referrals out,
19 involve situations in which the provider just gives
20 you a copy of the records that they're also giving to
21 the detention facility.
22   Q.   **Are you done?**
23   A.   (Witness nods head affirmatively.)
24   Q.   **I'm just trying not to interrupt you.**
25        MR. TOBIN:  Are you finished, Andrew?

Page 223

1        THE WITNESS:  I am.
2        MR. TOBIN:  Yes.
3    Q.   **(By Ms. Evans)  If you are a person in ICE**
4  **detention and you've had any kind of medical treatment**
5  **while you were in that facility, whether onsite or**
6  **offsite, where would your records be?**
7        MR. TOBIN:  Object to form.
8        If you understand, go ahead and answer
9    as best you can.
10       THE WITNESS:  Do you want to speak
11   specifically about Irwin or do you want to
12   speak generally?
13   Q.   **(By Ms. Evans)  Speak specifically about**
14 **Irwin.**
15   A.   Okay.  So the -- Irwin is a -- an FMC
16 facility.  They have field medical coordinators that
17 IHSC runs.  Those are administrators and sometimes
18 care providers that kind of monitor the provision of
19 medical services by a contractor as opposed to by
20 members of the Commissioned Public Health Service and
21 so the Health Corps.
22        At Irwin, like at other places, but not all
23 places, IHSC does not staff the facility day-to-day.
24 LaSalle Corrections or LaSalle West or whatever
25 corporate firm they use at Irwin to do the medical

Page 224

1  provision provides the care, which means that they use
2  community providers and doctors who often are
3  moonlighting between their practices and Irwin.  So
4  it's not like you have a facility doctor who is
5  onsite, and then they refer out higher levels of care
6  or specialist care that folks don't receive while
7  they're there, but they do have nurses.  They'll be,
8  you know, nursing and care staff.
9          The providers who are offsite are going to
10 be keeping their own records, and then hospitals that
11 treat folks, whether it's inpatient or outpatient
12 surgical centers, will also have records.
13         The VA will have some of those records
14 because at the time, the VA was processing payments
15 for IHSC.  But I think that those would need to be
16 duplicative or copies of what was sent to the VA would
17 need to be onsite at the facility.
18   Q.   **If a person detained at Irwin County**
19 **Detention Center saw Dr. Amin --**
20   A.   I'm sorry.  Can I just -- there's one more
21 part of the answer.
22   Q.   **Sure.**
23   A.   ICE uses telemedicine at some facilities.  I
24 do not, as I sit here today, recall whether they were
25 using any sort of telehealth then.  Sometimes the

Page 225

1  tele- -- like, the telemedicine providers, even though
2  they're kind of technically providing care in the
3  facility, for purposes of licensure, will keep the
4  notes offsite, and that's another place where the
5  records could go.
6          So even though you're getting care in the
7  facility and the facility should have those records,
8  the nature of the provider is that they're remote and
9  so they may have it.
10         Sorry.  I didn't mean to interrupt you.
11   Q.   **No.  That's fine.  I wanted to make sure I**
12 **got all of the answer.**
13         If a person was detained at Irwin County
14 **Detention Center, had seen Dr. Amin, and was still in**
15 **detention, how would that person get their medical**
16 **records from Dr. Amin's office?**
17   A.   That's a really good question.  You would
18 think he would give them to them.  You would think
19 that if they asked the LaSalle staff at the Irwin
20 County Detention Center for the records of the
21 treatment that LaSalle had driven them there for,
22 driven them back after they left the -- the office and
23 that they had authorized through ICE's med PARS system
24 that LaSalle would have those records, that
25 Dr. McMahan would have reviewed those records, but as

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                              Pages 226..229

Page 226

1  we've found out, that's not the way that it was being
2  done at Irwin.
3        So they had to have a way to call Dr. Amin
4  or send him a letter or send him a message, and you
5  don't get free doctor calls when you're in Irwin.  You
6  have to pay.  And you also can't get, you know, a
7  doctor's office on the phone when you're calling from
8  Securis because it says this is a call from a detainee
9  at Irwin County Detention Center.  Maybe it's not
10  Securis.  Maybe it's Global Telelink.
11        But practically speaking, without help from
12  the outside, an advocate, a family member, a lawyer,
13  another medical professional, Congress, you're not
14  going to get those records from Dr. Amin by asking
15  people at LaSalle.
16     Q.   If a person who was in detention at Irwin
17  County Detention Center had seen Dr. Amin, was still
18  in detention, and asked someone outside to help them
19  obtain their medical records from Dr. Amin's office,
20  how -- what -- what would be the process of that
21  person to get the records?
22     A.   You'd call them.  You'd ask for the records.
23     Q.   And how would Dr. Amin's office know that
24  you were authorized to receive those records?
25     A.   I don't know.

Page 227

1     Q.   Is there some kind of form that's required?
2     A.   You'd have to ask your client.
3     Q.   Do you remember telling me earlier that as
4  of September 15th, 2020, you were already involved in
5  efforts to get medical records?
6     A.   Yes.
7     Q.   What did that entail?
8     A.   It involved sending kind of, like,
9  generalized HIPAA waivers, making phone calls,
10  attempting to get the records from LaSalle and
11  convince LaSalle that you can't actually do a
12  continuity of care compliance process that ICE
13  requires unless you can tell people what the treatment
14  they received was, even if it's from an outside
15  provider.  So our position then was that ICE and
16  LaSalle should have whatever Dr. Amin had.  And I
17  still think that's what the rules say.
18        What practically happened was folks had to
19  try and call and not get a response and, furthermore,
20  a lot of the records that they were going to get,
21  Dr. Amin stove-piped, so their records from his office
22  and their records from surgeries that occurred at the
23  hospital where he was, you know, the medical -- the
24  clinical director.  So trying to get records from both
25  of those places through phone calls, faxes, e-mails.

Page 228

1     Q.   What do you mean by stove-piped?
2     A.   I mean that two things from the same chimney
3  are going up two different pipes, thus, diffusing
4  where the information is coming from.  So Dr. Amin's
5  office had one set of records and Irwin County
6  Hospital had a second set of records, and we're to
7  believe that Dr. Amin had no idea what happened at the
8  hospital as a matter of documentation and that his
9  medical professionals didn't either.
10        So if a woman had a moment in the hospital
11  when she fell over and hurt her knee and was
12  non-ambulatory as a result, like Yuridia did,
13  Dr. Amin's staff wouldn't know about that under the
14  system that he has set up.  The consent forms for
15  surgery were often not obtained in the office, but at
16  the hospital, we later learned, even though he had
17  scheduled the surgery saying that, you know, this was
18  necessary.
19        So that's what I mean by stove-piped.  He
20  was taking the same information pool that he had and
21  putting it out through two different sources.
22        Does that make sense to you?
23     Q.   I -- I hear your words.
24        Do you -- do you contend that Dr. Amin
25  having -- or strike that.

Page 229

1        Do you contend that Dr. Amin not having
2  records from Irwin County Hospital in his office is
3  some abhorrent medical procedure administrativewise?
4     A.   I don't know.
5     Q.   Because you're not qualified to talk about
6  how recordkeeping is done in a medical office, are
7  you?
8     A.   No.
9        MR. TOBIN:  Object to form.
10     Q.   (By Ms. Evans)  You're not?
11     A.   No.
12        MR. TOBIN:  You mean beyond the
13     recollections that he has cited chapter and
14     verse on?
15        MS. EVANS:  Are you testifying?
16        MR. TOBIN:  I'm just asking you.
17        MS. EVANS:  I think -- I think
18     everybody should take a step back because
19     there's so much speculation in that -- in
20     that answer and I move to strike all of it
21     as nonresponsive.
22     Q.   (By Ms. Evans)  Mr. Free --
23     A.   He could have explained it.  He pled the
24  Fifth.
25     Q.   Did you call -- have you ever spoken with

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 230..233

Page 230

1  Dr. Amin?
2      A.   I haven't.
3      Q.   Have you ever called his office?
4      A.   Not that I recall.
5      Q.   Have you personally ever requested medical
6  records from Dr. Amin's office?
7      A.   I don't remember.
8      Q.   Have you ever personally requested medical
9  records from Irwin County Hospital?
10     A.   I don't remember.
11     Q.   Have you ever personally requested medical
12 records from LaSalle?
13     A.   I think I aided when some folks inside made
14 requests and either I, myself, called or asked Sarah
15 to call and try and figure out why the fax number or
16 the e-mail, whatever it was that previously worked was
17 no longer working.  That's all I can recall on that
18 one.
19     Q.   Have you ever personally requested medical
20 records on behalf of a person detained at Irwin County
21 Detention Center from ICE?
22     A.   Yes.
23     Q.   When?
24     A.   I filed a FOIA request in 2020.
25     Q.   In 2020, when?

Page 231

1      A.   October maybe.  I'm not sure.
2      Q.   Are you aware at some point that Mr. Prado
3  from the Law Lab got waiver forms to assist him in
4  obtaining medical records?
5      A.   Yes.
6      Q.   Did you assist him with that process?
7      A.   What do you mean?
8      Q.   Did you assist him with that process in any
9  way?
10     A.   Yes.
11     Q.   How?
12     A.   I made sure that the form of the -- you know
13 what, huh-uh (negative).  Same -- same discussion
14 about the -- this exhibit --
15          MR. TOBIN:  Is this covered by
16     attorney-client --
17          THE WITNESS:  You're asking for
18     information related to how we were trying
19     to represent folks and you're asking for
20     communications between two people who are
21     in the capacity of doing that.
22          MR. TOBIN:  Co-counsel in the common
23     representation of a client is privileged,
24     so we're not going to answer that question.
25     I'll instruct you not to answer.

Page 232

1          (Plaintiff's Exhibit 131 was marked
2     for identification.)
3      Q.   (By Ms. Evans)  I'm going to hand you and
4  your counsel what I've marked as Exhibit 131.
5          MR. TOBIN:  Thank you.
6      Q.   (By Ms. Evans)  Exhibit 131 is a document
7  provided to us -- produced to us by your counsel.
8  It's a document -- produced to us by your counsel.
9  ICE third-party waivers with Alma Acosta.
10          Do you see that?
11     A.   I do.
12     Q.   And Alma Acosta works for what member of
13 Congress?
14     A.   She was the staff or chief of staff -- staff
15 director or chief of staff for the Congressional
16 Hispanic Caucus.  I'm not sure if she worked just for
17 CHC or also for Representative Castro, but I think
18 Castro was the chair of the caucus at the time.
19     Q.   Are you aware of any ICE third-party
20 waivers -- or strike that.
21          Do you -- do you see on the second page of
22 Exhibit 131 where Mr. Prado is forwarding you ICE
23 third-party waivers?
24     A.   Yes.
25     Q.   Are you aware of the -- or strike that.

Page 233

1          Are you aware of anyone obtaining ICE
2  third-party waivers for persons detained at Irwin
3  County Detention Center prior to this date reflected
4  in Exhibit 131?
5      A.   Not specifically.  It's a pretty common
6  form.  Prior to September 14th of 2020, folks who were
7  attempting to make Farihat release requests would have
8  as a standard practice included an ICE third-party
9  waiver in the set of things that you get people to
10 sign so that ICE can talk to you.
11          These ICE third-party waivers were, I
12 think -- yeah, I -- I'm not aware of anything before
13 then specifically, no.  These were all after that.
14     Q.   Do you know a reporter named Nomaan
15 Merchant?
16     A.   I do.
17     Q.   Where does that person work?
18     A.   The Associated --
19     Q.   What location?
20     A.   The Associated Press.
21     Q.   Do you recall sharing medical records for
22 Barbara Rua with Mr. or Ms. Merchant?
23     A.   Not specifically, but...
24          I don't have a specific recollection of
25 that, but I can imagine that I did.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 234..237

Page 234

1          (Plaintiff's Exhibit 132 was marked
2      for identification.)
3      Q.   (By Ms. Evans)  I'm going to hand you and
4  your counsel what I've marked as Exhibit 132.
5          Have you had a chance to look at
6  Exhibit 132?
7      A.   I have.
8      Q.   Exhibit 132 seems to reflect that you sent
9  medical records for Barbara Rua to Andrew -- I mean to
10 Nomaan Merchant; do you agree?
11     A.   Yes.
12     Q.   Why did you send these records to Mr. or
13 Ms. Merchant?
14     A.   Mr. Merchant.  I think that Mr. Merchant was
15 trying to confirm that folks had had the procedures
16 that they had said they did.
17     Q.   Did Mr. Merchant write a story regarding
18 Irwin County Detention Center and hysterectomies?
19     A.   He did.
20     Q.   Do you recall communicating with Justin Gray
21 at WSB-TV at some point regarding Irwin County
22 Detention Center and hysterectomies?
23     A.   I do not.
24          (Plaintiff's Exhibit 133 was marked
25      for identification.)

Page 235

1      Q.   (By Ms. Evans)  I'm going to hand you and
2  your counsel what I've marked as Exhibit 133.
3  Exhibit 133 is a document produced to us by your
4  counsel, an exchange with you and Justin Gray.  You
5  can take a moment and review you it and I'll have a
6  couple questions for you.
7          Have you had a chance to look at
8  Exhibit 133?
9      A.   I'm still reading.
10     Q.   Oh, sorry.
11     A.   Okay.
12     Q.   Does this refresh your recollection that you
13 had a communication with Justin Gray?
14     A.   Yes.
15     Q.   On the page Bates-numbered Free 877 --
16     A.   Uh-huh (affirmative).
17     Q.   -- towards the top, this is an e-mail from
18 Justin Gray, September 23rd, 2020 at 1:20 p.m.
19          Do you see that?
20     A.   Yes.
21     Q.   At the bottom of that e-mail, Justin is
22 saying, "ICE says on the record that only two
23 hysterectomy referrals took place since 2018.  Sounds
24 like what women are telling you refutes that."
25          Do you see that?

Page 236

1      A.   Yes.
2      Q.   Did you ever send him information refuting
3  that statement?
4          MR. TOBIN:  Object to the form.
5          THE WITNESS:  Yes.
6      Q.   (By Ms. Evans)  Yes?
7      A.   Yes.
8      Q.   What did you -- what did you --
9      A.   The statement that I gave later on.
10     Q.   Where?
11     A.   "You can attribute the following quote to
12 me."
13     Q.   Other than the quote that you provided on
14 the page Bates-numbered 874 of Exhibit 133, did you
15 provide any information to Justin Gray?
16     A.   Not directly no.
17     Q.   What about indirectly?
18     A.   I mean, yeah.  I spoke with Tanvi Misra at
19 CQ Role Call about the fact that the acting secretary
20 of Homeland Security had said in a writing to then
21 Senator Harris that five hysterectomies had been
22 scheduled.  And I'm assuming Mr. Gray also saw the
23 2021 Project South report indicating that six had
24 Amin's name on them between 2017 and 2020.  I have not
25 provided him any additional records that I can recall

Page 237

1  at this point.
2      Q.   What was the first name you said, Misra?
3      A.   Tanvi, T-A-N-V-I, Misra, M-I-S-R-A.
4      Q.   Is at Congressional Roll Call?
5      A.   Yeah, CQ Roll Call.
6      Q.   Do you have any knowledge of Justin Gray
7  communicating with Tanvi Misra or reviewing any
8  information from Congressional Roll Call?
9      A.   No.
10     Q.   Do you have any knowledge of Justin Gray
11 reviewing the 2021 Project South report you just
12 testified about?
13     A.   No.
14     Q.   Do you recall referring to the hysterectomy
15 allegations in the Project South letter as "muck"?
16     A.   Maybe.
17     Q.   What does the word "muck" mean?
18     A.   Mess, mud, something that's less than clear.
19          (Plaintiff's Exhibit 134 was marked
20      for identification.)
21     Q.   (By Ms. Evans)  I'm going to hand you and
22 your counsel what I've marked as Exhibit 134.  I think
23 you're doing it already, but I want to make sure.
24 Please take a moment to review Exhibit 134, and then
25 I'll ask you some questions.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                          Pages 238..241

Page 238

1    A.   Okay.

2    Q.   On the page Bates-numbered Free 269 of

3  Exhibit 134 -- or strike that.

4         First of all, Exhibit 134 is a document

5  produced to us in this litigation.  It appears to be

6  an e-mail exchange between you, Joshua Breisblatt and

7  Jennifer Chan.  Do you see that?

8    A.   I do.

9    Q.   It all takes place on September 23rd, 2020.

10  Do you see that?

11    A.   I do.

12    Q.   On the page Bates-numbered 269,

13  Mr. Breisblatt, toward the top, do you see his

14  signature line there?

15    A.   I do.

16    Q.   It says "Counsel."

17         Is he a lawyer?

18    A.   Yes.

19    Q.   Right above his signature line, it says,

20  "And we should chat on engagement with the IG.

21  Personally, I think the more your folks are talking to

22  them, the more it will force them to expand the scope

23  of the investigation."

24         Do you see that?

25    A.   Yes.

Page 239

1    Q.   Is he referring to the Congressional

2  investigation?

3    A.   I don't know.  You'd have to ask him what

4  he's referring to.

5    Q.   Is he referring to the IG investigation?

6    A.   That's what it seems from, like, the context

7  of it.

8    Q.   Did you believe that an investigation

9  focused on the allegations of hysterectomies in -- as

10  reflected in Exhibit 2 would not lead to a credible

11  investigation?

12    A.   Can you say that question again, please?

13    Q.   Did you believe that an investigation

14  focused on the allegations of hysterectomies as

15  reflected in Exhibit 2 would not lead to a credible

16  investigation?

17    MS. MCNAMARA:  Object to form.

18    MR. TOBIN:  Yeah, I'm going to join.

19    MS. MCNAMARA:  What period of time are

20  you asking about?

21    MR. TOBIN:  I'm going to join the

22  objection.

23    Q.  (By Ms. Evans)  At any time -- or strike

24  that.

25         As of the time of this Exhibit 134.

Page 240

1    A.   What do you mean by credible investigation?

2  Is there something you're referring to or...

3    Q.   What does the word "credible" mean to you?

4    A.   It's means something can be relied on.

5    Q.   Did you believe that an investigation at the

6  time of September 23rd, 2020 that was focused on

7  allegations of hysterectomies as reflected in

8  Exhibit 2 would be credible?

9    MR. TOBIN:  Object to the form.

10    THE WITNESS:  So again, I asked you

11    what you were asking me.  You asked me to

12    define credible.  I said something that

13    could be relied on.  So that's where I'm

14    going to go.  That's how I'm going to

15    answer this question.  If you have some

16    other definition of credible investigation,

17    please tell me now before I answer.

18    Q.  (By Ms. Evans)  No.  Go for it.

19    A.   Good.

20         This is happening in September of 2020.  In

21  July, July 15th, 2020, the House BSF and O -- excuse

22  me -- House Government Oversight had held a hearing in

23  which two independent physicians had concluded that

24  the Inspector General's office had not conducted a

25  thorough investigation into the deaths of two children

Page 241

1  who died in border patrol CBP custody, Jakeline Caal

2  and Felipe Gomez.

3         As part of that hearing, we were asked by

4  committee staff Candyce Phoenix to share the

5  allegations and findings, really, of the independent

6  pathologist and the two reviewers who reviewed what

7  CBP had done and what the IG had done, and I believe

8  GAO weighed in on it as well and said that that

9  investigation and the conclusions that the IG had

10  reached were not supported by the medical evidence in

11  July of 2020.

12         We had also had our own experiences in death

13  investigations with the IG's office, including in

14  Georgia, in which the Inspector General conducted a

15  follow-on investigation of Jean Jimenez's death at

16  Stewart, which resulted in the referral of one corps

17  civic guard to a -- to the U.S. Attorney's office for

18  the Middle District.  The U.S. Attorney's office has

19  declined to prosecute, and to this day, the OIG has

20  refused to turn over the declination memo.

21         I was skeptical then and am skeptical now,

22  based on that experience and others, that any

23  investigation that the Inspector General would take on

24  into these allegations would be credible.  My

25  skepticism was borne out when I saw that they had

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 242..245

Page 242

1  hired a contract team from the national
2  correctional -- the National Committee -- or
3  Commission on Correctional Health Care, NCCHC.  I felt
4  that when the Senate PSI hired -- excuse me -- when
5  OIG, as reflected in the Senate PSI report, hired
6  NCCHC, there were real concerns about conflicts of
7  interest because NCCHC was the accrediting body for
8  LaSalle at Irwin, just as IHSC was the authorizing
9  body for the medical treatment provided at Irwin.
10            Inspector General spent nearly a million
11  dollars paying WilmerHale to conduct an internal
12  investigation within the IG's office of whistleblowers
13  who blew the whistle about what they viewed to be
14  irregularities in the way he was conducting
15  investigations.  He testified in Congress that he
16  regularly deletes his own texts, an apparent violation
17  of the Federal Records Act.  Jen Costello, who was the
18  subject of the WilmerHale investigation, secured
19  $1.2 million, maybe it was 1.17, 1 -- over a million
20  dollars from the merit systems protection board in a
21  settlement involving Mr. Canary's actions.
22            The number of times we have spoken with the
23  Inspector General's office about what we believed were
24  very strong allegations of harm and wrongdoing that
25  they had the power to deal with led me to believe that

Page 243

1  the credibility of the investigation by that office
2  wouldn't be something that we could rely on if we were
3  going to try and get justice for these women, that it
4  had to be something else.
5            And the number of times that the Inspector
6  General has soft-pedalled findings of harm and deadly
7  risks that then resulted in death, including at
8  Stewart and subsequently at Torrance, and just sort of
9  let it go along, led then and now to concerns about
10  whether they could conduct a credible investigation.
11            More to your point, as I've discussed
12  previously, it became very clear that women claimed to
13  have hysterectomies who -- upon review of records that
14  we were able to get, when Dr. Amin saw fit to provide
15  them or when LaSalle saw fit to provide them or the
16  County Hospital saw fit to provide them, that they
17  were actually having other procedures and that those,
18  as I've mentioned before, the Senate PSI report
19  describes how Jaromy was told she was having a
20  hysterectomy by Irwin staff, but it wasn't a
21  hysterectomy.
22            So yeah, I thought that expanding the scope
23  to fully capture what the surgeries that he was doing
24  were was necessary to understand the harm that people
25  were complaining about, and I knew that if unrebutted,

Page 244

1  you know, these statements would allow the effective
2  silencing of those women's experiences.
3       Q.   Is it your testimony that you were
4  advocating for an expansion of the IG investigation to
5  include inspections -- or strike that -- to include an
6  investigation into procedures other than
7  hysterectomies?
8       A.   Yes.
9       Q.   Why would adding ICE agents -- or strike
10  that.
11            Do you see on Exhibit 134 your e-mail of
12  September 23rd, 2020 at 1:27 p.m.?
13       A.   What page is it on?
14       Q.   The first page of the exhibit, the 134.
15       A.   I don't see a September 20th -- at 1:27.
16  That's 23rd.  September 23rd.  Okay.  Yeah, I've got
17  it.
18            MR. TOBIN:  You're talking about the
19       middle of the first page.
20            MS. EVANS:  Yeah, that's what I said,
21       September 23rd, 2020.
22            MR. TOBIN:  We're all on the same
23       page.
24       Q.   (By Ms. Evans)  Yeah, September 23rd, 2020,
25  1:27 p.m.  Got it?

Page 245

1       A.   Yeah.
2       Q.   You say, "I tend to agree."
3            That's in response to Josh's e-mail; right?
4       A.   Uh-huh (affirmative).
5       Q.   "We're considering whether to file a
6  separate complaint on behalf of the women themselves
7  that names the ICE agents."
8            Do you see that?
9       A.   I do.
10       Q.   And how would that expand an investigation
11  into procedures other than hysterectomies, if it
12  would?
13       A.   Because the ICE agents were the ones who
14  came to huddle me a week before I sent this e-mail,
15  maybe less.  Maybe it was the 15th.  And said, You're
16  the one, aren't you, that talked to the lawyers, and
17  then deported her.
18            MS. EVANS:  Move to strike as
19       nonresponsive.
20       Q.   (By Ms. Evans)  How does adding the ICE
21  agents -- or strike that.
22            Do you have any other reason that you
23  contend that adding ICE agents expands the
24  investigation into procedures other than
25  hysterectomies?

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                  Pages 246..249

Page 246

1    A.   Yes.
2    Q.   What?
3    A.   They were the ones who were authorizing the
4  payments.  They were the ones who were reviewing
5  detainee grievances from people inside about the
6  medical abuse and neglect that people were supposed
7  to -- that the people were attempting to blow the
8  whistle on.
9         These ICE officers were responsible, whether
10  it's the DSCO, the Detention Standards Compliance
11  Officer or the DSM, the detention service manager or
12  it's the AFOD, Msuante, the assistant field office
13  director, these folks had a series of
14  non-discretionary duties upon receiving paper from
15  people inside, detainee grievances about staff and
16  about medical providers.
17         Moreover, the warden was aware.  He arranged
18  for women to see -- or one woman, at least, to see
19  another doctor because she had received rough
20  treatment, and understanding what the warden -- Warden
21  Paulk said to -- the AFOD at the time said to the
22  field medical coordinator who the Senate PSI
23  investigation revealed did not go to the facility from
24  January 2018 until October 2020 in violation of that
25  person's duties.

Page 247

1         Yeah, ICE was on the hook for some of this.
2  They let it happen.
3    Q.   Wouldn't ICE already be part of an -- of an
4  IG investigation regarding alleged hysterectomy
5  practices?
6    A.   No, not necessarily.
7    Q.   Why?
8    A.   For the same reason that -- well, let me
9  just explain.
10         ICE's line to this day and in front of the
11  Senate PSI was, Not our problem.  It happens in his
12  office.  How are we supposed to know?  But there's a
13  person at ICE who authorized all those payments and
14  who looked at all of these treatments and that person
15  had worked somewhere other than Irwin County Detention
16  Center and the Atlanta field office of the RO.  And
17  understanding how a person is going to get medical
18  record after medical record after medical record from
19  one gynecologist and allow 92 percent of the surgeries
20  to get paid for by this detention center, yeah, that's
21  an ICE problem.  That's not just a one-doctor problem.
22         Had there been those controls, which the
23  Senate said there should be in which ICE admitted that
24  there weren't, perhaps some of these people would have
25  been spared harm.  And so, yes, expanding so that we

Page 248

1  name ICE agents is necessary because, otherwise,
2  nobody looks into it.
3    Q.   Have you ever spoken directly -- strike
4  that.
5         Have you ever communicated directly with the
6  warden?
7    A.   Not that I recall.
8    Q.   The information that you're sharing about
9  the warden and arrangements being made for a woman,
10  that's information that you have obtained from someone
11  else; true?
12    A.   That's an e-mail that I saw.
13    Q.   But it's not -- it's not an e-mail to you,
14  is it?
15    A.   No, it's not.
16    Q.   It's not an e-mail from you?
17    A.   No, it's not.  Just exists.  It's just
18  there, in 2018, saying this other doctor is well
19  respected.
20    Q.   Back on Exhibit 134, your same e-mail there
21  in the middle, September 23rd at 1:27 p.m., the second
22  sentence, can you read what you wrote there?
23    A.   It says, "That will get us out of the
24  Project South hysterectomy muck and allow us to
25  dictate what they should investigate to have a

Page 249

1  credible investigation, which they'll know we're
2  giving to you."
3    Q.   Hysterectomy muck --
4    A.   Yeah.
5    Q.   Not -- you said something else.  You meant
6  hysterectomy muck?
7         MR. TOBIN:  I heard muck.
8         MR. McNAMARA:  I heard hysterectomy
9    muck.
10         THE WITNESS:  That's what I said.
11    Q.   (By Ms. Evans)  I just wanted to make it
12  clear.
13         You stated, "That will get us out of the
14  Project South hysterectomy muck and allow us to
15  dictate what they should investigate to have a
16  credible investigation which they'll know we're giving
17  to you."
18         Do you see that?  That's what you said?
19    A.   The thing that I just read to you?
20    Q.   That's what -- that's what you said?
21         MR. TOBIN:  Yes or no?  Yes or no?
22         THE WITNESS:  Yes.
23    Q.   (By Ms. Evans)  Thank you.
24         Was Project South a problem for this
25  investigation?

Page 250

1      A.   No, they were not.  They were the reason the
2  investigation happened.
3      Q.   But you thought it would be best if they
4  were to take a step back and others were to be more
5  involved; true?
6      A.   True.
7      Q.   And why is that?
8      A.   Because they represented Dawn Wooten who is
9  a whistleblower.  Whether you like it or not, that's
10  her legal category under, you know, the process that
11  she availed herself of.  And it felt like distributing
12  the sources of information such that Project South
13  could handle Dawn Wooten's representations to
14  whomever, and then having other folks whose job it was
15  to talk to women would be better.  She had other
16  issues with retaliation and with COVID and people
17  dying that far superseded and were separate from the
18  issues that women had, and the women inside had issues
19  that were separate from Nurse Wooten's.  And frankly,
20  with the amount of misinformation that the government
21  was spewing at the time, we needed all of the help we
22  could get.
23      Q.   Do you recall at some point having -- or
24  strike that.
25           Do you recall on September 16th, 2020 having

Page 251

1  a phone conversation with Barbara Rua?
2      A.   Yes.
3      Q.   Do you recall recording that conversation?
4      A.   I do.
5      Q.   Do you recall having that conversation
6  transcribed?
7      A.   I do.
8      Q.   What was the purpose of transcribing that
9  conversation?
10      A.   Making sure that she wasn't misquoted and
11  that whatever she said, she only had to say once
12  because it was very clear that she was upset by -- by
13  the treatment she received, and I did not want to have
14  to retraumatize her by asking her to repeat things
15  over and over and over again that she had already said
16  to Mr. Osorio and to...
17      Q.   Did you send the recording -- or strike
18  that.
19           Did you send the transcription of that
20  recording to anyone?
21      A.   I'm sure I did.
22      Q.   Reporters?
23      A.   Perhaps, yes.
24      Q.   Congress?
25      A.   Maybe.  I think so.  Yes.

Page 252

1      Q.   Department of Justice?
2      A.   Yes.
3      Q.   Anyone else that you can recall?
4      A.   Certainly, the co-counsel team, without
5  saying any more of that.
6      Q.   Who is Vivi?
7      A.   Who is who?
8      Q.   Vivi, V-I-V-I.
9      A.   I don't know.
10      Q.   You don't know?
11      A.   As I sit here today, I can't recall.  If you
12  could refresh -- refresh my --
13           MR. TOBIN:  Do you have a document you
14      want to -- that would help him?
15           THE WITNESS:  If you could refresh --
16      refresh my recollection.
17      Q.   (By Ms. Evans)  If you could pull up
18  Exhibit 125.  If you flip to Page 2, Question No. 5.
19      A.   Uh-huh (affirmative).
20      Q.   Do you know that Vivi was beaten up by
21  guards at Irwin?
22      A.   Oh, yeah.
23      Q.   Was Vivi a person detained at Irwin County
24  Detention Center?
25      A.   Yes.

Page 253

1      Q.   What is Vivi's last name?
2      A.   Manrique.
3      Q.   How do you spell that?
4      A.   M-A-R-I -- actually, it's in Exhibit -- it's
5  the exhibit where the nine folks voted.  It's Andrea
6  Manrique.
7           MR. TOBIN:  I think you're looking for
8      Exhibit 124.
9           THE WITNESS:  Yeah.
10           MR. TOBIN:  Item 4 has Andrea Manrique
11      Yaruro listed.
12           MS. EVANS:  What number is she on that
13      exhibit?
14           THE WITNESS:  No. 4.
15      Q.   (By Ms. Evans)  I'm going to hand you and
16  your counsel what I've marked as Exhibit 135.
17           Mr. Free, have you ever seen this document
18  before?
19           (Plaintiff's Exhibit 135 was marked
20      for identification.)
21           THE WITNESS:  No.  I think I've seen
22      the electronic version of it.
23      Q.   (By Ms. Evans)  Do you recognize it as a
24  part of a privilege log?
25      A.   I do.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                              Pages 254..257

Page 254

1      Q.   My understanding is this reflects privilege
2   log entries with regard to your notebooks that we
3   discussed earlier today.  Does that sound right to
4   you?
5      A.   They all say "notebook" on them.  So it
6   sounds right to me.
7           MR. TOBIN:  I'll stipulate to that.
8      Q.   (By Ms. Evans)  Do you see that the first
9   entry is dated September 23rd, 2020?
10     A.   I do.
11     Q.   Why are there no entries prior to that date?
12     A.   Because I hadn't started taking written
13  notes on this.  I was doing stuff in document -- on --
14  on an iPad or on a laptop.
15     Q.   Where are those notes that you were doing on
16  an iPad or a laptop?
17     A.   They were certainly not in the privilege log
18  that just is for a notebook.  I have turned over what
19  I searched for and got for my counsel.  This is only a
20  privilege log about a paper notebook.
21     Q.   Did you turn over the notes from your iPad
22  or laptop that you took?
23     A.   I think if there was anything that was --
24  yes.  Yes.
25     Q.   Do you recall this morning I asked you about

Page 255

1   notes that you took in your notebooks?
2      A.   Yes.
3      Q.   I asked you did you make any notes regarding
4   Irwin County Detention Center in your notebooks and
5   your answer was yes.  Do you recall that?
6      A.   That's right.
7      Q.   I said, "When did you start doing that?"
8           Your answer was, "When I found out, so
9   September 14th, September 15th maybe."
10          Do you recall that?
11     A.   Yeah, I recall I said maybe.
12     Q.   Do you stand by that?
13     A.   I stand by the maybe.  Yeah.
14     Q.   Your testimony now is that the notes
15  regarding Irwin County Detention Center starting
16  September 14th or 15th of 2020 would have been on an
17  iPad or a laptop instead of your written notebooks?
18          MR. TOBIN:  Object to the form of the
19      question.
20          THE WITNESS:  Now as opposed to what?
21          And also, this refreshes my
22      recollection that I was writing things down
23      in -- in a notebook starting
24      September 23rd.
25          As I recall, a lot of this stuff --

Page 256

1           MR. TOBIN:  "This," he was holding up
2      Exhibit 135 as referring to the word
3      "this."
4           THE WITNESS:  You know, in the first
5      week or so I think that there was, you
6      know, share files in a Google Drive.
7      Q.   (By Ms. Evans)  Did you -- well, strike
8      that.
9           Did you turn those documents over from the
10  Google Drive to your counsel?
11     A.   I did or at least I told my counsel who I
12  think owns that Google Drive.
13          MS. EVANS:  I'll state for the record
14      that I haven't seen any privilege log
15      entries regarding any notes by Andrew Free
16      other than those reflected in Exhibit 135,
17      and I ask that counsel check and see if any
18      supplements are necessary.
19          MR. TOBIN:  I'm happy to do that.  If
20      you'll send me an e-mail or a letter to
21      remind me, that would be helpful.
22          (Plaintiff's Exhibit 136 was marked
23      for identification.)
24     Q.   (By Ms. Evans)  I'm going to hand you and
25  your counsel what I've marked as Exhibit 136.

Page 257

1           MS. EVANS:  Definitely don't toss that
2      one.
3           THE WITNESS:  Should there be
4      pagination?
5           MR. TOBIN:  Probably not --
6           MS. EVANS:  No.
7           THE WITNESS:  Okay.
8           MR. TOBIN:  -- given the spreadsheet
9      format this is in, which means be very
10     careful when you remove the clip.
11          MS. EVANS:  Yes.
12     Q.   (By Ms. Evans)  And for the record, I've
13  handed you what I've marked as Exhibit 137, which is
14  a --
15          MR. TOBIN:  Stacey, 136.
16          MS. EVANS:  Oh, 136.  Thank you.
17     Q.   (By Ms. Evans)  I've handed you what I've
18  marked as Exhibit 136, which I understand to be a
19  privilege log of documents withheld for privilege from
20  the production of documents made on your behalf by
21  your counsel.
22          And while you may not have seen it in paper
23  form, but rather electronic form, do you agree that's
24  what this appears to be?
25     A.   Yes.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                    Pages 258..261

Page 258

1    Q.   Did you see this before it was produced?
2    A.   I'm not sure if it's the same version, but I
3  saw a version of this, yes.
4    Q.   On the -- you see the "record begin" column
5  on left, far left?
6    A.   Yep.
7    Q.   The second entry down, 2659, do you see
8  that?
9    A.   Yep.
10   Q.   Author says Taliba.  Do you see that?
11   A.   Yep.
12   Q.   Who is that?
13   A.   No idea.
14        The document is from 2019.  It's a Project
15  South release form in a document format or a .doc
16  format.  It appears to be potentially -- and I don't
17  know who it is, but we've got a third-party waiver
18  from 2011 here, so I'm guessing it's a Project South
19  form.
20   Q.   Does this refresh your recollection with
21  regard to whether you were aware of any work done that
22  eventually led to the document reflected in Exhibit 2
23  prior to September 14th, 2020?
24   A.   In what way?
25   Q.   In that there are references to documents

Page 259

1  regarding ultrasound surgery documents and Irwin
2  County Hospital admission history as early as July of
3  2020.
4    A.   That's when they were created.  It's not
5  when I knew about them.  So no, it doesn't refresh --
6  refresh my recollection as to whether I knew about the
7  Project South report before September of 2020.  I
8  testified that I didn't.  I did get documents that
9  pre-existed that, like your client's medical records.
10  So that appears to be what this is.
11   Q.   And did you share documents regarding
12  gynecological care or procedures performed at Irwin
13  County Hospital on behalf of women detained at Irwin
14  County Detention Center prior to September 14th, 2020?
15   A.   No.
16   Q.   You just had them in your possession either.
17   A.   I didn't have them in my possession either.
18   Q.   Then why would they be reflected on this
19  privilege log?
20   A.   They're not.  You're misreading it.
21   Q.   How am I misreading it?
22   A.   You're assuming that because it says
23  7/9/2020, that's when I had it.  That is not a
24  valid assumption.  That is when the document could
25  have been created independent of me having it.  Just

Page 260

1  like the 2011 waiver --
2        MR. TOBIN:  Can I just say this --
3    there's -- there's kind of a predicate for
4    this Google Drive that you haven't asked
5    about that may help explain why you're
6    confused.  I'm just offering the
7    opportunity to ask him -- for you to ask
8    him questions about that because, as he
9    said, the date reflected here, like
10   7/9/2020 or 5/12/2020, does not reflect the
11   date that he came into knowledge of these
12   documents.
13       I'm representing that just to help you
14   clean up your record or get what you need.
15   Q.   (By Ms. Evans)  Are the documents -- or
16  strike that.
17       Mr. Free, the entries that are dated July 9,
18  2020, of which there are several, do those represent
19  documents that you've stored on your Google Drive?
20   A.   It wasn't my Google Drive.  You have to take
21  a step back.  There was a shared Google Drive.  These
22  documents were on that shared Google Drive, that's why
23  I provided them to counsel.  That's why counsel has
24  privilege logged them, but they were not documents
25  that I had before the whistleblower report.

Page 261

1    Q.   These would have been documents that others
2  would have placed on the Google Drive?
3    A.   That's correct.
4    Q.   Who all had the ability to add documents to
5  the Google Drive?
6    A.   You know, I think the access to a privileged
7  space gets into work product and the joint defense
8  agreement.  I'll let my counsel tell me whether I'm
9  wrong.
10       MR. TOBIN:  Is -- is the question who
11   of his knowledge would have had access to
12   the Google Drive?  Is that the pending
13   question?
14       MS. EVANS:  Yes.
15       MR. TOBIN:  Andrew, I think you should
16   answer that question to the best of your
17   knowledge.
18       THE WITNESS:  Yes.  So Sarah Owings is
19   the admin of the Google Drive, and folks --
20   yeah.
21   Q.   (By Ms. Evans)  Is she the only one who
22  could add documents to the Google Drive?
23   A.   I don't recall.
24   Q.   Do you recall anyone else -- or strike that.
25       Do you have the ability to add documents to

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                    Pages 262..265

Page 262

1   the Google Drive?
2       A.   I did.
3       Q.   You don't now?
4       A.   I don't know whether I do now.  This was a
5   drive from 2020.
6       Q.   Are you aware of anyone else besides you or
7   Ms. Owings who had the ability to add documents to the
8   Google Drive?
9       A.   I don't know.  It would makes sense that the
10  team on the ground in Irwin would have been able to
11  upload things.  It would also make sense that other
12  counsel may have been able -- able to share subfolders
13  for clients.  But as I sit here today, I can't tell
14  you whether that's the case.  I wouldn't be surprised
15  if it was.
16      Q.   The Google Drive that we were just
17  discussing -- discussing -- the Google Drive that we
18  were just discussing, is that the same Google Drive
19  where your notes prior to you starting to write them
20  in notebooks would be found?
21      A.   Yes.
22      Q.   Who is Van Huynh, H-U-Y-N-H?
23      A.   Van Huynh is an attorney.
24      Q.   What is ccrjustice.org?
25      A.   Center for Constitutional Rights.

Page 263

1       Q.   Do you recognize the e-mail address
2   bazmy@ccrjustice?
3       A.   I do.
4       Q.   Is that person a lawyer?
5       A.   Yes.
6       Q.   Is Nora Phillips a lawyer?
7       A.   Yes.
8       Q.   What about Teresa Cheng?
9       A.   No.  She was a communications professional
10  brought in to work with the attorneys under our
11  supervision and on our behalf.
12      Q.   What about Peter McCool?  Is that an
13  attorney?
14      A.   Yeah, I think so, but I don't know exactly.
15      Q.   Do you recognize the e-mail -- is Becky
16  Casler a lawyer?
17      A.   Yes.
18      Q.   What about Parveen Parmar?
19      A.   She's a physician --
20      Q.   Was she involved in the medical review team?
21      A.   Yeah, you showed me an e-mail -- no, not in
22  the medical review team that All Good did, but she was
23  one of the folks that we reached out to in the e-mail
24  regarding Nomaan that you showed me earlier.
25  Probably -- she was at USC Tech School of Medicine.

Page 264

1   So she was reviewing medical records on a sort of
2   one-off until we realized that we had so many to
3   review and it was going to exceed her capacity.
4       Q.   Is there a person named Nora that works with
5   Mr. Prado -- never mind.  Strike that.
6            Do you recognize the e-mail
7   nora@alotrolavo.org?
8       A.   Yeah.  That's Nora with Al Otro Lado.  She's
9   the -- one of the co-founders of the organization that
10  I spoke of was a sponsor that we housed our project
11  in.
12      Q.   Is she an attorney?
13      A.   Yes.
14      Q.   What is the
15  bideninfluencerteam@googlegroups.com?
16      A.   It's a group of folks on Twitter, including
17  a lot of lawyers, who were kind of set up to organize
18  public-facing communications in the run-up to the 2020
19  election.
20      Q.   How many folks are in that group?
21      A.   I don't know.
22      Q.   More than five?
23      A.   Yes.
24      Q.   More than ten?
25      A.   Yeah, I would say it's between 100 and 200

Page 265

1   maybe.  I'm not the administrator of the group.
2            Can I take a pause?
3            MR. TOBIN:  You need to take a break?
4            THE WITNESS:  I just need to confer
5       with you, yeah.
6            MR. TOBIN:  Oh.  Let's go off the
7       record for just a minute.
8            VIDEOGRAPHER:  This is the end of
9       Media 3.  The time is 4:26 p.m.  We're now
10      off the record.
11           (A recess was taken.)
12           VIDEOGRAPHER:  This is the beginning
13      of Media 4.  The time is 4:32 p.m.  We're
14      back on the record.
15           MR. TOBIN:  So you've been asking
16      Stacey about a category of documents
17      labeled "Biden influencer group."  Those
18      documents we have determined should not
19      have been included on the privilege log, so
20      we are not going to object to your asking
21      questions about -- about that activity in
22      that group and we will produce the
23      documents to you in due course.
24           MS. EVANS:  Thank you.
25           And I'll follow up with you as well as

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                    Pages 266..269

Page 266

1   the -- on that as well as the other --
2   there was one other lingering question, I
3   believe.
4        MR. TOBIN:  I think it was the Google
5   Drive.
6        MS. EVANS:  The Google Drive.
7        MR. TOBIN:  And I'm hoping that you
8   have the background, if we can just
9   continue.
10       The Google Drive documents are logged
11  on Exhibit 136.  That's why I wanted you to
12  get into the predicate of understanding
13  it's a shared drive between the counsel who
14  were working under the shared joint defense
15  common interest privilege with the
16  exception of the Biden influencer docs.
17  They are appropriately logged as privileged
18  and we did give you documents that came off
19  of that drive that were not the subject of
20  privilege.
21       MS. EVANS:  Thank you.
22       MR. TOBIN:  So I think that clears
23  that up.
24       MS. EVANS:  Maybe.  Let me ask a
25  question and see if we can get there --

Page 267

1        MR. TOBIN:  Please.
2        MS. EVANS:  -- to avoid you having to
3   deal with me after today, at least on this.
4        Q.  (By Ms. Evans)  Mr. Free, if you look at
5   Exhibit 135, the smaller privilege log.
6        A.  Yeah.
7        Q.  You see the privilege descriptions are
8   "attorney notes" and "impressions"?
9        A.  Yes.
10       Q.  I could be wrong.  It's happened before.
11  But I don't believe there are any entries on
12  Exhibit 136 that indicate attorney notes and
13  impressions.
14       Actually, you know what?  I just flipped to
15  some, but those are in October of 2020.
16       MR. TOBIN:  So what's your question?
17       Q.  (By Ms. Evans)  It seems like there should
18  be some on September 14th or 15th according to
19  testimony earlier.
20       MR. TOBIN:  I don't know if you have
21  posed a question to Andrew.  Let's see if
22  he's able to answer it for you.
23       THE WITNESS:  Yeah.  I mean, so you're
24  asking, like, where are the notes, where
25  are the impressions between September 14th

Page 268

1   and September 23rd?
2        Q.  (By Ms. Evans)  Correct.
3        A.  Basically, it's like having phone calls,
4   grabbing something that you can write with.  To the
5   extent that that stuff then got transferred, it would
6   have gotten transferred into the drive, the share
7   drive, either in a Google sheet or a Google document
8   or some other form of kind of, like, a running list
9   that folks can share because it was ineffective for
10  me, as many people that were sharing information, to
11  have all my stuff on Post-its and scraps of paper that
12  were lying around the house.  I was not prepared for
13  the amount of notes that needed to be taken.  And it
14  took me over a week to sort of standardize that so I
15  could go back to it.
16       So that's the answer.
17       Q.  You endeavored to move some of the notes
18  that you had on Post-it notes to the Google Drive, but
19  you -- your testimony is you may have missed some?
20       A.  So the information on those Post-it notes, I
21  didn't, like, individually take --
22       Q.  Sure.
23       A.  -- photographs.
24       But yeah, I mean, the point at which it
25  became very clear we were going to have to collaborate

Page 269

1   in my kind of farkakte method of keeping information
2   where it's just all over the place was not going to
3   work for the volume of people.  The rest of it was
4   basically, like, just essentially, like, trying to
5   sequence the next thing that we were trying to do.
6   Those notes kind of went away as soon as the task got
7   done because of the volume of information that was
8   coming in.
9        Q.  Got you.
10       Back on Exhibit 136, if you go to the third
11  page, on the first entry on the third page is
12  relativity entry 872.
13       A.  Yep.
14       Q.  Do you see that?
15       A.  Yep.
16       Q.  If you go down to the seventh entry, which
17  is relativity 2535.
18       A.  Yeah, I see that.
19       Q.  Do you see an e-mail exchange it looks like
20  with Alyssa Milano?
21       A.  I do.
22       Q.  Is that Alyssa Milano who used to be
23  Samantha on "Who's the Boss"?
24       A.  Yeah.
25       Q.  Not an attorney?

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 270..273

Page 270

1    A.  No.  That's why we just kind of explained.
2    Q.  Oh.  So this would be part of the e-mails
3  that would be coming off?
4    A.  Right.  So -- so to be clear, I wanted folks
5  to understand who were collaborating what
6  communications that we were having with these folks.
7  That's why it was on the -- in this collection of
8  documents.  We've told you these are mislabeled.
9    Q.  We've told you these are?  I just didn't
10  hear you.
11    A.  They're not joint defense.
12    MR. TOBIN:  That they were mislabeled
13      as privileged and we'll review.
14    MS. EVANS:  Understood.  Okay.
15    Q.  (By Ms. Evans)  Is Toby Gialluca an
16  attorney?
17    A.  I don't know.  I don't think so.
18    Q.  What about Antonio Scruggs?
19    A.  No, I don't think so.
20    Q.  Let me make sure I understood.  When you
21  said that some documents would be coming off, are you
22  referring to more than just the documents that are
23  bideninfluencerteam@googlegroups.com?
24    A.  Yeah.  So you're looking at the -- when
25  you're saying bideninfluencerteam@googlegroups, that's

Page 271

1  the fourth column from the right?
2    Q.  Yes.
3    A.  I'm looking at that subject line of that
4  e-mail in the fourth column from the left.
5    Q.  I see.
6    A.  So that's a bunch of e-mails that I think
7  some of the folks within this Biden influencer group
8  responded to.
9    Q.  I see.
10    A.  In -- you know what I'm saying?  So they
11  were logged individually.
12    Q.  I see.  And I see actually the -- I see.
13  Thank you.  I appreciate that.
14    Is Piola Louise an attorney?
15    A.  Piola Louise is not.  She was a
16  communications professional who works for attorneys
17  who speaks to the public on attorneys' behalf.
18    Q.  Was she engaged by you?
19    A.  She was.
20    Q.  Is Noelle Smart an attorney?
21    A.  I think so.  Noelle and her colleague, whose
22  name is escaping me but whose e-mail might be here,
23  they had reached out from The Vera -- The Vera Project
24  which does a lot of -- they -- they were on the legal
25  orient- -- orientation program contract for DOJ for

Page 272

1  people inside detention centers.
2    Q.  Is Kelly White an attorney?
3    A.  Can you show me where you're looking?
4    Q.  I'm sorry.  I went back.  The fourth page of
5  the document, last entry on that page.
6    A.  Yeah.
7    Q.  Or next-to-last entry on that page.
8    A.  Yeah, I don't know.  I think so.
9    Q.  And I -- you know, I have a lot of questions
10  about who some people are, and it might -- if -- if it
11  would be agreeable to you and your counsel, I would be
12  happy to maybe just compile a list, and then you can
13  just tell me yes or no if they are attorneys instead
14  of me asking.  I can do it either way, but I thought
15  it might be more efficient if I send you a list and
16  then we can confer on whether there are challenges to
17  the privilege log further.
18    MR. TOBIN:  So what would you do?  You
19      would extract names from that column and
20      just send us a list of names?
21    MS. EVANS:  Just names that cause me
22      to have questions about whether the entries
23      should actually be privileged so that you
24      can evaluate, and if you say yes, we can
25      discuss it.  If you say no, then you can

Page 273

1  produce the documents.
2    MR. TOBIN:  Let's do it that way.
3    MS. EVANS:  Okay.
4    MR. TOBIN:  Send it to me and I'm
5      happy to re-evaluate our privilege position
6      based on the names in consult- -- private
7      consultation obviously with Andrew.
8    MS. EVANS:  Sure.
9    MR. TOBIN:  We might want to wait
10      until we give you the Biden influencer docs
11      so you are able to kind of check those
12      names off the list.
13    MS. EVANS:  I think that makes sense
14      and I'll definitely do that.
15    Q.  (By Ms. Evans)  Did you -- you can put this
16  document away.
17    Did you work with Daily Kos with regard to
18  Irwin County Detention Center?
19    A.  I think Gabe Ortiz writes for Daily Kos, and
20  Daily Kos, I think, may have written about this.  I
21  don't have a specific recollection of, as you said,
22  working with them, but I wouldn't be surprised if I
23  coordinated.
24    MR. TOBIN:  Can we stipulate that when
25      you say working with them, you mean

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 274..277

Page 274

```
1    providing them information as a source for
2    journalism?
3         MS. EVANS:  Sure.
4         THE WITNESS:  Yeah, so I think the
5    answer is maybe.
6    Q.   (By Ms. Evans)  Did they send out any
7    petitions with regard to Irwin County Detention
8    Center?
9    A.   I think they did.
10        (Plaintiff's Exhibit 137 was marked
11   for identification.)
12   Q.   (By Ms. Evans)  I'm going to hand you and
13   your counsel what I've marked as Exhibit 137.
14        MS. EVANS:  Just for fun apparently.
15   Thank you for checking, though,
16   because I had all my secret notes on it.
17        MR. TOBIN:  That's my concern.
18        THE WITNESS:  Okay.
19   Q.   (By Ms. Evans)  Have you had a chance to
20   look at Exhibit 137?
21   A.   I have.
22   Q.   If you could flip to the next-to-last
23   page -- or the -- I'm sorry.  Could you flip to the
24   page Bates-numbered 299.
25   A.   Yep.
```

Page 275

```
1    Q.   Do you see an e-mail from the associate
2    campaign director for Daily Kos?
3    A.   Ntebo?
4    A.   Yes.
5    A.   Yes.
6    Q.   She says, "Hi" -- he or she?
7    A.   She.
8    Q.   She says, "Hi, Andrew and Lynn.  Here's the
9    updated petition link.  Please use the above URL
10   because I ended up updating the URL to match the
11   language change from 'forced hysterectomy' to 'forced
12   sterilization'."
13        Do you see that?
14   A.   I do.
15   Q.   Why was that change made in the petition
16   language?
17   A.   Because I asked for it to be made.
18   Q.   Why?
19   A.   To encompass the true scope of the harm that
20   we were encountering, particularly as to Pauline.
21   Q.   Particularly as to?
22   A.   Pauline Binam, who is referenced in the --
23   part of the e-mail.
24   Q.   And what is it about Pauline Binam that is
25   encompassed by sterilization but not hysterectomy?
```

Page 276

```
1    A.   She had a sterilizing -- potentially
2    sterilizing procedure that was not a hysterectomy, but
3    it was not done with informed consent.
4    Q.   Do you contend that that procedure was
5    performed by Dr. Amin?
6    A.   I don't know.
7    Q.   Are you involved in the -- the litigation
8    oftentimes referred to as the Oldaker litigation in
9    the Middle District of Georgia?
10   A.   No.
11   Q.   Have you ever been?
12   A.   That is the litigation that grew out of the
13   investigation we conducted.  So depending on how you
14   define "involved," I'll tell you what my involvement
15   was and you can decide for yourself.
16        We -- we had been supporting folks who were
17   on the brink of removal, kind of in a onesie, twosie
18   habeas posture and trying to avoid people being in the
19   brink -- on the brink of removal, "people" being Amin
20   patients and folks who had also been subjected to
21   medical abuse and neglect earlier.
22        I'm trying to figure out what I can say
23   without getting into attorney-client -- client
24   privileged communications or work product.
25   Q.   Well, I can ask you a couple of questions --
```

Page 277

```
1    A.   Yeah, if you want to.  I mean, I'll just
2    tell you I turned over the investigative -- the sort
3    of document transfer that I referred to when I was
4    speaking about the communications with Ms. Ahn.
5    That's what I was talking about.  That's who I gave
6    that stuff to.  Those are the lawyers for the women,
7    so that's my role is having been a person at the
8    beginning, but not someone who is carrying that
9    forward.
10   Q.   Did you ever represent Ms. Binam in that
11   litigation?
12   A.   Binam?
13   Q.   Binam.  I'm sorry.
14   A.   In the Oldaker litigation, I'm not counsel,
15   so the answer is no.
16   Q.   Did you facilitate in any way her
17   involvement in that litigation?
18   A.   Yes.
19   Q.   Was that done by introducing her to other
20   counsel?
21   A.   Yes.
22   Q.   Did you review her medical records prior to
23   introducing her to counsel that were involved in the
24   Oldaker litigation?
25   A.   I don't recall.  She was represented by Von
```

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                    Pages 278..281

Page 278

1   with Klar.  The work that I did for Pauline, without
2   getting into privileged information, was in halting --
3   helping Representative Jackson Lee halt her removal
4   when it was imminent.  She was on the tarmac in
5   Chicago.
6          And then on the day that the House passed a
7   bipartisan resolution condemning allegations of
8   medical abuse and neglect at Irwin, Pauline was
9   checking in at ICE in Maryland, in Baltimore, and ICE
10  officers in Baltimore took her into custody and
11  attempted to re-detain her.  And upon learning that, I
12  re-engaged with the work I had been doing before and
13  attempted to block her detention.
14         And I think I also helped Pauline get in
15  touch with the Columbia lawyers and the lawyers at IP
16  who eventually became Oldaker's counsel.
17    Q.   Do you recall earlier we were discussing
18  the -- the medical review team?
19    A.   Yes.
20    Q.   And I asked you if they reviewed records of
21  women who were not detained at Irwin County Detention
22  Center and you said no.  Do you recall that?
23    A.   I don't recall what I said.  I remember you
24  asking.
25    Q.   Let me ask a new question.

Page 279

1          Were any of the medical records that the
2   medical review team reviewed of women who, while they
3   were detained at Irwin County Detention Center, were
4   not Dr. Amin's patients?
5     A.   Sitting here today, I don't know.  I can't
6   recall.
7     Q.   You don't recall one way or the other?
8     A.   No, not as I sit here today.
9     Q.   Today's -- strike that.
10         During today's deposition, we've taken a
11  number of breaks that we've been extremely efficient
12  and I appreciate that.  During any of those breaks,
13  did you speak with Ms. McNamara?
14    A.   No.
15    Q.   Have you ever billed Ms. McNamara's firm for
16  any legal fees related to this litigation or subpoenas
17  you've received?
18    A.   No.
19    Q.   Who is paying for your litigation fees to
20  Mr. Tobin's firm?
21         MR. TOBIN:  I'm going to object and
22    instruct you not to answer.  That's within
23    the ambit of attorney-client privilege.
24         MS. EVANS:  On who's paying his
25    litigation fees?

Page 280

1          MR. TOBIN:  Yes, presumptively.  I
2     mean, there's -- there's a faulty process
3     step if you want to challenge that, but
4     there's no predicate for that kind of
5     answer or response today.
6     Q.   (By Ms. Evans)  Mr. Free, have you received
7   any invoices for payment from Mr. Tobin's law firm?
8          MR. TOBIN:  Object to the question and
9     instruct you not to answer.  Any such
10    communications would be attorney-client
11    privilege.
12    Q.   (By Ms. Evans)  Mr. Free, have you entered
13  into an agreement with any person to pay any legal
14  fees that you incur in relation to the subpoenas that
15  you've received in this litigation?
16         MR. TOBIN:  Say that -- would you
17    repeat your question?  I'm not sure where
18    you're going.
19    Q.   (By Ms. Evans)  Have you -- Mr. Free, have
20  you entered into an agreement with any person to pay
21  any legal fees that you may incur in relation to the
22  subpoenas that you've received in this litigation?
23         MR. TOBIN:  Are you asking whether
24    he's -- with respect to any person,
25    including me and my law firm?

Page 281

1          MS. EVANS:  How about I'll exclude you
2     and your law firm from the question for
3     now.
4          MR. TOBIN:  You may answer the
5     question.
6          THE WITNESS:  No.
7     Q.   (By Ms. Evans)  Mr. Free, have you entered
8   into an agreement with any person other than -- strike
9   that.
10         Have you entered into an agreement --
11         Mr. Free, do you have an expectation that
12  you will pay for any legal fees in connection with the
13  subpoenas you've received in this litigation?
14         MR. TOBIN:  I'm going to instruct the
15    witness not to answer.  That would involve
16    conversations with his counsel and that's
17    privileged.
18    Q.   (By Ms. Evans)  Are you going to follow your
19  attorney's advice?
20    A.   I am.
21    Q.   Have you entered into -- strike that.
22         Have you -- strike that.
23         Do you have any expectation that
24  NBCUniversal, NBC News or MSNBC will pay for any legal
25  fees that you incur in relation to the subpoenas in

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                                Pages 282..285

Page 282

1  this litigation?
2         MR. TOBIN:  You may answer that
3     question.
4         THE WITNESS:  No.
5     Q.   (By Ms. Evans)  Do you expect to receive
6  invoices for legal fees in connection with your
7  subpoenas received in connection with this litigation?
8         MR. TOBIN:  Again, I'm going to
9     instruct you not to answer to the extent
10    that it calls for information involving
11    attorney-client discussions.
12        THE WITNESS:  I'm going to follow my
13    attorney's instruction.
14    Q.   (By Ms. Evans)  Do you know if there's any
15 arrangement between Mr. Tobin's law firm and any other
16 person other than you with regard to any legal fees
17 that you may incur in connection with the subpoenas
18 you've received in this litigation?
19    A.   I do not.
20    Q.   Is it your understanding -- strike that.
21        Do you have any expectation -- strike that.
22        Do you have any expectation that Mr. Tobin's
23 law firm will send invoices with regard to legal fees
24 incurred in connection with your subpoenas in this
25 litigation to someone other than you?

Page 283

1     A.   No.
2         MS. EVANS:  Okay.  If we can take five
3     minutes, I might be done.
4         MR. TOBIN:  Sure.
5         VIDEOGRAPHER:  The time is 4:55 p.m.
6     We're now off the record.
7         (A recess was taken.)
8         VIDEOGRAPHER:  The time is 5:01 p.m.
9     We're back on the record.
10    Q.   (By Ms. Evans)  I just have a couple more
11 questions, Mr. Free, and we'll be finished from my
12 perspective.
13        I'm going to hand you what's been marked --
14 what I'm marking as Exhibit 138.  You're welcome to
15 look at it.  I'm going to just tell you my question in
16 advance so that it might help.
17        On Exhibit 138 is an e-mail with some
18 attachments, and I was wondering if you could tell me
19 whose notes are represented in those attachments.
20        (Plaintiff's Exhibit 138 was marked
21     for identification.)
22        THE WITNESS:  Can I take a look?
23    Q.   (By Ms. Evans)  Yes.
24    A.   The short answer is no.  I can't tell you
25 whose notes these are.  I can give you a longer answer

Page 284

1  if you want.
2     Q.   Please.
3     A.   I think that these are screenshots of the
4  conclusions of a preliminary consulting panel from
5  Doctors for Camp Closure that would have come out of,
6  I mean, I think either a Google document or Signal.  I
7  might have copied them out of Signal and put them into
8  a Google document so that they could be in a form that
9  wasn't seriatim.
10        Before we engaged Parveen, Dr. Parmar at USC
11 or All Good, we had a team of inside folks with
12 Doctors for Camp Closure.  These were volunteer
13 positions, hospitalists, OB/GYNs -- I want to say that
14 there was a nurse practitioner -- I'm not sure --
15 taking a look at what we were getting so we could
16 understand what we were seeing.
17    Q.   Is that group different from the medical
18 review team that we were talking about earlier?
19    A.   It was, yeah.
20    Q.   Do you recognize the name Lourdes Silas,
21 L-O-U-R-D-E-S, last name S-I-L-A-S?
22    A.   Lourdes Silas?
23    Q.   Yes.
24    A.   Yeah.
25    Q.   You recognize her as a woman that was

Page 285

1  detained at Irwin County Detention Center?
2     A.   Is her surname Terraza, T-E-R-R-A-Z-A?
3  There were a couple of Lourdeses, the second last
4  name.
5     Q.   I think that's probably -- I think that's
6  right.
7     A.   Okay.
8     Q.   Do you know where she is today?
9     A.   No.
10    Q.   Do you know if she's in the United States?
11    A.   No.
12    Q.   Do you recognize the name Tatiyana Sokolova?
13    A.   I do.
14    Q.   Is she in the United States?
15    A.   I think so, but I'm not sure.
16    Q.   Do you know where within the United States?
17    A.   No.
18    Q.   Any state that you can --
19    A.   No.  I -- I just think that she had relief
20 from removal and that she didn't take a voluntary
21 departure.  I think the reason that that -- she stands
22 out more to me than Lourdes was Sarah speaks Russian
23 and I think she had taken a statement from Tatiyana at
24 some point, but I don't know what help that is.
25    Q.   Got you.

**MAHENDRA AMIN, M.D. vs NBCUNIVERSAL MEDIA, LLC**
Andrew Free on 08/15/2023                    Pages 286..289

Page 286

1    MS. EVANS:  Okay.  Those are my
2  questions.  Thank you, Mr. Free.
3    THE WITNESS:  Thank you.
4    MS. MCNAMARA:  No questions.  Thank
5  you.
6    MR. TOBIN:  Okay.  We will read, if
7  you'll forward that through me.
8    MS. EVANS:  I was hoping you were
9  going to say that so we can make sure we
10  get the spellings.
11    VIDEOGRAPHER:  This -- this concludes
12  the deposition.  The time is 5:06 p.m.
13  We're now off the record.
14    (Deposition concluded at 5:06 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 288

1  STATE OF GEORGIA:
2  COUNTY OF FULTON:
3
4      I hereby certify that the foregoing
5    transcript was reported, as stated in the
6    caption, and the questions and answers
7    thereto were reduced to typewriting under
8    my direction; that the foregoing pages
9    represent a true, complete, and correct
10    transcript of the evidence given upon said
11    hearing, and I further certify that I am
12    not of kin or counsel to the parties in the
13    case; am not in the employ of counsel for
14    any of said parties; nor am I in any way
15    interested in the result of said case.
16
17
18
19          *Blanche J. Dugas*
20          BLANCHE J. DUGAS, CCR-B-2290
21
22
23
24
25

Page 287

1              DISCLOSURE
2
3      Pursuant to Article 10.B of the Rules
   and Regulations of the Board of Court
   Reporting of the Judicial Council of
4  Georgia which states:  "Each court reporter
   shall tender a disclosure form at the time
5  of the taking of the deposition stating the
   arrangements made for the reporting
6  services of the certified court reporter,
   by the certified court reporter, the court
7  reporter's employer or the referral source
   for the deposition, with any party to the
8  litigation, counsel to the parties, or
   other entity.  Such form shall be attached
9  to the deposition transcript," I make the
   following disclosure:
10
     I am a Georgia Certified Court
11  Reporter.  I am here as a representative of
   Huseby Global Litigation.  Huseby Global
12  Litigation was contacted to provide court
   reporting services for the deposition.
13  Huseby Global Litigation will not be taking
   this deposition under any contract that is
14  prohibited by O.C.G.A. 9-11-28(c).
15      Huseby Global Litigation has no
   contract/agreement to provide reporting
16  services with any party to the case, any
   counsel in the case, or any reporter or
17  reporting agency from whom a referral might
   have been made to cover this deposition.
18
     Huseby Global Litigation will charge
19  its usual and customary rates to all
   parties in the case, and a financial
20  discount will not be given to any party to
   this litigation.
21
22          *Blanche J. Dugas*
23          Blanche J. Dugas
            CCR No. B-2290
24
25

Page 289

1              CAPTION
2
3      The Deposition of ANDREW FREE, taken in the
4  matter, on the date, and at the time and place set out
5  on the title page hereof.
6      It was requested that the deposition be
7  taken by the reporter and that same be reduced to
8  typewritten form.
9      It was agreed by and between counsel and
10  the parties that the Deponent will read and sign the
11  transcript of said deposition.
12
13
14
15
16
17
18
19
20
21
22
23
24
25